**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| _____ | X | |
| PLYMOUTH COUNTY RETIREMENT SYSTEM, | ) | |
| Individually and on Behalf of All Others Similarly | ) | Case No. |
| Situated, | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| -against- | ) | |
| | ) | |
| PATTERSON COMPANIES, INC., SCOTT P. | ) | |
| ANDERSON, and ANN B. GUGINO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | X | |

## Table of Contents

I. NATURE OF THE ACTION ................................................................................. 1

II. JURISDICTION AND VENUE ........................................................................... 4

III. PARTIES ............................................................................................................. 5

IV. SUBSTANTIVE ALLEGATIONS ..................................................................... 6

    A. Background ............................................................................................... 6

    B. Defendants' False and Misleading Statements ....................................... 8

        1. Patterson's 2015 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors ........................ 8

        2. Patterson's 2016 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors ........................ 8

        3. Defendant Anderson Abruptly Steps Down and the Company Begins to Reset Expectations ................................................................................. 9

        4. Patterson's 2017 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors .................. 10

    C. The Truth is Revealed ............................................................................ 10

V. CLASS ACTION ALLEGATIONS ................................................................... 14

VI. UNDISCLOSED ADVERSE FACTS ............................................................... 16

VII. LOSS CAUSATION .......................................................................................... 17

VIII. SCIENTER ALLEGATIONS ........................................................................... 18

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ...................................................................................... 19

X. NO SAFE HARBOR ......................................................................................... 20

XI. COUNTS AGAINST DEFENDANTS .............................................................. 21

XII. PRAYER FOR RELIEF .................................................................................... 26

XIII. JURY TRIAL DEMANDED ............................................................................. 26

Plaintiff Plymouth County Retirement System ("Plaintiff"), by and through its attorneys, brings this federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Patterson Companies, Inc. ("Patterson") common stock between June 26, 2015, and February 28, 2018, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq.* (the "Exchange Act"). Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Patterson, and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Patterson's website concerning the Company's public statements; and (d) review of other publicly available information concerning Patterson and the Individual Defendants.

## I.     NATURE OF THE ACTION

1.     Patterson is one of the nation's only full-service distributors of dental products. The Company distributes its products mainly through two subsidiaries—Patterson Dental and Patterson Animal Health. The Company refers to its dental supply business as a "market leader" with a "strong competitive position."

2.     Patterson, along with its two largest competitors, Henry Schein, Inc. ("Schein") and Benco Dental Supply Co. ("Benco"), controls 85% of all distributor sales of dental products and services in the United States—a $10 billion market – with Patterson alone controlling 33% of the market.

3.      During the Class Period, in order to maintain control of that market, and prop-up their margins and profitability, Defendants colluded with their competitors, Schein and Benco, to fix the prices of dental supply products that their companies sold to buying groups or group purchasing organizations ("GPOs") that represented small and individual dental practices.  To that end, Patterson, Schein and Benco instructed each of their sales forces to refuse to sell products to these GPOs or provide any discounts to GPOs unless the GPOs agreed to margins set collectively by these companies.

4.      With this fraudulent scheme in place, Patterson enjoyed years of profitability. And without disclosing the truth, Patterson's public filings falsely maintained throughout the Class Period that the Company's financial results were accurate, and that the Company differentiated itself from the competition through "competitive pricing."

5.      However, the truth behind Patterson's growth emerged on February 12, 2018, when the FTC filed an administrative complaint against Patterson, Schein and Benco, alleging that from at least February 2013, these companies had been engaging in a conspiracy to fix the prices of dental supply products and refused to sell to GPOs in violation of U.S. antitrust laws (the "FTC Complaint").[1]

6.      The FTC Complaint, citing numerous internal communications from Patterson, Benco and Schein executives as well as communications between the three co-conspirators, confirmed Defendants' fraudulent scheme.  For instance, in a February 27, 2013 e-mail quoted in the FTC Complaint, a Patterson executive instructed Patterson's sales team to reject a certain buying group that was looking to do business with Patterson, stating that both Benco and Schein were also rejecting such groups: "Confidential and not for discussion … our 2 largest

---

[1] The FTC action is *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. and Patterson Companies, Inc.,* Dkt. No. 9379 (Feb. 12, 2018, Fed. Trade Comm.)

competitors stay out of these as well. If you hear differently and have specific proof please send that to me."

7.     Then in June 2014, a Patterson executive wrote in a text message: '[W]e've signed an agreement that we won't work with GPO's [Group Purchasing Organizations]."

8.     In August 2013, after a new executive joined Patterson and inquired "is it worth it to explore GPO???????...I used to get 1 [request] per month…" a more veteran Patterson executive responded, "We don't need GPO's in the dental business. Schein, Benco, and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry."

9.     By the beginning of the Class Period, internal emails from Defendants' co-conspirators confirmed the existence of Patterson's collusion and fraudulent scheme.  In May 2015, a Benco executive rejected a particular GPO and commented in an internal email: "The best part about calling these [buying groups] is I already KNOW [sic] that Patterson and Schein have said NO." Similarly, in June 2015, a Benco executive informed a Benco sales representative: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either."

10.     On this news, Patterson's stock price fell $1.71, or 5%, on more than 5.5 million shares of trading volume compared with its average trading volume of just 1.8 million shares, resulting in a market cap loss of $160 million.

11.     Then, just weeks later, on March 1, 2018, before the markets opened, Patterson announced its quarterly earnings data for the third quarter of fiscal 2018.  With its price-fixing scheme now under scrutiny, the Company shocked investors by announcing a 26% decrease in earnings which also missed consensus expectations, and that its Chief Financial Officer, Ann Gugino, was stepping down. Patterson blamed its dismal results on "changes in the Company's

sales organization" and "disruptions in its sales force."  As a result, the Company was forced to cut full year guidance for the second quarter in a row.  On this news, Patterson's stock price declined precipitously, dropping $7.48 per share or 23% in one day, on trading volume of more than 15 million shares.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's headquarters is located in this District at 1031 Mendota Heights Road, St. Paul, Minnesota, 55120.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III. PARTIES

17. Plaintiff Plymouth County Retirement System, as set forth in the accompanying certification, attached hereto as Exhibit "A", purchased Patterson common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

18. Defendant Patterson Companies, Inc. is a corporation with its headquarters located at 1031 Mendota Heights Road, St. Paul, Minnesota, 55120. Patterson's common stock is traded on the NASDAQ under the symbol "PDCO."

19. Defendant Scott P. Anderson ("Anderson") served as the Chief Executive Officer and President of Patterson from April 25, 2010 through June 1, 2017 and as Chairman of the Board from April 2013 to June 1, 2017. Since June 1, 2017, Defendant Anderson has served as a non-officer special advisor to the Company.

20. Defendant Ann B. Gugino ("Gugino") served as the Chief Financial Officer of Patterson from November 1, 2014 until her resignation from the Company on March 1, 2018. In connection with her resignation, the Company announced that Defendant Gugino will serve as a special advisor to the Company through July 2018.

21. Defendants Anderson and Gugino are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, at the time each was employed by Patterson, because of their positions with the Company, possessed the power and authority to control the contents of Patterson's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Individual Defendant, while serving as a senior executive of Patterson, was provided with copies of the Company's reports and press releases alleged herein to be misleading

prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

22.    Originally founded in 1877, Patterson is a specialty distributor serving the U.S. and Canadian dental supply markets and the U.S., Canadian and U.K. animal health supply markets. Patterson operates through its two strategic business units, Patterson Dental and Patterson Animal Health, offering similar products and services to different customer bases. The Company refers to its dental supply business as a "market leader" with a "strong competitive position."

23.    The Company's two largest competitors in the dental supply market are Schein and Benco. Together, these three companies control 85% of all distributor sales of dental products and services in the United States—a $10 billion market.

24.    A substantial part of the dental industry is made up of individual dentists and small dental practices that, on their own, have no bargaining power with the much larger dental supply distributors and manufactures they must work with to run a dental practice. As insurance

companies have cut back on reimbursement to dentists, these small and solo dental practices have looked to cut expenses wherever they can.

25.     For years, small and rural hospitals have used GPOs to pool their purchasing power to secure significant discounts on virtually all medical and other hospital supplies. Typically, membership in a GPO is free with the organizations funded by administrative fees paid to the GPO by contract vendors, including manufacturers and distributors, based on sales volume.

26.     In the last several years, as GPOs entered the dental supply market, such organizations have put pressure on Patterson and its competitors to reduce costs and to negotiate discounted pricing for each GPO's members. As distributors have been forced to compete for a GPOs business, these discounts have threatened to reduce distributors' sales margins and, ultimately, their profitability.

27.     To counteract the power of these GPOs, and to prop-up its profit margins throughout the Class Period, Defendants colluded with executives at Schein and Benco to fix the prices of dental supply products that these companies sold to GPOs and to instruct each of their sales forces to refuse to sell products to GPOs or provide any discounts to GPOs.   Through its fraudulent scheme, unbeknownst to the market, Patterson, Schein and Benco would only sell to GPOs at prices reflecting agreed to margins set collectively by Patterson and its co-conspirators.

28.     Yet without disclosing the truth, Patterson's public filings falsely maintained throughout the Class Period that the Company's financial results were accurate and that the Company differentiated itself from the competition through "competitive pricing."

B.     **Defendants' False and Misleading Statements**

1.     **Patterson's 2015 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors**

29.     On June 24, 2015, after the close of trading, Patterson filed its Annual Report, for the fiscal year ending April 30, 2015 with the SEC on Form 10-K (the "2015 10-K").  For 2015, the Company reported net sales of $3.9 billion and net income of $223 million.  The Company also reported full year earnings from continuing operations of $1.81 per share.  The 2015 10-K was signed by Defendants Anderson and Gugino.  The 2015 10-K stated,

> We approach our markets by emphasizing and delivering a value-added model to the practitioner. ***To differentiate ourselves from our competition, we deploy a strategy of*** premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and distribution centers, and ***competitive pricing.***

30.     The 2015 10-K also included certifications, signed by Defendants Anderson and Gugino, that assured investors that the Company's financial reporting "accurately and fairly reflect" Patterson's financial condition.

31.     However, as explained below, these statements were knowingly and/or recklessly false and misleading because they failed to disclose that Defendants' revenue and earnings were fraudulently inflated by an illegal and fraudulent price-fixing scheme aimed at prohibiting sales to and price negotiations by GPOs that represented small and independent dental practices.

2.     **Patterson's 2016 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors**

32.     Similarly, on June 29, 2016, after the close of trading, Patterson filed its 2016 Annual Report with the SEC on Form 10-K (the "2016 10-K").  For 2016, the Company reported net sales of $5.39 billion and net income of $187 million.  The Company also reported full year

8

earnings from continuing operations of $1.90 per share.   The 2016 10-K was signed by

Defendants Anderson and Gugino.  The 2016 10-K stated,

> We approach our markets by emphasizing and delivering a value-added model to
> the practitioner. ***To differentiate ourselves from our competition, we deploy a
> strategy of*** premium customer service with multiple value-added components, a
> highly qualified and motivated sales force, highly-trained and experienced service
> technicians, an extensive breadth and mix of products and services, technology
> solutions allowing customers to easily access our inventory, accurate and timely
> delivery of product, strategic location of sales offices and distribution centers, and
> ***competitive pricing.***

33.     However, as explained below, these statements were knowingly and/or recklessly

false and misleading because they failed to disclose that Defendants' revenue and earnings were

fraudulently inflated by an illegal and fraudulent price-fixing scheme aimed at prohibiting sales

to, and price negotiations by, GPOs that represented small and independent dental practices.

### 3.    Defendant Anderson Abruptly Steps Down and the Company Begins to Reset Expectations

34.     On June 1, 2017, with absolutely no warning and just weeks before the Company

filed its 2017 annual report, the Company shocked the market by issuing a press release, which

was also filed with the SEC on Form 8-K on the same day, announcing that Defendant Anderson

would step down from the roles of CEO, President and Chairman of the Board, effectively

immediately.  The only explanation provided by the Company was that "now is the time for a

new leader to guide Patterson going forward."  James W. Wiltz, a member of Patterson's board

of directors and a former CEO of Patterson, was named Interim President and CEO while the

Company's Lead Director, John D. Buck, took over as the non-executive Chairman of the Board.

35.     On August 24, 2017, Patterson issued a press release announcing the Company's

first quarter 2018 financial results.  In his first quarterly results announcement as interim CEO,

Wilitz explained, without mentioning the FTC Complaint or Defendant Anderson's departure,

that Patterson's "performance in the 2018 first quarter reflects a period of significant transition."

36.     On October 24, 2017, Patterson named Mark Walchirk as its new President and CEO, effective November 20, 2017.

### 4.     Patterson's 2017 10-K Touts the Company's Competitive Pricing as Its Way of Differentiating its Business from Competitors

37.     On June 28, 2017, after the close of trading, Patterson filed its 2017 Annual Report with the SEC on Form 10-K (the "2017 10-K"). For 2017, the Company reported net sales of $5.6 billion and net income of $170 million. The Company also reported full year earnings from continuing operations of $1.82 per share. The 2017 10-K was signed by Defendant Gugino and Interim CEO Wiltz. Just like the 2015 and 2016 10-K, the 2017 10-K continued to tout Patterson's ability to differentiate itself from competition by "deploy[ing] a strategy of…competitive pricing."

> We approach our markets by emphasizing and delivering a value-added model to the practitioner. ***To differentiate ourselves from our competition, we deploy a strategy of*** premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and distribution centers, and ***competitive pricing.***

38.     However, again, these statements were knowingly and/or recklessly false and misleading because they failed to disclose that Defendants' revenue and earnings were fraudulently inflated by an illegal and fraudulent price-fixing scheme aimed at prohibiting sales to, and price negotiations by, GPOs that represented small and independent dental practices.

### C.     The Truth is Revealed

39.     The truth emerged on February 12, 2018, when the FTC filed an administrative complaint seeking injunctive relief against Patterson and its two largest competitors, Schein and Benco, alleging that from well before the start of the Class Period, Patterson, Schein and Benco

had been engaging in a conspiracy to fix the prices of dental supply products that these companies sold to GPOs.

40.     As discussed herein, in order to maintain its revenues, Patterson instructed its sales force to avoid selling its products to GPOs or to provide discounts to GPOs.  Pursuant to the price-fixing conspiracy, Patterson would only sell to GPOs at prices reflecting margins agreed upon by Defendants and their coconspirators.

41.     As the FTC Complaint asserted:

Benco, Schein, and Patterson executives agreed not to provide discounts to or otherwise contract with Buying Groups [GPOs] composed of independent dentists (the "agreement"). The agreement sought to prevent the falling of prices charged by the Distributors to independent dentists. Senior executives of Benco, Schein, and Patterson entered into, ensured compliance with, and monitored the agreement through a series of private inter-firm communications. They also reaffirmed their conscious commitment to concerted action on various occasions.

42.     For instance, in February 2013, after Benco suspected that Patterson was offering discounts to a GPO in New Mexico, a Benco executive reached out to a Patterson executive to tell him "our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups…"  After forwarding the original email to other executives at Patterson, the Patterson executive replied, "[t]hanks for the heads up.  I'll investigate the situation. We feel the same way about these."

43.     Shortly thereafter, as the FTC Complaint explains, "top Patterson executives began instructing its sales force to avoid selling to Buying Groups."  In a February 27, 2013 e-mail quoted in the FTC Complaint, a Patterson executive instructed his sales team to reject a certain GPO that was looking to do business with Patterson, stating that both Benco and Schein were also rejecting such groups: "Confidential and not for discussion … our 2 largest

competitors stay out of these as well. If you hear differently and have specific proof please send that to me."

44.     According to the FTC complaint, "in June 2014, a Patterson executive wrote in a text message: '[W]e've signed an agreement that we won't work with GPO's [Group Purchasing Organizations]."

45.     In August 2013, after a new executive joined Patterson and inquired "is it worth it to explore GPO???????...I used to get 1 [request] per month…" a more veteran executive responded "We don't need GPO's in the dental business. Schein, Benco, and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry."

46.     Then in September 4, 2013, when Patterson announced the creation of its Special Markets Division intended to handle large accounts, the Company internally announced in a memorandum to all regional and branch managers that it would exclude GPOs as potential customers.

47.     By the beginning of the Class Period, internal emails from Defendants' co-conspirators confirmed the existence of Patterson's collusion and fraudulent scheme.  In May 2015, a Benco executive rejected a particular GPO and commented in an internal email: "The best part about calling these [buying groups] is I already KNOW [sic] that Patterson and Schein have said NO." Similarly, in June 2015, another Benco executive informed a Benco sales representative: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either."

48.     On this news, Patterson's stock price fell $1.71 or 5% on more than 5.5 million shares of trading volume compared with its average trading volume of just 1.8 million shares, resulting in a market cap loss of $160 million.

49.     On February 13, 2018, Patterson issued a press release refuting the FTC Complaint's allegations, saying "Patterson maintains the highest levels of integrity and ethical standards and has a 140 year history of partnering with all types of customers to grow their business."

50.     Then, just weeks later, on March 1, 2018, before the markets opened, Patterson announced its quarterly earnings data for the third quarter of fiscal year 2018.  With its price-fixing scheme now under scrutiny, the Company shocked investors by announcing a 26% decrease in earnings, which also missed consensus expectations.  Patterson blamed its dismal results on "changes in the Company's sales organization" and "disruptions in its sales force."

51.     As Patterson's new CEO, Mark Walchirk, explained during the Company's earnings conference call:

> Overall, the main issue facing our business today is execution. In the Dental segment, our results reflect the various transitions we have underway in the business, namely changes in our sales organization, disruptions related to our ERP implementation and the transition to selling an expanded digital equipment portfolio. ***These factors all contributed to lower revenues and margin compression during the quarter.***

52.     As a result, the Company was forced to cut full year guidance for the second quarter in a row.

53.     In addition, the March 1, 2018 press release also shockingly announced the immediate resignation of Defendant Gugino from her role as CFO.  The Company appointed Dennis Goedken, Patterson's corporate controller, to serve as interim CFO, while the Company searches for a permanent replacement. Following her resignation, Defendant Gugino is serving as a special advisor to the Company until July 31, 2018.

54.     On this news, Patterson's stock price declined precipitously, dropping $7.48 per share or 23% in one day, on trading volume of more than 15 million shares, resulting in a market cap loss of nearly $700 million.

## V.     CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Patterson Companies, Inc. common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Patterson Companies and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Patterson common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "PDCO." Millions of Patterson shares were traded publicly during the Class Period on the NASDAQ.  Record owners and the other members of the Class may be identified from records maintained by Patterson and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.   Whether Defendants participated in and pursued the common course of conduct complained of herein;

c.   Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of Patterson;

d.   Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or mitted to disclose facts about the business, finance, value, and performance of Patterson;

e.   Whether the market price of Patterson common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

      f.   The extent to which the members of the Class have been damaged and the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    UNDISCLOSED ADVERSE FACTS

60.    The market for Patterson common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Patterson common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Patterson shares relying upon the integrity of the market price of the Company's stock and market information relating to Patterson, and have been damaged thereby.

61.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Patterson common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

62.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Patterson's legal compliance, financial well-being and prospects.

63.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## VII.   LOSS CAUSATION

64.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Patterson stock and operated as a fraud or deceit on Class Period purchasers of Patterson's stock by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Patterson's stock fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Patterson stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

65.     By failing to disclose the true state of the Company's financial statements and public filings, investors were not aware of the true state of the Company's status. Therefore, Defendants presented a misleading picture of Patterson's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Patterson to conceal the truth.

66.     Defendants' false and misleading statements had the intended effect and caused Patterson's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's common stock during the Class Period.

67.     The decline in the price of Patterson common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Patterson's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Patterson's common stock and the subsequent decline in the value of Patterson stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

68.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

69.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Patterson, including communications concerning the price-fixing scheme, their control over, receipt and/or modification of Patterson's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Patterson, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

70.     At all relevant times, the market for Patterson common stock was an efficient market for the following reasons, among others:

a.   Patterson met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.   As a public company, Patterson filed periodic public reports with the SEC;

c.   Patterson securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.   Patterson regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

71.     As a result of the foregoing, the market for Patterson common stock promptly digested current information regarding Patterson from all publicly available sources and reflected

such information in Patterson's stock price. Under these circumstances, all purchasers of Patterson common stock during the Class Period suffered similar injury through their purchase of Patterson common stock at artificially inflated prices and a presumption of reliance applies.

72.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Patterson's business practices, financial results and condition, and the Company's internal financial controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.    NO SAFE HARBOR

73.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

74.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Patterson who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

76.     During the Class Period, Patterson and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Patterson common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Patterson common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Patterson's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary

participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of Patterson, as alleged herein.

78. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, et seq.) and S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

79. Patterson and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Patterson as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patterson's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Patterson and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Patterson common stock during the Class Period.

80.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

81.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.

82.     Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Patterson's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of

the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Patterson common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Patterson common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Patterson common stock during the Class Period at artificially inflated prices and were damaged thereby.

84.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Patterson, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Patterson common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

85.     By virtue of the foregoing, Patterson and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     The Individual Defendants were and acted as controlling persons of Patterson during the Class Period within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, Patterson and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d. Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 28, 2018                    Respectfully Submitted,

**ROBINS KAPLAN LLP**

*/s/ Anne M. Lockner*
Anne M. Lockner (MN 295516)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612.349.8500
Facsimile: 612.339.4181
ALockner@RobinsKaplan.com

*Liaison Counsel for Plaintiff Plymouth County Retirement System*

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac forthcoming*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena (*pro hac forthcoming*)
Joseph E. White, III (*pro hac forthcoming*)
Lester R. Hooker (*pro hac forthcoming*)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Plaintiff Plymouth County Retirement System*