**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>PATTERSON COMPANIES, INC., SCOTT P. ANDERSON, ANN B. GUGINO, R. STEPHEN ARMSTRONG and JAMES W. WILTZ,<br><br>Defendants | Case No. 0:18-cv-00871-MJD-SER<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


CAST OF CHARACTERS ........ iv

I. NATURE OF THE ACTION ........ 3

II. JURISDICTION AND VENUE ........ 10

III. PARTIES ........ 11

- A. Lead Plaintiffs ........ 11
- B. Defendants ........ 11
  - 1. Patterson Companies, Inc. ........ 11
  - 2. The Individual Defendants ........ 12
  - 3. Relevant Non-Defendants ........ 14

IV. OVERVIEW OF THE FRAUD ........ 15

- A. Background of Patterson ........ 15
- B. The Big Three's Illicit Price-Fixing Agreement ........ 17
  - 1. In 2011, Benco and Schein Enter Into an Illicit Agreement to Fix Their Profit Margins by Refusing to do Business With GPOs ........ 17
  - 2. In February 2013, Patterson Joined the Price-Fixing Conspiracy with Schein and Benco ........ 20
  - 3. Internal and Inter-Firm Communications of Patterson and Its Co-Conspirators Make Clear That The Collusive Scheme Continued During the Class Period ........ 23
  - 4. During the Class Period, the Big Three Also Colluded to Boycott Buying Groups Created by State Dental Associations ........ 30
    - a) The Distributors' Collusive Boycott of TDA Perks Supplies ........ 30
    - b) The Distributors' Collusive Boycott of AZDA Buying Group ........ 34
    - c) The Distributors' Collusive Boycott of Other State Trade Associations 37
  - 5. Despite the Distributors' Attempts to Continue to Price-Fix, the Scheme Begins to Unravel ........ 38
- C. The Truth Begins to Emerge ........ 39
- D. Post Class Period Events Confirm the Continuing Ramifications of Defendants' Fraud ........ 47

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 49
A. 2013 Form 10-K ..... 50
B. 2014 Fiscal First Quarter ..... 53
C. 2014 Fiscal Second Quarter ..... 53
D. 2014 Fiscal Third Quarter ..... 54
E. Fiscal Year 2014 ..... 55
F. 2015 Fiscal First Quarter ..... 55
G. 2015 Fiscal Second Quarter ..... 56
H. 2015 Fiscal Third Quarter ..... 57
I. Fiscal Year 2015 ..... 58
J. 2016 Fiscal First Quarter ..... 59
K. 2016 Fiscal Second Quarter ..... 60
L. 2016 Fiscal Third Quarter ..... 61
M. 2016 Fiscal Fourth Quarter ..... 62
N. 2016 Form 10-K ..... 63
O. 2017 Fiscal First Quarter ..... 65
P. 2017 Fiscal Second Quarter ..... 66
Q. 2017 Fiscal Third Quarter ..... 68
R. 2017 Fiscal Fourth Quarter ..... 69
S. 2017 10-K ..... 70
T. 2018 Fiscal First Quarter ..... 71
U. 2018 Fiscal Second Quarter ..... 72
V. False Statements in the Company's Principles of Business Conduct and Code of Ethics ..... 74
VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..... 75
VII. LOSS CAUSATION ..... 81
VIII. PRESUMPTION OF RELIANCE ..... 85
IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..... 86
X. CLASS ACTION ALLEGATIONS ..... 87

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......... 89
COUNT ONE .......... 89
COUNT TWO .......... 91
XII. PRAYER FOR RELIEF .......... 93
XIII. JURY DEMAND .......... 94

# CAST OF CHARACTERS

| Name | Title | Company |
|---|---|---|
| Anderson, Scott | Special Advisor (2017-Present) CEO (2010-2017) | Patterson |
| Capaldo, Frank | Executive Director and CEO (2014-Present) | Georgia Dental Association |
| Cavaretta, Joe | VP of Sales – Eastern Area (2018-Present) VP of Sales – West and Western Area Director (2015-2018) Zone Director, North Central Zone (2013-2015) Zone Manager, Western Zone (2009-2013) | Henry Schein |
| Cohen, Charles (Chuck) | Managing Director & Co-Owner (1996-Present) | Benco |
| Fernandez, Ron | Regional Manager, Texas (2011-2016) | Benco |
| Foley, Randy | Vice President of Field Sales, Special Markets (2014-2016) Director of Field Sales, Special Markets (20092013) | Henry Schein |
| Fruehauf, Anthony | Southeast Region Manager/President (2012Present) | Patterson |
| Goldsmith, Andrew | Chief Dental Officer (2013-2015) President (2011-2013) | Smile Source |
| Guggenheim, Paul | Chief Innovation Officer (2016-Present) President of Patterson Dental (2010-2016) | Patterson |
| Lepley, Joe | Director of Strategic Pricing (2015-Present) | Patterson |
| Mason, Brent | Dentist in New Mexico Member of NM Dental Co-op (2014-2015) | New Mexico Dental Cooperative |
| Maurer, Trevor | President | Smile Source |
| McElaney, Mike | Director of Sales, Northeast, and Regional Manager of New England (2015-2017) VP of Sales, Northeast (2013-2015) Director of Northeast (2011-2013) | Benco |
| McFadden, Neal | President, Special Markets (2013-2017) Regional Manager, Southeast (2009-2013) | Patterson |
| Meadows, Jake | VP of Sales, Special Markets (2017-Present) VP of Sales, Eastern Area (2014-2017) Northwest Zone General Manager (2011-2014) | Henry Schein |
| Misiak, David (Dave) | President (2016-2018) VP of Sales (2010-2016) | Patterson |
| Muller, Hal | President, Special Markets (2008-Present) | Henry Schein |
| Reece, Jeffrey | VP of Sales and Marketing (2008-Present) | Burkhart |
| Rogan, Tim | VP and General Manager (2017-Present) VP of Marketing/Merchandise (2009-2017) | Patterson |
| Ryan, Patrick | Director of Sales, Strategic Markets (2007Present) Director of Bus. Development (2011-2014) Director of Equipment Sales (Pre-2016) | Benco |
| Showgren, Glenn | VP of Sales, West (2017-Present) Zone General Manager, California (2013-2017) Regional Manager, South Texas Region (2010-2013) | Henry Schein |
| Steck, Dave | VP & General Manager (2005-Present) | Henry Schein |
| Sullivan, Tim | President of Henry Schein Dental (1997-Present) | Henry Schein |

Lead Plaintiffs Plymouth County Retirement System, Pembroke Pines Pension Fund for Firefighters and Police Officers, Central Laborers Pension Plan, and Gwinnett County Public Employees Retirement System (collectively, "Lead Plaintiffs"), by and through their attorneys, bring this federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Patterson Companies, Inc. ("Patterson") common stock between June 26, 2013 and February 28, 2018, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq*. (the "Exchange Act"). Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Patterson, and other related parties and non-parties, with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Patterson's website concerning the Company's public statements; and (d) review of other publicly available information concerning Patterson and the Individual Defendants, including:

- Emails, text messages and phone records obtained by the Federal Trade Commission ("FTC") in connection with its antitrust and price-fixing investigation of Patterson and its main competitors—Henry Schein, Inc. ("Schein") and Benco Dental Supply Company ("Benco") (together, the "Distributors")—to collusively boycott Group Purchasing Organizations ("GPOs" or "buying groups") in the dental industry in violation of Section 5 of the Federal Trade Communication Act, 15 U.S.C. §45 (the "FTC Act"), culminating in a formal complaint filed against Patterson, Schein and Benco on February 12, 2018;
- Documents provided to Lead Plaintiffs by the Texas Attorney General ("Texas AG") pursuant to Lead Plaintiffs' request under the Texas Information Act in connection with the Texas AG's four-year investigation of Patterson and its co-conspirators' anticompetitive scheme to collusively boycott the 2014 annual

convention hosted by the Texas Dental Association ("TDA") because of its creation of a GPO, resulting in the Texas AG filing a formal complaint against Patterson on April 19, 2018;

- Evidence recounted by Judge Brian M. Cogan of the Eastern District of New York in his April 12, 2018 opinion denying Patterson and Benco's motion for summary judgment in a private action filed by SourceOne Dental, Inc. ("SourceOne"), a company that provides online sales platforms to GPOs, captioned *SourceOne Dental, Inc. v. Patterson Companies, Inc. and Benco Dental Supply Company*, No. 15-cv-05440 (E.D.N.Y.) (*see* Dkt. No. 225), alleging that Patterson and its co-conspirators unlawfully colluded to force SourceOne out of the dental market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1 (the "Sherman Act");

- The Second Consolidated Class Action Complaint filed against the Distributors by consumers of their supplies, alleging that Patterson, Benco and Schein engaged in a collusive effort to collectively boycott dental supply and equipment manufacturers, state dental trade associations, and dental practices that chose to deal with GPOs in violation of Section 1 of the Sherman Act, captioned *In re Dental Supplies Antitrust Litigation*, No. 1:16-cv-00696 (E.D.N.Y. Oct. 22, 2016).

- The complaint filed by IQ Dental Supply, Inc. ("IQ"), a dental supply distributor, against Patterson, Schein and Benco in the Eastern District of New York, alleging that the Distributors collusively engaged in anticompetitive conduct to force IQ out of the dental market due to its partnership with SourceOne in violation of Section 1 of the Sherman Act, captioned *IQ Dental Supply, Inc. v. Henry Schein, Inc., Patterson Companies, Inc. and Benco Dental Supply Co.*, No. 2:17-cv-4834 (E.D.N.Y. August 17, 2017);

- The August 8, 2018 counterclaims filed by Dental Brands For Less, LLC ("Dental Brands"), a GPO, in the action captioned *Dentsply International, Inc. v. Dental Brands For Less, LLC*, No. 1:15-cv-08775 (S.D.N.Y.) (Dkt. No. 331), alleging that Patterson, Schein and Benco unlawfully colluded in a deliberate disinformation campaign against Dental Brands in retaliation for Dental Brands selling supplies offered by the Distributors at steep discounts; and

- The amended complaint filed by the lead plaintiffs in the recent securities fraud class action against Schein and certain of its executives regarding Schein's collusive price-fixing scheme with Patterson and Benco, captioned *In re Henry Schein, Inc. Securities Litigation*, 1:18-cv-01428 (E.D.N.Y. Sept. 14, 2018).

## I. NATURE OF THE ACTION

1. This case arises from a coordinated scheme by Patterson, the second largest distributor of dental supplies in the United States, to illegally fix prices on dental supplies by colluding with its principal competitors—Schein and Benco—who, together with Patterson, controlled nearly 85% of the dental supply market during the Class Period. Patterson, along with its co-conspirators, carried out this scheme through an explicit and documented agreement to collectively boycott Group Purchasing Organizations ("GPOs") in the dental industry in order to protect the Distributors' historically high profit margins.

2. On February 12, 2018, the FTC filed a formal complaint against Patterson and its co-conspirators for this conduct, alleging that it violated federal antitrust laws. The FTC's complaint—which it filed only after completing an extensive three-year investigation—was extraordinarily detailed, including excerpts from a plethora of internal and inter-firm emails, phone calls and text messages. These communications, which were obtained by Lead Plaintiffs from the FTC's public filings in its action against the Distributors, were among the most senior officers at each of the three companies. Indeed, the senior Patterson executives who perpetrated the price-fixing scheme included Paul Guggenheim, President of Patterson's dental supply business ("Patterson Dental"); David Misiak, Head of Sales for Patterson Dental and later President of Patterson Dental; Tim Rogan, Head of Marketing for Patterson Dental and later Head of North America for Patterson Dental; and Defendant Scott Anderson, the CEO of Patterson, and to whom each of the afore-named executives directly reported.

3. Historically, the dental supply market was highly fragmented, with nearly 90% of customers consisting of solo dentists or small group practices that each needed a wide range of supplies and equipment in order to run their practices. Patterson—one of only three full-service

distributors in the dental supply market—offered all of these items in one place and could deliver them within a day or two due through its broad distribution network. This convenience, coupled with the individual dentists' lack of bargaining power, allowed Patterson to charge dentists significantly marked-up prices for dental supplies. When GPOs entered the market, this began to change. GPOs are membership organizations that aggregate the buying power of solo dentists and small group practices, giving them the leverage to negotiate substantial discounts on dental supplies. GPOs save costs by offering online sales platforms for dentists to purchase supplies in one place as opposed to relying on a traditional door-to-door sales force.

4. Because GPOs fundamentally changed the way dentists purchased their supplies, their growing prevalence in the dental industry threatened to render Patterson's business model obsolete. Patterson's response to what it viewed as an existential threat to its business was to neutralize the threat by entering into an illegal price-fixing agreement with its main competitors, Benco and Schein, in order to use their significant market leverage to collectively freeze GPOs out of the dental industry.

5. Emails obtained by the FTC in its case against Patterson and its co-conspirators show that Patterson's agreement to join the price-fixing scheme was explicit and unambiguous. For example, in February 2013, not long after Benco and Schein had agreed to collude with each other to boycott GPOs, Benco's Managing Director Chuck Cohen learned that Patterson was considering doing business with a buying group in New Mexico. Within minutes, Cohen emailed Patterson's President Paul Guggenheim directly, stating: "FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups."[1] Guggenheim immediately forwarded Cohen's email to Patterson executives Misiak (Head of Sales) and Rogan

[1] Throughout this Amended Class Action Complaint ("Complaint"), unless otherwise stated, all emphasis is added.

(Head of Marketing) and, a few hours later, responded to Cohen by accepting his invitation to collude: "We feel the same way about these." Remarkably, just after this exchange, Cohen sent a text message to a Benco Regional Manager confirming that the Distributors were well aware that their conduct was unlawful and violated federal antitrust laws: "I just sent Paul [Guggenheim] a note about [the New Mexico buying group]. Don't want to call because it might be construed as price fixing."

6. Defendants' collusion with Patterson's competitors to boycott GPOs was confirmed by Patterson's actions in the immediate wake of these communications. Just weeks after Guggenheim told Cohen that Patterson would join the conspiracy, Patterson's Head of Sales, Misiak, sent an email to his team instructing them to reject an entity he believed was a GPO—despite a sales representative raising the concern that doing so would result in Patterson "los[ing] a big chunk of business." Misiak explained to his team that Patterson was colluding with Benco and Schein to collectively boycott GPOs, and then explicitly asked them to help ensure that Benco and Schein adhered to the illicit agreement: "Confidential and not for discussion . . . our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me."

7. Patterson continued to actively participate in the collusive scheme during the Class Period. For example, in August 2013, shortly after Patterson appointed Neal McFadden to head its newly formed Special Markets division, McFadden contacted Patterson executives Misiak and Rogan to ask if he should consider doing business with GPOs. Rogan responded by unequivocally stating: "We don't need GPOs in the dental business. Schein, Benco and Patterson have always said no." A month later, Misiak and McFadden sent an internal memorandum to all Patterson branch managers explicitly stating that the Special Markets

division would not work with GPOs. Then, on June 12, 2014, McFadden expressly told a buying group attempting to do business with Patterson via text message: "[W]e've signed an agreement that we won't work with GPOs."

8. Significantly, Defendant Scott Anderson, Patterson's CEO, was directly involved in perpetrating and monitoring the price-fixing scheme. For example, on June 10, 2013, just weeks prior to the start of the Class Period, Patterson's President Guggenheim emailed Benco's Managing Director Cohen to confirm that Benco's "position on buying groups [wa]s still as you articulated back in February," in light of Benco's recent deal with Atlantic Dental Care ("ADC"), an entity Patterson suspected was a GPO. Cohen responded by explaining in detail why ADC was not a GPO, stating: "As we've discussed, we don't recognize buying groups." Guggenheim responded: "Just wanted to clarify where you guys stand," then forwarded the exchange to Defendant Anderson the same day, stating: "FYI…" Later in September 2013, Patterson Dental's Head of Sales Misiak alerted Anderson and Guggenheim via email of an article that had come out about Burkhart, the fourth largest full-service distributor in the country, doing business with a GPO. Burkhart had not joined the Distributors' conspiracy. Misiak assured Anderson and Guggenheim that, in contrast to Burkhart, Patterson "said no [to GPOs] at every turn." Tellingly, Anderson did not question or reject Misiak's recitation of Patterson's anti-GPO policy, but commented that the article showed "how weak Burkhart is," and told Misiak and Guggenheim that "[w]e need to watch [Burkhart]" lest its actions undermine the Distributors' conspiracy.

9. By mid-2014, regulators began to investigate Patterson's anticompetitive activities—and Defendants responded by trying to cover up their fraudulent conduct. For example, on July 18, 2014, Patterson received a Civil Investigation Demand ("CID") from the

Texas AG regarding the Distributors' collective boycott of a GPO created by the Texas Dental Association ("TDA"). Just three days later, Patterson's Head of Sales, Misiak, explicitly told his team as they discussed a boycott of another state-run GPO: "Please discuss live and no more emails on this topic"—implicitly acknowledging that Patterson's email communications evidenced an illegal price-fixing scheme. Similarly, soon after Patterson was informed that the FTC had begun its investigation of the Company in mid-2015, Patterson's President Guggenheim texted Benco's Managing Director Cohen asking him to meet with him at an upcoming trade convention in New York. Cohen did not respond until two days later, stating: "Paul, sorry for the delayed response. Spoke with our attorney this week and I think we should pass on any conversations until current antitrust issues are resolved."

10. During the Class Period, investors had no idea that Patterson's financial results were materially and artificially inflated by its illegal scheme with its main competitors, Schein and Benco, to fix profit margins by shutting GPOs out of the dental industry. This was because Patterson told investors the exact opposite—that it was operating in the "highly competitive U.S. dental products distribution industry," and that it specifically and successfully "compete[d] against Henry Schein, Inc. and Benco Dental Supply Company." Patterson falsely attributed its competitive advantage in the dental market to the Company's "premium customer service with multiple value-added components," "highly qualified and motivated sales force," "competitive pricing," and top-of-the-line products. Indeed, as Patterson's dental supply and equipment sales steadily grew during the Class Period and as it gained market share despite the purportedly "highly competitive" dental supply industry, Defendants repeatedly and deceptively attributed the Company's success to Patterson's ability to "excel[] at providing customers with industry-

leading technology wrapped by a suite of value-added services," "high demand for the portfolio of products we sell," "stability in the dental market," and "strong execution" by its sales force.

11. Significantly, Defendants also unequivocally claimed in the Company's "Principles of Business Conduct and Code of Ethics"—incorporated by reference in Patterson's Form 10-Ks filed with the SEC during the Class Period, and continuously available on the Company's website—that Patterson "fully complie[d] with the antitrust laws and fair trade practices of the United States." That document further stated that the Company's employees followed "specific guidelines" designed to prevent anticompetitive behavior, including instructions to "[n]ever discuss pricing policy with competitors," "[n]ever engage in a joint selling activity with a competitor," and "[a]void even the appearance of improper or collusive conduct when meeting with competitors . . . at trade shows or trade association meetings." However, unbeknownst to investors, rather than "fully compl[ying]" with antitrust laws and these "specific guidelines," Patterson and its most senior executives were engaged in a years-long collusive scheme with the Company's main competitors to intentionally violate them.

12. The truth about Patterson's anticompetitive conduct was not fully revealed until early 2018. On February 12, 2018, the FTC announced that it had filed a complaint against Patterson and its co-conspirators for antitrust violations. As stated above, the FTC's complaint set forth in remarkable detail numerous internal and inter-firm communications showing that Patterson's price-fixing scheme with Benco and Schein had spanned several years, and was perpetrated by Patterson's most senior executives. On this news, Patterson's stock price fell 5%, wiping out $160 million in market capitalization in one day. Then, less than three weeks later, on March 1, 2018, Patterson announced disappointing results for the third quarter of fiscal year

2018, stunning the market by disclosing a dramatic decline in overall earnings of 26%, coupled with the immediate resignation of Defendant Anne Gugino, Patterson's CFO.[2]

13. The FTC complaint and the magnitude of the Company's earnings decline caused the market and analysts to immediately understand the truth: absent illegal collusion, Patterson's obsolete business model could not maintain its historically healthy profit margins due to GPOs increasingly taking hold in the dental industry. For example, analysts commented that Patterson's business model was clearly "broken"; that it was "obvious to us now that the dental channel is challenged and given FTC review we don't see multiple relief in sight"; that "[dental supply] pricing is more acute with FTC coverage intense"; that "the market's shift away from small practices (PDCO's historical strength) to larger practices is accelerating"; and that there would "be no easing of troubles" for Patterson since its "competitive position within the dental wholesaling market ha[d] significantly deteriorated."

14. On this news, Patterson's stock dropped precipitously, falling 24% on March 1, 2018, from $31.58 per share to $24.11 per share, on unusually high trading volume and wiping out nearly $700 million in market capitalization.

15. The ramifications of Defendants' scheme continued after the Class Period ended. For example, on April 19, 2018, the Texas AG brought suit against Patterson, alleging that its collusive "group boycott" of the TDA buying group and the TDA's 2014 annual convention violated state antitrust laws. Patterson settled the action the same day, agreeing to cease its anticompetitive conduct, pay $200,000 in costs, and provide the Texas AG an ongoing log of all oral and written communications among its senior level executives for one year. Then on August 30, 2018, Patterson reported that its earnings missed consensus expectations again. This time,

[2] Patterson's fiscal year begins on May 1st and ends on April 30th.

the Company explicitly admitted that the shortfall was due to "competitive pricing pressures at the point of sale" driven by a changing customer base of buying groups that "purchase[] a larger volume of products, and obviously, command[] an improved price position." On this news, Patterson's stock fell again by 5%.

16. Significantly, Patterson's stock price has never regained its value. Indeed, to date, it trades at approximately $23 per share—less than half the Class Period high of over $51 per share.

## II. <u>JURISDICTION AND VENUE</u>

17. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's headquarters is located in this District at 1031 Mendota Heights Road, St. Paul, Minnesota, 55120.

20. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

21. Lead Plaintiff Plymouth County Retirement System, as set forth in the accompanying certification attached hereto, purchased Patterson common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

22. Lead Plaintiff Pembroke Pines Pension Fund for Firefighters and Police Officers, as set forth in the accompanying certification attached hereto, purchased Patterson common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

23. Lead Plaintiff Central Laborers Pension Plan, as set forth in the accompanying certification attached hereto, purchased Patterson common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

24. Lead Plaintiff Gwinnett County Public Employees Retirement System, as set forth in the accompanying certification attached hereto, purchased Patterson common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

#### 1. Patterson Companies, Inc.

25. Defendant Patterson is a corporation with its headquarters located at 1031 Mendota Heights Road, St. Paul, Minnesota, 55120. Patterson is one of the nation's only full-service distributors of dental products. The Company distributes its products mainly through two

subsidiaries—Patterson Dental and Patterson Animal Health. Patterson's common stock is traded on the NASDAQ under the symbol "PDCO."

### 2. The Individual Defendants

26. Defendant Scott P. Anderson ("Anderson") served as the Chief Executive Officer and President of Patterson from April 25, 2010 through June 1, 2017, and as Chairman of the Board from April 2013 to June 1, 2017. Prior to that, from June 2006 to April 2010, Defendant Anderson served as President of Patterson Dental. Defendant Anderson worked at Patterson until his sudden and immediate resignation on June 1, 2017.

27. During the Class Period, Defendant Anderson made materially false and misleading statements and omissions during earnings calls and in earnings press releases, including on August 22, 2013, November 21, 2013, February 20, 2014, August 21, 2014, November 20, 2014, February 19, 2015, May 21, 2015, August 27, 2015, November 24, 2015, February 25, 2016, May 26, 2016, August 25, 2016, November 22, 2016, February 23, 2017, and May 25, 2017. Defendant Anderson also reviewed, approved and signed and certified Patterson's annual filings with the SEC on Form 10-K, including on June 26, 2013, June 25, 2014, June 24, 2015 and June 29, 2016, which contained materially false and misleading statements and omissions.

28. Defendant R. Stephen Armstrong ("Armstrong") was elected Executive Vice President, Chief Financial Officer and Treasurer of Patterson effective July 1999. He served in that role until October 2014. Defendant Armstrong's "planned retirement" was announced by the Company in June 2014.

29. During the Class Period, Defendant Armstrong reviewed, approved and signed and certified Patterson's annual filings with the SEC on Forms 10-K, including on June 26, 2013 and June 25, 2014, which contained materially false and misleading statements and omissions.

30. Defendant Ann B. Gugino ("Gugino") served as the Chief Financial Officer of Patterson from November 1, 2014 until her abrupt resignation from the Company on March 1, 2018. Prior to that, she served as Vice President of Finance and Operations for Patterson Dental from 2008 until April 2012, and Vice President of Strategy & Planning from April 2012 to November 2014.

31. During the Class Period, Defendant Gugino made materially false and misleading statements and omissions during earnings calls, including on November 24, 2015, August 25, 2016, November 22, 2016, and November 21, 2017. Defendant Gugino also reviewed, approved and signed and certified Patterson's annual filings with the SEC on Form 10-K, including on June 24, 2015, June 29, 2016 and June 28, 2017, which contained materially false and misleading statements and omissions.

32. Defendant James W. Wiltz ("Wiltz") served as an Interim Chief Executive Officer and Interim President of Patterson from June 1, 2017 to November 20, 2017. Defendant Wiltz served as a director of Patterson since March 2001, and held a variety of roles over more than 40 years at Patterson, including serving as the Company's President and Chief Executive Officer from May 2005 to April 2010. Prior to that, Defendant Wiltz served as President and Chief Operating Officer of Patterson from April 2003 through May 2005, and as President of Patterson Dental from 1996 to April 2003.

33. During the Class Period, Defendant Wiltz made materially false and misleading statements and omissions during earnings calls, including on August 24, 2017. During the Class

Period, Defendant Wiltz reviewed, approved and signed and certified Patterson's annual filing with the SEC on Form 10-K, including on June 28, 2017, which contained materially false and misleading statements and omissions.

34. Defendants Armstrong, Anderson, Gugino, and Wiltz are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions within Patterson, possessed the power and authority to control the contents of Patterson's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. While serving as a senior executive of Patterson, each Individual Defendant was provided with copies of the Company's reports and press releases–alleged herein to be misleading prior to, or shortly after, their issuance–and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

### 3. Relevant Non-Defendants

35. During the Class Period, Paul Guggenheim ("Guggenheim") served as the President of Patterson Dental from April 2010 until June 15, 2016, and served as the Company's Chief Innovation Officer from June 15, 2016 until June 01, 2017. As stated by Defendant Anderson, Guggenheim had "responsibility for all North American dental operations."

36. David (Dave) Misiak ("Misiak") served as Head of Sales at Patterson from 2010 to 2016. On November 1, 2016, Misiak became President of Patterson Dental North America, until his unexpected resignation on May 3, 2018.

37. Timothy (Tim) Rogan ("Rogan") was Head of Marketing for Patterson Dental from 2010 to 2017. In 2017, he was promoted to the position of Vice President/General Manager of North America. On the Q1 2016 earnings conference call, Defendant Anderson stated: "Tim Rogan, formerly Vice President of Merchandise is now Vice President of Strategy and Organizational Effectiveness for Patterson Companies, reporting directly to me."

38. Neal McFadden ("McFadden") was appointed the President of Patterson Dental's then-newly formed Special Markets Division in June 2013. Prior to that, he spent 21 years working with Patterson Dental as the Greenville, South Carolina Branch Manager, and later the Southeast Region President.

## IV. <u>OVERVIEW OF THE FRAUD</u>

### A. Background of Patterson

39. Originally founded in 1877, Patterson operated through three strategic business units during the Class Period, Patterson Dental, Patterson Animal Health and Patterson Medical, offering similar products and services to each customer base. Patterson Dental is Patterson's largest business, accounting for nearly 60% of its overall annual profits and generating annual net sales well in excess of $2 billion. According to the Company's 2015 10-K, Patterson Dental is "one of the two largest distributors of dental products in North America"—the other being Patterson's main competitor, Schein. Patterson Dental has operations in the United States and Canada, and provides "consumable" products (such as x-ray film, restorative materials, hand

instruments, and sterilization products) as well as basic and advanced dental equipment to dentists, dental laboratories, and other healthcare professionals.

40. Patterson and its two largest competitors in the dental supply market—Schein and Benco—control nearly 85% of all distributor sales of dental products and services in the United States, a $10 billion market. Patterson's share of that market is substantial at 33%, while Schein and Benco each have a 38% and 12% share, respectively. Together, these three distributors are widely known in the dental supply industry as the "Big Three."

41. Patterson has historically enjoyed large profit margins in its dental supply businesses, in excess of 30%, due to the highly fragmented nature of the dental industry. Indeed, of the approximately 200,000 dentists practicing in the United States, the vast majority, between 85-90%, are independent—*i.e.*, solo practitioners or small group practices, as opposed to large corporate practices with common ownership across offices (known as "Dental Support Organizations," or DSOs)—and each of these practitioners needs a wide range of dental supplies and equipment to be able to run their practices. While there are over 300 dental supply and equipment manufacturers, none of them offer the full range of dental supplies and equipment necessary to run a dental practice. As a result, manufacturers sell the vast majority of their supplies and equipment (over 75%) to full service distributors such as Patterson, who then resell those supplies and equipment to individual dentists at substantial mark-ups for the convenience of being able to purchase all necessary supplies and equipment in one place. As a full-service distributor, Patterson is also able to deliver these dental supplies within a day or two due to its nation-wide distribution centers, allowing individual dentists to avoid carrying large inventories in their own office space. Thus, as Patterson stated in its SEC filings: "The underlying structure of the dental supply market consists of a <u>sizeable geographically dispersed number of</u>

fragmented dental practices and is attractive for our Company's role as a value-added, full service distributor."

42. However, in 2011—a few years prior to the Class Period—the dental supply market began to dramatically shift. Indeed, in the face of decreasing insurance reimbursements and the growth of DSOs, independent dentists faced mounting pressure to lower their overhead costs or join larger corporate practices. This pressure soon gave rise to "group purchasing organizations," or GPOs, which are membership organizations that aggregate the buying power of individual dentists and small group practices, giving them leverage to obtain significant discounts on dental supplies while remaining independent—thereby significantly threatening the substantial margins historically enjoyed by the "Big Three."

43. As detailed further below, Patterson's response to this development was to enter into an illegal agreement with its two largest competitors, Benco and Schein, to fix their high profit margins on dental supplies by collectively refusing to do business with GPOs. This GPO boycott aimed to prevent GPOs, and any manufacturers or suppliers who supported them, from cutting into the Distributors' profits and market share.

## B. The Big Three's Illicit Price-Fixing Agreement

### 1. In 2011, Benco and Schein Enter Into an Illicit Agreement to Fix Their Profit Margins by Refusing to do Business With GPOs

44. GPOs began to establish themselves in the dental supply industry around 2011, marketing themselves as a means for independent dentists to lower their overhead costs by being able to leverage large group power to obtain substantial discounts on dental supplies and equipment. GPOs also provided unprecedented opportunities for smaller dental distributors trying to break into the dental supply market historically controlled by the Big Three. By selling

to GPOs, these smaller distributors could amass large groups of loyal customers and grow their own market shares.

45. Patterson was acutely aware of the significant threat GPOs posed to its traditional business models and historically high profit margins. Indeed, the Distributors understood the threat posed by GPOs because a similar phenomenon in the medical supply industry several years prior had caused distributors' margins to rapidly and substantially decrease. Patterson was intimately familiar with this industry through its medical supply business, Paterson Medical.

46. Numerous internal documents confirm the Distributors' view that GPOs posed an existential threat to their historically dominant position in the dental industry. For example, on August 4, 2013, Tim Rogan, Head of Marketing at Patterson, responded to an email from Head of Special Markets Neal McFadden asking if Patterson should consider GPOs as prospective customers by stating flatly: "<u>We don't need GPOs in the dental business</u>." Joe Cavaretta, Schein's Vice President of Sales, emailed his team on February 1, 2011, stating GPOs were "<u>incredibly risky on many fronts,</u>" and "<u>as soon as we start doing this we will turn into medical, margins will go down and commissions of course will follow</u>" resulting in "<u>a bad deal all the way around</u>." Patrick Ryan, Head of Strategic Markets at Benco, stated in an internal message to his team on February 23, 2013 that "<u>GPOs are what ruined the medical supply business and why they work on single digit margins</u>." Ryan added: "<u>If this door is ever opened in dental, it's all over for all of us . . .[it's] a race to the bottom</u>."

47. In the face of this significant threat, the Distributors did not devise legitimate business strategies to remain competitive. Instead, they came up with an illicit scheme to illegally protect their profit margins and respective market shares: they would each agree to refuse to do business with any GPOs, effectively freezing them out of the market, while

protecting their marked-up prices from erosion. Indeed, as far back as September 15, 2010, when GPOs were just beginning to emerge on the dental supply market, Schein's President Tim Sullivan noted internally that Schein's decision at the time to do business with Smile Source—a GPO—created a risk that its main competitors would "follow[] suit" and a "huge price war [would] break[] out."

48. Accordingly, in 2011, Benco and Schein entered into an illicit agreement to collectively refuse to do business with GPOs. In September 2011, Smile Source approached Benco explaining that it worked with Schein, and offered Benco the opportunity to take its business from Schein. Over the next several months, Benco's Managing Director Cohen and Schein's President Sullivan exchanged dozens of text messages and multiple phone calls regarding Smile Source. In these communications, Cohen and Sullivan agreed that Benco and Schein would collectively refuse to do business with or provide discounts to GPOs in order to protect their respective profit margins.

49. This agreement was implemented by December 2011, when Schein's historical practice of working with buying groups such as Smile Source abruptly changed. That month, Randy Foley, Head of Special Markets at Schein, turned down a GPO by explicitly informing it of Schein's new policy: "[U]nless you have some 'ownership' of your practices [as would be the case for a DSO] Henry Schein considers your business model as a Buying Group, and we no longer participate in Buying Groups." Not long after, Schein also ended its otherwise profitable relationship with Smile Source. In a February 2, 2012 internal email, Schein's President Tim Sullivan commented that, while Schein would do its best to retain Smile Source customers after terminating its relationship with the GPO: "I'm really less concerned about the actual revenues,

although very important too, rather more about <u>what we can do to KILL the buying group model!!</u>"

50. The existence of the illicit agreement between Schein and Benco was further evidenced by Benco's constant monitoring of whether Schein was adhering to the agreement. For example, in January 2012, Patrick Ryan, Head of Strategic Markets at Benco, suspected Schein of reneging on the Distributors' illicit agreement by working with a GPO called Unified Smiles. Ryan forwarded an email regarding Unified Smiles to Benco's Managing Director Cohen, stating: "For Timmy [Sullivan] conversation." Cohen responded: "Talking this AM." Phone records show Cohen and Sullivan spoke that morning for 12 minutes—and that neither Schein nor Benco ever did business with Unified Smiles thereafter.

51. A few months later, in July 2012, Benco's Ryan heard that Schein was doing business with Smile Source. Ryan wrote an email to Benco's Managing Director, Cohen, asking him to confront Schein's President, Sullivan, about it: "<u>Better tell your buddy Tim [Sullivan] to knock this shit off</u>." Cohen responded agreeing to do so:

> Please resend this email without your comment on top so that I can print & send to Tim with a note. <u>The good news is: perhaps they're looking to us because Schein told them NO</u>. That works for me.

52. After Schein and Benco had firmly established their illicit price-fixing agreement, they set their sights on recruiting the second largest of the "Big Three," Patterson. With minimal prodding from Benco, Patterson eagerly joined the collusive scheme in early February 2013, just prior to the start of the Class Period.

### 2. In February 2013, Patterson Joined the Price-Fixing Conspiracy with Schein and Benco

53. As the FTC stated in its recently filed pre-trial brief in its administrative action against the Distributors, "[t]he evidence of a[] [price-fixing] agreement between Benco and

Patterson is *direct and unambiguous*" (emphasis in original), as shown by "written communications between Benco's [Managing Director] Cohen and Patterson's then-President, Paul Guggenheim," who reported directly to Defendant Anderson during the Class Period. *See id.* at 21.

54. For example, on February 8, 2013, Benco's Managing Director, Cohen, received an internal email from his team forwarding an announcement from Dr. Brent Mason (a prominent dentist in New Mexico) to numerous area dentists about the newly formed New Mexico Dental Cooperative ("NMDC"), a GPO. Dr. Mason stated that NMDC had partnered with "Patterson Dental to provide the individual office the same opportunities as the larger corporations." Cohen responded to this information by stating: "We don't recognize buying groups . . . I'll reach out to my counterpart at Patterson to let him know what's going on in NM."

55. Within five minutes, Cohen forwarded NMDC's announcement to Guggenheim, and invited Patterson to join Benco in its refusal to compete for GPOs:

> Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy.

56. Guggenheim understood the invitation and immediately forwarded Cohen's email to Dave Misiak (Patterson Head of Sales) and Tim Rogan (Patterson Head of Marketing). A few hours later, Guggenheim responded to Cohen by expressly agreeing to collude: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these."

57. Significantly, the Distributors were well aware that their conduct violated antitrust laws, such that they needed to disguise their communications so they would not "be construed as price fixing." For example, shortly after Cohen invited Guggenheim to collude, Cohen texted a

Benco Regional Manager who had asked him about NMDC: "I just sent Paul [Guggenheim] a note about it. Don't want to call because it might be construed as price fixing."

58. Tellingly, three days later, Patterson suddenly changed course on NMDC and informed Dr. Mason that it would not be partnering with the buying group after all. This came as a surprise to Dr. Mason, who testified to the FTC that, prior to February 8, 2013—and as reflected in his mass email to prospective NMDC members—he understood that Patterson had agreed to be the preferred vendor for the buying group.

59. Patterson's internal communications during this time period confirmed its commitment to the scheme. On February 27, 2013, Patterson executive Dave Misiak (Head of Sales) sent an email to Patterson Mid-Atlantic Regional Manager Anthony Fruehauf instructing him to reject Atlantic Dental Care ("ADC"), which he believed to be a GPO, despite Fruehauf raising the concern that Patterson would "los[e] a big chunk of business" if it did. In his email, Misiak instructed Fruehauf to tell his sales reps that it was in "their best interest long term . . . not to take our business in that direction." Misiak then confided in Fruehauf that it was acceptable for Patterson to lose ADC's business because Benco and Schein had also agreed to reject GPOs, stating in bolded text: "Confidential and not for discussion . . . our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me."

60. In May 2013, Benco determined ADC was not a GPO but a DSO, prompting it to bid on and win ADC's business. Tellingly, on June 6, 2013, upon learning that Benco had won ADC's business, Patterson's President Guggenheim emailed Benco's Managing Director Cohen—on the same February 8, 2013 email chain in which Patterson agreed to join the Distributors' price-fixing agreement—asking Cohen to explain, in light of Benco's deal with

ADC, whether Benco's "position on buying groups [was] still as you articulated back in February":

> Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? . . . I'm wondering if your position on buying groups is still as you articulated back in February? . . . Sometimes these things grow legs without our awareness!

61. Cohen responded on June 10, 2013, stating: "As we've discussed, we don't recognize buying groups." Cohen then provided Guggenheim a detailed explanation of the features of ADC that showed it was not a GPO but a DSO, including that its practices "legally merged together" (emphasis in original). Cohen reassured Guggenheim that Benco had "asked to see the merger documents" to ensure this was the case:

> Although they're in the early stages of the process, we believe this meets our criteria for a large group practice. We've asked to see the merger documents once they are completed, to confirm that they've really become a legally merged entity, and we're going to continue monitoring the process to ensure that ADC delivers on their commitment to us. Happy to discuss in more detail, if you'd like.

62. Guggenheim responded by email on June 10, 2013, stating: "Sounds good Chuck, Just wanted to clarify where you guys stand." Significantly, Guggenheim then forwarded this exchange with Cohen to Defendant Scott Anderson, CEO of Patterson, stating "FYI" in the text of his email—indicating that Guggenheim was keeping Anderson apprised of his actions to ensure that Patterson's co-conspirators adhered to the illicit price-fixing scheme.

### 3. Internal and Inter-Firm Communications of Patterson and Its Co-Conspirators Make Clear That The Collusive Scheme Continued During the Class Period

63. Patterson's collusive scheme with Benco and Schein to refuse to compete for GPO business was its key strategy for countering the threat posed by GPOs during the Class Period, which begins with Patterson's filing of its 2013 Form 10-K with the SEC on June 26, 2013. As numerous emails among and between the Distributors' top executives show—

including emails directly to and from Defendant Anderson—Patterson and its co-conspirators refused to do business with GPOs in lock-step while closely monitoring each other's adherence to the illicit agreement.

64. For example, in June 2013, Neal McFadden was appointed to head Patterson's newly formed "Special Markets" division, which was created to help Patterson develop relationships with large DSOs. Shortly thereafter in August 2013, after being contacted by a GPO, McFadden emailed Misiak, Patterson's Head of Sales, and Rogan, Patterson's Head of Marketing, to ask: "Is it worth it to explore GPO???????" Rogan responded unequivocally:

> We don't need GPOs in the dental business. Schein, Benco and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry.

65. Accordingly, a month later, on September 4, 2013, McFadden and Misiak sent out an internal memorandum to all Patterson regional and branch managers clarifying that, as a "guiding principle," Special Markets would "not include group purchasing organizations (GPOs)."

66. On September 3, 2013, Misiak, Head of Patterson Sales, directly emailed Patterson's CEO Defendant Anderson and Patterson's President Guggenheim about the ongoing threat of GPOs and the need to freeze them out of the market. Specifically, Misiak forwarded Anderson and Guggenheim an article entitled: "GPOs Expand Their Reach." The article described the relationship between Burkhart, the fourth largest dental supply distributor, and HRS, a GPO. The article highlighted a quote from Jeffrey Reece, Head of Sales at Burkhart, in which he stated: "It's been an education for our account managers and our clients, to understand how programs like HRS can complement a traditional supply dealer relationship." In his email forwarding the article, Misiak stated to Defendant Anderson and Guggenheim:

> I would not currently classify [GPOs] as a big threat to the business but the GPO noise has been pretty loud from the field. We have said no at every turn, including to Delta Dental. Benco has also crept into a few of these. My guidance has been to politely say no and weather the storm with these. Incredible to me that Burkhart has bit this apple and that they are broadcasting it.

67. Tellingly, Anderson did not question or reject Misiak's recitation of Patterson's policy to say no to GPOs "at every turn." Nor did he ask Misiak to clarify what he meant when he said that Benco had "crept into" a few deals with GPOs. To the contrary, Anderson's response showed that he was well aware that Patterson did not do business with GPOs, and that he was concerned that Burkhart, who had not joined the Distributors' illicit agreement to reject GPOs, would undermine the Distributors' price-fixing conspiracy: "We need to watch this . . . Jeff Reece's quote shows how weak Burkhart is."

68. Shortly after Anderson's instruction to Guggenheim and Misiak to "watch" Burkhart, on September 13, 2013, Michael McElaney (Benco Vice President of Sales) called Reece of Burkhart and told him that GPOs were a threat to the dental industry. McElaney reported his conversation with Reece to Benco executives Cohen and Ryan in a September 16, 2013 email, stating: "I spoke with Jeff Reece at length late Friday about buying groups. JEFF DOES NOT GET IT!!!" Ryan responded by asking Cohen to reach out to Schein and Patterson to reaffirm the Distributors' collective stance against GPOs, stating: "CHUCK – maybe what you should do is make sure you tell Tim [Sullivan] and Paul [Guggenheim] to hold their positions as we are."

69. In the months that followed, Patterson, Schein and Benco repeatedly and routinely rejected GPOs in lock-step, while consistently reaffirming their illicit agreement with each other. For example, the Distributors colluded to refuse to do business with Smile Source, a GPO. On October 1, 2013, Patrick Ryan (Benco Head of Strategic Markets) called his counterpart at Schein, Randy Foley, and reaffirmed Benco's commitment to boycotting GPOs, and specifically

Smile Source. Ryan described this call in a later email to Benco's Managing Director Cohen, stating: "Randy at Schein and I talked specifically about [Smile Source]. Buh-bye." Foley likewise told his superior at Schein, Hal Muller, in an October 9, 2013 email: "Next time we talk remind me to tell you about my conversation with Pat Ryan at SM [Strategic Markets] Benco. They're anti Buying Group and Smile Source recently reached out to them. I'm being careful not to cross any boundaries, like collusion." Significantly, Foley later testified to the FTC that he was "uneasy" about this discussion, because it was "against company . . . rules" to discuss customers with competitors.

70. Around the same time, Patterson also rejected Smile Source. On November 20, 2013, Misiak responded to Andy Goldsmith from Smile Source, stating Patterson was "currently not interested but will keep the strategy and Smile Source on the 'idea board' and get back to you should things change." On December 30, 2013, Trevor Maurer from Smile Source contacted Patterson's Misiak, copying McFadden, expressing confusion as to why Patterson was not interested in working with Smile Source in light of how profitable it could be for Patterson. Maurer wrote: "I never heard back from you and I find that odd. We purchase over $14MM annually in supplies, and that number continues to double every year. Dr. Goldsmith advised me that you are not interested in working with us." Nevertheless, Patterson still refused to do business with Smile Source.

71. The same day, on November 20, 2013, a Patterson sales representative emailed Rogan, Head of Marketing at Patterson, inquiring about how to respond to a GPO that had reached out to her. Rogan stated: "We don't sell to buying groups," adding: "Let's talk live"—indicating Rogan's understanding that he did not want to create a paper trail showing Patterson's collusive agreement with its competitors to boycott GPOs.

72. Numerous internal emails confirm Patterson instituted a formal policy against GPOs in accordance with the Distributors' illicit agreement, and strictly adhered to it. Notably, these emails, which began with the 2013 emails described above, spanned several years and were sent to and from Patterson's most senior executives. For example:

- On February 10, 2014, McFadden, Head of Special Markets at Patterson, informed the Lighthouse Dental Buying Group, LLC (a GPO) that Patterson would not do business with it: "At the advice of our legal department and our executive leadership team I am respectfully declining your offer to participate further in your RFP. Patterson has historically never done business with GPOs and culturally we do not feel it is a long term strategy for our company."
- On April 23, 2014, McFadden informed Patterson's President Guggenheim that he had dutifully instructed a Patterson sales representative that "we should pass on [GPOs]" because "[i]t's a slippery slope . . . [t]hey tout a 20% saving to the dentists on supplies."
- On May 8, 2014, McFadden responded to a Patterson sales representative in Atlanta who stated that Smile Source was "really growing," stating: "I did meet with Smile Source. Quite frankly, they're very sleazy . . . Basically giving small dentists better buying power. Most dealers are not working with them except small desperate ones. I'm sorry you're experiencing this."
- On May 19, 2014, McFadden told a Patterson sales representative inquiring about doing business with GPOs: "I am electing to not participate with these groups—we have said no to several already . . ."
- On June 12, 2014, McFadden texted a former colleague who was working for a prospective buying group and inquiring about doing business with Patterson: "Is Choice One a GPO or are you all actually acquiring practices? The reason I'm asking is we've signed an agreement that we won't work with GPOs."
- On October 11, 2014, a dentist emailed a Patterson sales representative, Walter Turner, to tell him that he was switching his practice's supply business from Patterson to the Kois Buying Group. Turner forwarded the message to another Patterson customer, commenting: "Patterson corporate has concluded 'we will NOT be entertaining participating in any buying group of this nature.'"
- On October 23, 2014, a Patterson Branch Manager told McFadden that one of his customers "told us that they are trimming back on their orders with Patterson as they are waiting to hear about a new pricing structure through their affiliate with the Kois Buying Group, from Patterson." McFadden responded: "As a rule we are trying our best to steer clear of all buying groups. As far as 'Kois Group through Patterson'—that's news to me. Special Markets has had no communications with Dr. John Kois and his team."

- On January 14, 2015, Patterson's Southeast Regional Manager, Fruehauf, emailed McFadden asking about a GPO formed by a dentist in Orlando. McFadden responded: "If he calls I will ask him for financials. – does [the dentist] own all these offices – if not then he is a GPO – we don't deal with GPOs."
- On March 26, 2015, McFadden explained to a sales representative: "[W]e have said no to Smile Source. It is a direct competition to our sales reps. They are buying club and have agreements with study clubs, state institutions, and everybody they can connect with."
- On July 29, 2015, Bill Neal, a Patterson Special Markets Executive, informed McFadden that he had met with the GPO Dentistry Unchained—and that, despite its sizeable 226 dentist membership and the fact that "80% of those who have joined have said they will switch suppliers if the discount offered is favorable," he was "honest with [Dentistry Unchained] that we have not elected to participate in these types of programs in the past."
- On August 7, 2015, Patterson received a letter from the Texas AG, informing it that the FTC had opened an investigation of the Distributors' price-fixing scheme and that the Texas AG planned to share materials from its own investigation of the Distributors' anticompetitive conduct with the FTC. Shortly thereafter, on November 10, 2015, Patterson's President Guggenheim texted Benco's Managing Director Cohen, asking him to meet with him in person at an upcoming dental trade meeting in New York. When Cohen failed to respond, Guggenheim prodded him again two days later. Cohen responded later that day, stating: "Paul, sorry for the delayed response. Spoke with our attorney this week and I think we should pass on any conversations until current antitrust issues are resolved."

73. This pattern of behavior was not unique to Patterson. Each of the three Distributors during this period instituted an explicit policy of boycotting buying groups, which, in some communications, they expressly stated was in accordance with the Distributors' illicit agreement with each other.

74. For example, on July 11, 2013, a Benco Regional Manger explained to another Regional Manager: "Let's talk live about this . . . [s]hort version is Chuck Cohen is adamant about not participating in any way, shape or form in anything that looks, walks, talks, smells or acts like [a GPO]" because "[i]t's death to dealers." On June 10, 2014, a Schein Special Markets executive referenced Schein's express anti-GPO policy when he told Steadfast Medical GPO that Schein would no longer be its supplier: "After examination of your GPO business model we

have concluded that continuation of our current relationship is counter to our business practices." The Schein executive forwarded the exchange to Cavaretta, Head of Sales at Schein, who tellingly commented that it was "nice" to "shut [the GPO] down": "Thanks for leading the charge . . . GPOs are popping up like crazy so it is nice when we can shut one down and still keep the business from the individual customers."

75. In other communications that occurred in mid-2015, Benco Head of Strategic Markets Patrick Ryan expressly confirmed the existence of the illicit price-fixing agreement between the three Distributors. For example, on May 19, 2015, Ryan of Benco turned down Dentistry Unchained—the same GPO with 226 dentists that Patterson would turn down two months later—stating internally to his team: "The best part about calling these [GPOs] is I already KNOW that Patterson and Schein have said NO." Similarly, on July 13, 2015, Ryan clarified Benco's position on GPOs to a sales representative who was concerned about losing $1 million in "current business" to a buying group: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either."

76. Significantly, in each of these instances, Patterson's individual conduct in refusing to do business with buying groups made no economic sense, but for the fact that Patterson had entered into a collusive agreement with its competitors to boycott GPOs. Indeed, Patterson declined contracts with Smile Source even though it purchased $14 million in supplies every year, and with Dentistry Unchained even though it had a strong membership of 226 dentists, 80% of which were willing to switch to Patterson as their supplier if it provided a group discount—actions that, under normal circumstances, would have risked Patterson losing significant market share to its competitors. Thus, the only circumstance in which these actions

made sense was if Patterson were colluding with its main competitors to illicitly boycott GPOs in the dental industry for their collective gain.

### 4. During the Class Period, the Big Three Also Colluded to Boycott Buying Groups Created by State Dental Associations

77. During the Class Period, the Big Three also conspired to collectively boycott a series of State Dental Associations because of their creation of, or support for, GPOs. As before, this collusion was explicit, and evidenced by numerous inter-firm and internal emails, text messages and phone calls between the top executives at Patterson and its co-conspirators Benco and Schein.

#### *a) The Distributors' Collusive Boycott of TDA Perks Supplies*

78. In October 2013, the Texas Dental Association ("TDA") launched TDA Perks Supplies, a state-run GPO that planned to sell discounted dental supplies to member dentists on an online sales platform, in partnership with SourceOne. The program was a quick success, with rapidly increasing membership and sales. Patterson and its co-conspirators recognized the substantial threat posed by TDA Perks Supplies almost immediately. In response, and as numerous phone calls, emails and text messages explicitly show, the three Distributors colluded at the highest levels to boycott TDA Perks Supplies as well as the TDA's annual trade convention in retaliation for the TDA's creation of a GPO, breaking their longstanding practice of attending that convention every year—which was important for maintaining the Distributors' respective market positions in Texas and in the industry.

79. For example, on October 14, 2013, soon after TDA Perks Supplies was launched, Benco's Managing Director Cohen wrote to his team in an internal email that they should "make it clear to the TDA that we will be cutting back our support of their meetings & programs," and

that Benco should "give a heads up to our friends from Patterson, Schein" so that they "understand what's going on here."

80. Two days later, on October 16, 2013, Glenn Showgren, a Schein Regional Manager, wrote in an internal email to Schein executives: "Benco considering suspending all activities with the TDA including pulling out of the state show. Chuck Cohen will be reaching out to, and has reached out to, [Schein's President] Tim Sullivan to see if [Schein] would do the same thing. Ron (Fernandez) [of Benco] wanted to know if I have a relationship with local PDCO [Patterson] RM [Regional Manager] to see if they would consider pulling out as well."

81. Ron Fernandez, Benco's Regional Manager for Texas, then called John Hyden, Patterson's Regional Manager for San Antonio, to discuss whether their respective companies would attend the TDA convention in light of the TDA's partnership with SourceOne. Fernandez later testified in SourceOne's 2015 lawsuit against the Distributors that one of his goals during this discussion was to determine whether Patterson would attend the TDA convention to avoid placing Benco at a competitive disadvantage if it pulled out of the TDA. Fernandez told Hyden that Benco was considering pulling out of the 2014 TDA, and asked Hyden if Patterson planned to do the same. Fernandez testified that he provided this information to induce Hyden to share similar information. Hyden then discussed the conversation with Clint Edens, his supervisor, who was Patterson's South Central Regional Manager.

82. On October 23, 2013, Edens emailed Misiak (Patterson Head of Sales) and Rogan (Patterson Head of Marketing) stating the TDA had "flooded the market with advertisements offering 35% savings." Edens added: "I am committed to pulling from the TDA if they do not discontinue competing with us via TDA Perks." Rogan responded: "This one has royally p….ed me off." Rogan then instructed Edens to put together a PowerPoint presentation for the TDA of

"[a]ll things Patterson does in the state," and to "[t]hen spin it to our mantra about helping our customers grow and not trying to decrease their supply bill."

83. On December 11, 2013, Rick Dunn of Benco wrote to Fernandez of Benco stating: "I heard from the ex TDA president that Patterson pulled out of the meeting. What did we decide?" Fernandez responded: "I will call the Patterson manager right now. Last time I spoke with him, about three weeks ago, they were out, but considering options." Fernandez then told Barrett Spencer, a Benco salesperson, in a text message: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against [the TDA]."

84. On December 13, 2013, Patterson announced that it would not attend the 2014 TDA meeting. Immediately after, Schein's Zone Manager passed this information along to his boss, stating: "FYI Patterson pulled out of [the TDA] Convention. I firmly believe they made the move expecting us to follow suit."

85. On January 6, 2014, Misiak called Steck, Head of Sales of Schein, to discuss whether Schein would attend the TDA convention. Misiak specifically told Steck that Patterson would not attend. Steck later testified in SourceOne's 2015 action against the Distributors that, although he had known Misiak for five or six years, it was "unusual" for Misiak to contact him. Steck also testified he told Schein's President, Sullivan, about the call because he felt it was important for Sullivan to know Patterson's plans with respect to the TDA.

86. On January 21, 2014, Schein's Steck emailed Patterson's Misiak with the subject "Texas," stating: "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days." Misiak forwarded Steck's email to Rogan expressing outrage, stating: "He already told me they were out. Full blown!" Rogan responded:

"That sucks. You should call him. 'Thought I could trust you' type of conversation." The same day, Steck reported to his superiors at Schein: "Guys, I have to get back to PDCO on whether or not we are attending the TDA."

87. On March 5, 2014, Chad Thompson of Heartland (a DSO customer of Schein's) asked Foley of Schein if he had heard about the TDA "offering supplies to members at discount prices." Foley claimed that he had not, to which Thompson stated: "[W]e heard Patterson was boycotting their TDA annual meeting because of this so I thought Schein must have worked with them on it." Foley responded by expressly confirming the Distributors' illicit collective boycott of GPOs: "The good thing here is that PDCO, Benco and us are on the same page regarding these buying groups/consortiums. Checking to see if we should join the TDA boycott."

88. That same month, Patterson representatives met privately with TDA representatives and demanded that the TDA end its contractual relationship with SourceOne or Patterson would no longer attend TDA's trade show or advertise in its publications. A month later, Schein representatives also met privately with TDA representatives and delivered the same threats and demands.

89. On April 8, 2014, the day before Schein and Benco officially pulled out of the TDA, Mike Rowe, Benco's Director of Sales, rejected a suggestion from Ron Fernandez, his direct report, that Benco advertise at the TDA that it would match the prices of TDA Perks. Rowe told Fernandez he should instead: "encourage more vendor partners to join the big three dealers and boycott future conventions. [The TDA] dying a slow death will have more impact than matching prices." Fernandez responded to Rowe that he was "going to have discussions with all of the manufacturers that support the TDA Perks program," and stated that "Schein and

Patterson have already told most of them that if they support the program, they will no longer be invited to attend their regional meetings."

90. On April 9, 2014, Schein's President Sullivan confirmed internally that Schein had pulled out of the TDA. He stated: "We know PDCO and Sirona have also pulled out." Later that day, Fernandez of Benco told Steck (his counterpart at Schein) that Benco had officially decided to pull out of the TDA because "Schein & Patterson are as well."

91. On April 16, 2014—soon after all three Distributors had confirmed that they would pull out of the TDA annual meeting—Cohen emailed Sullivan and Guggenheim forwarding an article about the TDA entitled: "Texas Private Practices Gain the Volume Purchasing Power of Corporate Practices." The article stated that the main distributors "rarely provide the best deal" while TDA Perks could allow members to save "an average of more than 35 percent on dental supplies." In his email, Cohen commented: "Thought you'd be interested in this 'essay' from our friends at the TDA. Not only are they our new competitor, but they basically tell their members that dental distributors rip off their dentists. Nice!"

***b) The Distributors' Collusive Boycott of AZDA Buying Group***

92. The Distributors engaged in a coordinated boycott not only of the TDA annual convention, but also the Arizona Dental Association ("AZDA") annual convention, which was to occur in April 2015. The coordinated boycott resulted from receiving word that the AZDA had also created a GPO in partnership with SourceOne. As with the TDA, internal and inter-firm emails show that this collusive boycott was explicit, and orchestrated by top executives at Patterson and its co-conspirators.

93. For example, on June 18, 2014, Mike Wade (Benco's Regional Manager in charge of Arizona) responded to an email from a Benco sales representative asking if Benco

would sit out the 2015 AZDA convention. Wade indicated that he would reach out to his contemporaries at Schein and Patterson to discuss the situation with them: "Playing phone tag with Upchurch at Schein and will get PDCO Manager involved."

94. On July 21, 2014, Wade emailed Chad Bushman, Patterson's Regional Manager in charge of Arizona and the AZDA. In that email, Wade expressly noted that all three Distributors had jointly agreed to "boycott" the TDA annual convention, and explicitly asked Patterson to "create the same message" with respect to the AZDA annual convention:

> I wanted to catch up and get your take on our friends at the AZDA becoming our competitors? I am sure you are hearing plenty from your reps about the AZDA partnership with SourceOne selling supplies. Needless to say we are not real happy and we are looking at pulling our sponsorship including the AZDA meeting. I know that Patterson, Schein and Benco boycotted the [TDA] meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ.

95. Bushman responded, copying his supervisor Dan Reinhardt, by expressly agreeing to collude: "Mike, thank you for reaching out. If the AZDA has in fact signed with SourceOne (which it looks like they have) we will be pulling our sponsorship and attendance of the state meeting as they will have positioned themselves as a competitor." Wade responded the next day acknowledging Bushman's acceptance of his invitation to collude, stating: "Thanks for the quick response. We are of the same mindset. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea to become a distribution competitor."

96. Following this exchange, Bushman's supervisor at Patterson, Reinhardt, emailed Clint Edens, Patterson's Regional Manager in charge of Texas, about Patterson's boycott of the TDA convention, copying Misiak, Patterson's Head of Sales. Significantly, just three days earlier on July 18, 2014, the Texas AG had issued a Civil Investigation Demand on Patterson stating that it was "investigating the possibility of anticompetitive conduct" in connection with

the Distributors' boycott of TDA Perks Supplies and the TDA annual convention. Misiak responded on the email exchange between Reinhardt and Edens discussing the TDA boycott less than an hour later, explicitly instructing them: "Please discuss live and no more emails on this topic." Reinhardt wasted no time in passing this message along to Bushman, emailing him on the same exchange with Wade discussing the AZDA boycott on which Reinhardt was copied, stating: "Please discuss live and no further emails."

97. On July 30, 2014, Wade emailed a representative of Dentsply, a major dental supplies manufacturer, in which he explicitly referenced the Distributors' illicit agreement to collectively boycott the AZDA annual meeting:

> Wanted to keep you apprised of our newest competition in AZ. AZDA! They have partnered with Source One Dental to provide dental supplies. Can you let me know if Source One is an authorized dealer of Dentsply? I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's meeting next year.

98. In September 2014, the three distributors announced they would not attend the AZDA annual trade show. Indeed, when the AZDA annual convention ultimately occurred in March 2015, Patterson, Benco and Schein did not attend. Shortly thereafter, in October 2014, the Arizona Attorney General began its own investigation of the Distributors' anticompetitive conduct, which it coordinated with the Texas AG's investigation.

99. Significantly, it did not make economic sense for Patterson to forego attending two major statewide industry conventions put on by two major state dental associations with numerous member dentists absent its collusive agreement with its competitors. Indeed, doing so risked putting Patterson at a significant competitive disadvantage in the Texas and Arizona dental supply markets, as well as nationally—but for the fact that Patterson had illicitly agreed with its main competitors that all three would not attend.

### c) *The Distributors' Collusive Boycott of Other State Trade Associations*

100. In the years that followed, the Distributors continued to collude in order to boycott an increasing number of state trade associations that were considering creating or partnering with buying groups in order to help their members obtain discounts on dental supplies and equipment.

101. For example, according to SourceOne's complaint in its 2015 action against the Distributors, in January 2015, the Louisiana Dental Association ("LDA") endorsed SourceOne's GPO platform. In April 2015, just before the LDA convention was scheduled to occur, the Big Three told the LDA it would boycott the convention if it did not abandon its business relationship with SourceOne.

102. In January 2015, the Colorado Dental Association ("CDA") told SourceOne that it was "concerned about the major dental suppliers in our area, Schein, Paterson and others, pulling their support to the CDA and our largest component society which hosts the Rocky Mountain Dental Conference each year."

103. In September 2015, the Georgia Dental Association ("GDA") contacted Patterson about an RFP for its newly formed buying group. Peter Cousins, a Patterson sales manager, responded stating: "After careful consideration Patterson Dental has made the decision not to respond to the RFP at this time." Frank Capaldo, the Executive director of the GDA, responded: "I am confused as your immediate prior email indicated you were setting up dates to sit down and talk with us and include your president!" Cousins forwarded the exchange to Fruehauf and McFadden, Head of Special Markets at Patterson, stating: "The sooner the better on some sort of positioning statement that I can give to the sales team . . . my phone is ringing today b/c Frank

took my email reply and relayed it to the board last night." Cousins later commented to Fruehauf: "I think we just say the company has chosen not to participate in GPOs at this time."

104. In September 2016—according to the testimonial of a former Schein employee recounted in the amended securities fraud class action complaint filed against Schein currently pending in the Eastern District of New York (No. 1:18-cv-01428)—Jake Meadows, Schein's Vice President of Sales, told Paul Lettieri, then-Regional General Manager at Schein, not to attend the Maryland State Dental Association ("MSDA") annual convention because "Patterson [had] pulled out. Lettieri was already on his way to the meeting when Meadows called him about something else. When Lettieri said he was heading to the meeting, Meadows was surprised, and stated: "Patterson pulled out, why are we still going?"

### 5. Despite the Distributors' Attempts to Continue to Price-Fix, the Scheme Begins to Unravel

105. By late 2016, the Distributors faced new difficulties in carrying out their conspiracy amid increased scrutiny from federal and state regulators and multiple civil lawsuits filed by customers, competitors and GPOs. Adding to the complications, online platforms used by GPOs began undermining the Distributors' scheme to freeze them out of the dental industry, as evidenced in the above discussion of SourceOne's increasing engagement with state dental buying groups beginning in 2014.

106. The Distributors therefore realized they could no longer prevent GPOs from entering the dental supply market, as new competitors were accepting GPO business and gaining market share. Indeed, the Distributors were forced to all but cease electronic communications with each other regarding the price-fixing scheme due to increasing scrutiny from government investigations, as evidenced by the mid-2015 text message in which Benco's Managing Director

Cohen informed Patterson's President Guggenheim that "I think we should pass on any conversations until current antitrust issues are resolved."

107. In March 2017, Travis Almquist, Patterson's Team Lead of Product & Pricing, expressed continuing uncertainty over Patterson's approach to GPOs in an email to his superior, Joseph Lepley, the Director of Strategic Pricing at Patterson. In the email, Almquist forwarded a contract from Schein that appeared to show that Schein was instituting a discount program to do business with GPOs. Almquist told Lepley: "Normally I would send this back to the GM [General Manager] (or have the pricing desk send something) stating that we do not participate in buying groups for multiple reasons, but I wanted your feedback on it since so many things are changing in that MidMarket space." Lepley then forwarded Almquist's email to Rogan, Head of Marketing at Patterson, informing him that Schein appeared to be breaching the co-conspirators' agreement and inquiring if that meant Patterson should now pursue GPOs as well: "Attached is some competitive intel from Schein on a program on Buying Groups . . . . Given our recent discussions with Smile Source are we looking at talking with Buying Groups now?"

### C. The Truth Begins to Emerge

108. As shown by the numerous inter-firm and internal emails set forth above, during the Class Period, Patterson was engaged in a price-fixing scheme with its two principal competitors, Schein and Benco, to shut GPOs out of the dental industry for years. However, Defendants actively concealed this scheme from investors, and in fact told them the exact opposite. For example, in the Company's Form 10-Ks filed with the SEC during the Class Period, Patterson claimed that the U.S. dental supply market was "highly competitive," and that the Company directly "compete[d] against Henry Schein, Inc. and Benco Dental Supply Company." These filings further claimed that Patterson's "strong competitive position" was a result of its "competitive pricing," "highly qualified and motivated sales force," "proprietary

products," and "premium customer service," which "differentiat[ed] [Patterson] from our competition." Similarly, as Defendants reported steady increases in its dental consumable and equipment sales by consistent percentages in Patterson's quarterly earnings calls during the Class Period—and as the Company's stock price simultaneously soared from $37.20 per share at the start of the Class Period on June 26, 2013 to a Class Period high of $51.55 per share on August 18, 2015—Defendants repeatedly attributed these increases to, for example, Patterson's "industry-leading technology wrapped by a suite of value-added services," "best-in-class technology," "industry leading after-sales support platform," "solid execution by our industry leading sales force," and overall "stability in the dental market."

109. Significantly, Defendants also unequivocally and falsely asserted in the Company's "Principles of Business Conduct and Code of Ethics," which was incorporated by reference in Patterson's Form 10-Ks and continuously available on the Company's website, that Patterson "<u>fully complie[d] with the antitrust laws and fair trade practices of the United States and all other applicable jurisdictions</u>," and that its employees followed "additional specific guidelines" to prevent anticompetitive behavior. These guidelines included: "never discuss pricing policy with competitors," "never engage in a joint selling activity with a competitor," "[n]ever ask a vendor to cease doing business with a competitor," and "<u>[a]void even the appearance of improper or collusive conduct when meeting with competitors . . . at trade shows or trade association meetings</u>."

110. Notwithstanding the Company's representations and its attempts to conceal the price-fixing scheme, as set forth above, by mid-2015, Defendants' conduct had caught the attention of federal and state regulators as well as numerous dental industry participants. In August 2015, the Texas AG, who was already investigating Patterson, informed the Company by

letter that Patterson was now also under investigation by the FTC. Significantly, Patterson never disclosed the existence of the Texas AG or FTC investigations in its SEC filings—indeed, the FTC's investigation was not disclosed to investors until the FTC filed its complaint against the company in February 2018. Then, in September 2015 and February 2016, GPOs and dentists filed individual and class actions against Patterson, alleging that it, Benco and Schein violated Section 1 of the Shearman Act by engaging in a collusive price-fixing scheme.

111. Although Patterson vehemently denied any wrongdoing, asserting in its SEC filings that these claims were "without merit," the resulting scrutiny from these actions and the state and federal regulatory investigations made it increasingly difficult for Patterson to collude with its two principal competitors. Indeed, as stated above, in response to these developments, Patterson executives David Misiak and Dan Reinhardt expressly instructed their sales teams to "discuss live" and to exchange "no more emails" in furtherance of the collusive scheme. As Defendants' collusive scheme began to unravel, and as GPOs gained a firmer foothold in the dental industry, Defendants understood that Patterson's traditional business model—which relied on sales to "a sizeable geographically dispersed number of fragmented dental practices"—could not, and would not, survive much longer.

112. Accordingly, on the Company's August 22, 2016 earnings call for the first quarter of fiscal year 2017, Defendants discussed the Company's "sales force realignment," a significant reduction in Patterson's sales force, which Defendant Anderson stated was designed to "transform[] the customer experience" so Patterson could remain at "the forefront" of changes in the dental market. However, in reality, and unbeknownst to investors, the "realignment" was due to the growing prevalence of GPOs in the dental market, which was rendering the Company's traditional sales model obsolete.

113. The truth about Patterson's failing business model began to emerge on November 22, 2016, when Defendants announced Patterson's financial results for the second quarter of fiscal year 2017. On that date, Patterson reported a sudden decline in consumable sales of 2.5%—the first decline in that key metric during the Class Period—and unexpectedly reduced its annual earnings guidance by nearly 15%, as a result of "softness in the U.S. dental market." While the Company attempted to assert that "the sales force realignment that we implemented in the first quarter primarily contributed to the consumables decline," analysts understood this news to mean that increased competition in the dental market was suddenly beginning to weigh on the Company's financial results, "forc[ing] Patterson . . . to adjust [its] pricing strategies."

114. However, while analysts understood that this "realignment" reflected changing market conditions in the dental industry, they remained unaware that Patterson had been illegally colluding with its main competitors to boycott GPOs, and, as a result, had failed to adequately adapt their business model to address new threats from GPOs and online competitors. For example, a William Blair report noted on the same day that "we have yet to hear a convincing theory about the underlying cause [of the market slowdown]." Likewise, a Jeffries report on November 29, 2016 described the financial hit from the "sales force realignment" and the resulting deceleration of consumables sales as "largely self-inflicted" by Patterson.

115. On this news, Patterson's stock plummeted by $7.95 per share—from $47.51 per share to $39.56 per share—dropping 16.7% in a single day.

116. Thus, while investors began to understand that increased competition in the dental market and the onset of other industry players was impacting the Company's financial results, they remained in the dark about the Company's illegal price-fixing scheme with its principal competitors to collectively freeze GPOs out of the dental industry. Indeed, Defendants

continued to claim in Patterson's filings with the SEC that the dental industry was "highly competitive," that it "deploy[ed] a strategy of . . . competitive pricing," and that "premium customer service with multiple value-added components," "proprietary branded products," and the Company's "highly qualified" sales force differentiated it from its competitors. Defendants also continued to claim in the Company's "Principles of Business Conduct and Code of Ethics" that Patterson "fully complie[d] with the antitrust laws and fair trade practices of the United States."

117. The truth continued to emerge on February 12, 2018, when the FTC announced that it had filed a complaint against Patterson, Benco, and Schein. The complaint alleged that the Big Three had "entered into an agreement refusing to provide discounts to or compete for the business of buying groups," constituting a *per se* violation of Section 5 of the FTC Act. The complaint asserted that the Distributors' scheme "unreasonably restrain[ed] price competition in the sale of dental products in the United States"; "distort[ed] prices and undermin[ed] the ability of independent dentists to obtain lower prices and discounts for dental products"; "depriv[ed] independent dentists of the benefits of vigorous price and service competition among full-service, national distributors of dental products"; "unreasonably reduc[ed] output of dental products to buying groups of independent dentists in the United States"; and "eliminate[ed] or reduc[ed] the competitive bidding process among the Distributors for sales to these buying groups."

118. While private civil actions had been filed against Patterson in previous years alleging that the Distributors were engaged in collusive anti-competitive conduct, as stated above, Patterson and its co-conspirators had vigorously denied any such allegations at every turn. Furthermore, as analysts noted, the FTC's complaint was "very serious [and] much more severe"

than any prior proceedings had let on. Indeed, the FTC had been extensively investigating Patterson, Benco and Schein for at least three years. As a result, the public version of the FTC's complaint was extraordinarily detailed—much more so than any of the civil actions previously filed against the Distributors—and quoted numerous internal emails, phone calls and text messages among and between each of the three Distributors, many of which are excerpted above, showing that the scheme was perpetrated at the highest levels by the Distributors' senior-most executives.

119. For example, a February 12, 2018 Evercore ISI report commented that the FTC's complaint was "a pretty big deal" and that "the stakes here appear to be fairly high."

> Clearly, the FTC's complaint against the three largest dental suppliers is a pretty big deal. While antitrust violations are nothing new, we don't quite remember the last time we saw the FTC charge an entire industry that functioned as an oligopoly, let alone within healthcare . . . [W]e couldn't find a ton of examples of where the FTC sued an entire industry under this premise and thus the stakes here appear to be fairly high. We also think that the bar is relatively high for bringing a suit of this magnitude and thus the FTC must feel as if they have sufficient evidence to move forward.

120. A February 13, 2018 Jeffries report similarly commented: "At a minimum, we think the FTC move should be taken seriously & could have negative LT implications for margin." The report stated that while prior civil litigation had raised antitrust allegations against the Distributors before, "the FTC's move here is very serious & much more severe":

> The core tenets of the FTC's case have been levied in other lawsuits against HSIC & PDCO . . . [b]ut the FTC's move here is very serious & much more severe, in our view. It is very rare for the FTC to formally sue on antitrust grounds (we found only 7 other cases of 'unfair competition' since 2006) . . . Longer-term we think this bolsters the case for greater competition in the current oligopoly market & the need for better pricing transparency (which emerging disruptors like Amazon, Supply Clinic, Net 32 & others are seeking to exploit), which put the future margin structure of the industry at further risk in our view.

121. In reaction to this news, Patterson's stock price fell 5% in one day, from $32.92 per share to $31.21 per share, on more than 5.5 million shares of trading volume (compared with

its average trading volume of just 1.8 million shares)—resulting in a market cap loss of $160 million.

122. Notably, the FTC complaint sought injunctive relief—indicating that the Distributors could be continuing to engage in anticompetitive and collusive behavior, despite increasing state and federal government scrutiny. Specifically, the complaint sought an order that, among other things, would require the Distributors to "cease and desist from the conduct alleged in the [c]omplaint"; "[p]rohibit[] [the Distributors] from conspiring or agreeing with each other [] to refuse to provide discounts to or compete for the business of" GPOs; that each of the Distributors "establish an antitrust compliance program"; and that the Distributors "document all communications with any competitor" for an undetermined period of time and "submit such documentation to the [FTC]."

123. On March 1, 2018, investors learned the full truth: without being able to illegally collude with its two main competitors, Patterson could not maintain its high profit margins. On that day, the Company announced a shocking 26% decline in its earnings for the third quarter of fiscal year 2018, missing consensus expectations by far, in addition to an overall contraction in profit margins of 236 basis points. Patterson further announced that dental sales had declined by 7.7%, with consumables decreasing again by 7.4% and equipment sales by 10.6%, leading to a reduction in the Company's annual guidance by 18%. Defendants also announced the surprising and immediate resignation of Defendant Gugino from her post as CFO of Patterson.

124. During the Company's March 1 earnings call, Defendants attempted to attribute the massive shortfalls in Patterson's key metrics to "changes in our sales organization" and "various transitions we have underway in the business," just as they had done following the second quarter 2017 earnings miss. This time, however, investors and analysts saw the writing

on the wall. Indeed, as multiple analyst reports issued that day concluded, in light of the FTC action against the Company, the massive decline in Patterson's financial results was due to what Patterson had managed to cover up for years through its collusive price-fixing scheme: with the growing prevalence of GPOs in the dental market, Patterson's outdated business model could not maintain its historically high margins.

125. For example, a March 1, 2018 Evercore ISI report stated:

> Management acknowledged the seriousness of the company's problems and has begun implementing some changes to right the ship. However, given the uncertainty surrounding dental sales and underlying margin stability, it is hard to get any degree of comfort around the longer term earnings power of the business . . . [W]e have decided to downgrade the stock from In Line to Underperform. Ultimately there is no quick fix . . . the normal turnaround levels are not apparent and while improved execution could help the long term negative mix shift and in turn unavoidable margin pressure is a structural headwind. <u>While we wish we would have concluded this earlier (say when we launched) it is obvious to us now that the dental channel is challenged and given FTC review we don't see multiple relief in sight</u>.

126. A March 1, 2018 Morgan Stanley analyst report stated:

> The performance of the business however makes rep retention an even more critical concern, which is all the more challenging as competitive barriers vs HSIC are now lower, <u>end market focus on pricing is more acute with FTC coverage intense</u>, the market's deterioration appears to be ongoing, and the market's shift away from small practices (PDCO's historical strength) to larger practices is accelerating.

127. On the March 1, 2018, news that Patterson could not maintain its profit margins absent the illicit price-fixing scheme, the Company's stock price plunged, falling $7.47 per share—from $31.58 per share to $24.11 per share—and losing nearly a quarter of its value, or 24%, in a single day. This precipitous decline occurred on extraordinarily heavy trading volume of over 15 million shares, more than eight times higher than Patterson's average trading volume of 1.8 million shares, and represented a market cap loss of nearly $700 million.

### D. Post Class Period Events Confirm the Continuing Ramifications of Defendants' Fraud

128. A series of post Class Period events confirm that Defendants' collusive scheme—and Patterson's inability to continue to rely on that scheme to bolster its financial results—continues to have a devastating impact on the Company.

129. First, on April 12, 2018, Judge Cogan of the Eastern District of New York issued an opinion denying the Distributors' motion for summary judgment in SourceOne's 2015 action against them alleging antitrust violations for their collective boycott of the 2014 TDA annual meeting. In his opinion, Judge Cogan recounted numerous pieces of evidence set forth above, and concluded that, based on that evidence:

> [A] jury could reasonably find that at some point between October 2013 and January 2014, Defendants agreed with each other or with Schein to exclude SourceOne from the market, including by agreeing to boycott the conventions hosted by the [TDA] and the [AZDA] if those associations did not discontinue their relationship with SourceOne, and by pressuring individual manufacturers and at least one prominent dentist to also discontinue their relationship with SourceOne in furtherance of this conspiracy. SourceOne has shown both parallel conduct and evidence to support at least three 'plus factors.'

130. The three "plus factors" Judge Cogan found were (i) the "pervasive" inter-firm communications between Patterson, Schein and Benco, which employees testified were "unusual," and which "involved people at many levels of the companies, from salespeople to managers and decision-makers and vice presidents"; (ii) the Distributors' numerous actions contrary to their economic self-interest, including first and foremost dropping out of the TDA and AZDA meetings when historically the Distributors viewed those meetings as highly important and would "compet[e] with each other for prime booth location and overall presence"—while being unable to offer any legitimate business justification for doing so; and (iii) the fact that the Distributors had a strong motive to conspire due to the high concentration of

the distribution market and the "relative ease of excluding others," which "make the allegations of collusive behavior all the more plausible."

131. On April 19 2018, the Texas AG filed a formal complaint against Patterson, which was nearly identical to complaints it had filed against Benco in 2015 and against Schein in 2017, alleging that Patterson had "participated in a group boycott by dental supply distributors to suppress the entry of a new market participant in the dental supply distribution market." Like Benco and Schein, Patterson settled with the Texas AG the same day the complaint was filed, agreeing to pay $200,000 in costs, cease its anti-competitive behavior, and provide oral and written logs of all communications between its senior level employees and with other distributors for one year.

132. On May 3, 2018—less than three months after the FTC filed its complaint—Patterson Dental President Dave Misiak, a main player in Patterson's price-fixing scheme who reported directly to Defendant Anderson, abruptly resigned "to pursue a new opportunity."

133. On August 30, 2018, during Patterson's first quarter earnings call for fiscal year 2019, Patterson announced disappointing earnings yet again, stating that "[o]ur earnings results for the first quarter did not meet [] expectations." Significantly, Patterson's new CEO Mark Walchirk did not again blame the "sales force realignment" for the disappointing financial results, as Defendants had done in prior quarters. Instead, he finally and explicitly acknowledged that the shortfall was attributable to "competitive pricing pressures" being placed upon Patterson:

> [W]e fell short on our margin expectations due primarily to two factors: <u>competitive pricing pressures at the point of sale</u> and an inventory adjustment . . . As I mentioned, <u>margins in the first quarter were primarily impacted by pricing pressure at the point of sale</u>. While we have always operated in a very competitive environment, the impact during the first quarter was greater than anticipated.

134. When an analyst asked if Patterson's disappointing earnings were the result of the Company being forced to "tak[e] out the Patterson premium that's often been there and maybe even us[e] price a little bit to win back some business," Walchirk admitted that the source of the "competitive pricing pressure" was a changing customer base (GPOs) that "purchases a larger volume of products, and obviously, commands an improved price position." On this news, Patterson's stock dropped again, falling 5% in a single day.

135. On September 7, 2018, Benco, Schein and Patterson reached a tentative agreement to pay $80 million to settle the consumer antitrust class action pending against them in the Eastern District of New York, with Patterson expected to contribute the entirety of a $28.5 million reserve it had set aside for the settlement earlier that year.

136. Accordingly, once the FTC's investigation and enforcement proceedings put a stop to Defendants' price-fixing conspiracy, Patterson's financial results suffered tremendously, and investors suffered substantial damages as a result. Indeed, tellingly, Patterson's stock price has never regained its value. Today, it trades at approximately $23 per share, less than half the Class Period high of over $51 per share.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

137. Defendants made materially false and misleading statements or omitted material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Patterson's press releases, investor presentations, and public filings to the SEC included material misstatements and/or omissions concerning the Company's Dental segment growth and profitability, which were artificially inflated as a result of Defendants' illicit business practices.

138. In their statements, Defendants repeatedly emphasized Patterson's value-added services, industry-leading technology, and competitive pricing, which purportedly differentiated the Company from its competitors. Defendants also repeatedly and consistently reassured investors that Patterson operated in an extremely competitive environment.

139. Defendants' statements were false. In reality, Patterson Dental's purportedly strong results were artificially inflated by Defendants' illicit, anti-competitive scheme with its purported competitors, Benco and Schein, to prevent the formation of buying groups that would allow its customers who were office-based practitioners to take advantage of pricing arrangements identical or comparable to those enjoyed by large-group customers. Indeed, Patterson was not engaging in "competitive pricing," but was instead deliberately and actively colluding to fix margins, eliminate low-priced competitors, and prevent customers from joining buying groups to reduce prices, all in a concerted effort to maximize profits at the expense of small and independent dental practices.

140. Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Patterson's business, operational status, profitability, and future growth prospects as the Company was relying on improper and unlawful business practices to boost profitability.

**A. 2013 Form 10-K**

141. On June 26, 2013, the first day of the Class Period, Defendants Armstrong and Anderson caused the Company to file its Form 10-K with the SEC for the fiscal year ending April 27, 2013 ("2013 Form 10-K"). The 2013 Form 10-K contained certifications signed by Defendants Armstrong and Anderson.

142. The 2013 Form 10-K described how Patterson's reportable segments, including dental supply, "is a market leader with a strong competitive position." In describing the competition specifically faced by Patterson Dental, the 2013 Form 10-K made numerous representations regarding the supposedly "highly competitive U.S. dental products distribution industry," including how Patterson "deployed a strategy of . . . competitive pricing" to differentiate [itself] [] from competition":

> The highly competitive U.S. dental products distribution industry consists principally of national, regional and local full-service and mailorder companies. The dental supply market is extremely fragmented. In addition to Patterson Dental and one other national, full-service firm, Henry Schein Dental . . . there are at least 15 full-service distributors that operate on a regional level, and hundreds of small local distributors. Also, some manufacturers sell directly to end users.
>
> We approach our markets by emphasizing and delivering a value-added model to the practitioner. To differentiate ourselves from our competition, we deploy a strategy of premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and distribution centers, and competitive pricing.

143. The 2013 Form 10-K further stated that the dental supply market was "highly fragmented and competitive" and further described price competition, stating:

> Industry consolidation among suppliers, price competition, the unavailability of products, whether due to our inability to gain access to products or to interruptions in supply from manufacturers, or the emergence of new competitors also could increase competition. Our failure to compete effectively may limit and/or reduce our revenue, profitability and cash flow.

144. The 2013 Form 10-K described how Patterson Dental's strategy was "to emphasiz[e] our value-added, full-service capabilities, using technology to enhance customer service, continuing to improve our own operating efficiencies, and growing through internal expansion and acquisitions."

145. The statements in paragraphs 142-144 above were materially false and misleading and omitted material facts. As numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was not doing business in a "highly competitive" environment against its main competitor Schein. To the contrary, it was actively colluding with Schein and Benco in a concerted effort to avoid offering "competitive pricing" to dentists and instead fix the Big Three's large profit margins. Patterson's financial success was therefore not attributable to its "value-added components"—which, with the onset of GPOs, were quickly becoming obsolete—but to its collusive scheme to shut GPOs out of the dental industry.

146. Further, in describing health industry efforts to reduce costs, the 2013 Form 10-K specifically described "collective purchasing arrangements and consolidation among office-based healthcare practitioners that may enable purchasing at more favorable prices":

> The healthcare industry is experiencing substantial changes which are causing uncertainty in the market and may adversely affect our dental and rehabilitation and assistive products supply business. . . In recent years, the healthcare industry has undergone significant change driven by various efforts to reduce costs, including . . . collective purchasing arrangements and consolidation among office-based healthcare practitioners that may enable purchasing at more favorable prices than we can obtain and may shift purchasing decisions to entities or persons with whom we do not have a historical relationship; and changes in reimbursements to customers. Our profit margins and the profit margins of our suppliers and our customers may be adversely affected by industry changes. If we are unable to react effectively to these and other changes in the healthcare industry, our operating results could be adversely affected.

147. The statements in paragraph 146 above were materially false and misleading and omitted material facts. It was misleading for Defendants to state that the healthcare industry "has undergone significant change driven by various efforts to reduce costs." In truth, and as alleged in detail above, Defendants internally were not merely speculating about possible threats to profit margins. Instead, they had already begun manipulating the market by engaging in multiple illicit, anti-competitive activities to fight dental consumers' attempts to "reduce costs,"

including by colluding with Patterson's main competitors to block GPOs from gaining a foothold in the dental market.

**B. 2014 Fiscal First Quarter**

148. On August 22, 2013, the Company issued an earnings press release announcing financial results for fiscal 2014 first quarter ("Q1 2014") ended July 27, 2013 and held its Q1 2014 earnings call.

149. During the Company's earnings call, Defendant Anderson proclaimed that Patterson's "consumable" sales (*i.e.*, traditional dental supplies such as exam gloves and sterilization products) had been experiencing "six months of solid growth," which Defendants attributed to remarkable "stability in the dental market." As Defendant Anderson stated:

> We feel real good about the consumables story. This is now six months of solid growth, and it feels like it's strengthening across all product lines . . . I would say we really take a macro look at it, and we feel like the underlying market is starting to grow. And I think that just lends to the thesis of stability in the dental market . .

150. The statements in paragraph 149 above were materially false and misleading when made and omitted material facts. To the extent Defendants attributed the Company's positive results to "stability in the dental market," that statement is false because, in reality, that "stability" was manufactured by Defendants' collusive price-fixing scheme with its two principal competitors. Indeed, as numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was involved in multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**C. 2014 Fiscal Second Quarter**

151. On November 21, 2013, the Company issued its earnings press release for the fiscal 2014 second quarter ("Q2 2014"). In the Q2 2014 earnings release, Defendant Anderson

stated: "Patterson Dental is well known for providing customers with industry-leading technology wrapped by a suite of value-added services. This approach helped generate improved second quarter results in our dental business . . ."

152. Also on November 21, 2013, Patterson held its Q2 2014 earnings call in which Defendant Anderson similarly attributed higher Q2 2014 dental results to "excel[ing] at providing customers with industry-leading technology wrapped by a suite of value-added services."

153. The statements in paragraphs 151-152 above were materially false and misleading when made and omitted material facts. As numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was engaging in illegal anticompetitive conduct to artificially inflate its profit margins. Thus, Patterson's successful quarterly results were not attributable to its "value-added services" or "providing customers with industry-leading technology," but to Patterson and its two principal competitors' multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**D. 2014 Fiscal Third Quarter**

154. On February 20, 2014, the Company issued its earnings press release for the fiscal 2014 third quarter ("Q3 2014") and held its Q3 2014 earnings call. During the call, Defendant Anderson stated that Patterson's "strong growth" in Dental was attributable to Patterson's "dental team execut[ing] well with equipment and software sales increasing 5.6% from the year earlier level and all major categories posting gains."

155. The statement in paragraph 154 above was false and misleading when made and omitted material facts. As numerous internal documents—including emails, text messages and

phone records—during the Class Period show, Patterson was engaging in illegal anticompetitive conduct to artificially inflate its profit margins. Thus, Patterson's quarterly results were not attributable to the "dental team execut[ing] well," but to Patterson and its two principal competitors' multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**E. Fiscal Year 2014**

156. On June 25, 2014, the Company filed its Form 10-K with the SEC for the fiscal year ending April 26, 2014 ("2014 Form 10-K"). The 2014 Form 10-K contained certifications signed by Defendants Armstrong and Anderson.

157. In the Company's 2014 Form 10-K, Defendants made the same misrepresentations as in Patterson's 2013 Form 10-K, as described above in paragraphs 142-144, and 146, regarding the competitive nature of the dental business and how collective purchasing arrangements and consolidation among office-based healthcare practitioners may enable purchasing at more favorable prices. These statements continued to be materially false and misleading for the reasons described above in paragraphs 145 and 147.

**F. 2015 Fiscal First Quarter**

158. On August 21, 2014, the Company issued its earnings press release for the fiscal 2015 first quarter ("Q1 2015"). In discussing Patterson Dental's sales growth, Anderson stated: "In the fiscal first quarter we saw positive trends in sales of dental consumables. We are the proven leader in the dental equipment market, <u>offering best-in-class technology and basic equipment that is wrapped with Patterson's industry leading after-sales support platform</u>. We saw this continue to play out during the first quarter . . ."

159. The statements in paragraph 158 above were materially false and misleading when made and omitted material facts. As numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was engaging in an illicit price-fixing scheme with its main competitors to artificially inflate its profit margins. Thus, Patterson's quarterly results were not attributable to the Company's "technology" and "after sales support platform," but to Patterson and its two principal competitors' multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**G. 2015 Fiscal Second Quarter**

160. On November 20, 2014, the Company issued its earnings press release for the fiscal 2015 second quarter ("Q2 2015"). Anderson stated that Patterson Dental's "[s]olid growth in sales of consumables was augmented by double-digit gains in basic equipment and technology sales. Patterson Dental is <u>known for providing customers with industry-leading technology that is supported by an unparalleled suite of value-added services. This model continues to be validated in the market as we executed well</u> in equipment sales throughout North America."

161. Also on November 20, 2014, the Company held its Q2 2015 earnings call where Defendant Anderson stated that there was "continued positive trends in sales of Dental consumables," which stemmed from "<u>solid execution by our industry-leading sales force</u>."

162. Further, in response to an analyst question about whether Patterson was gaining market share in light of its closest competitor (Schein) also claiming to have gained share, Defendant Anderson stated:

> I think it's clear if you look at the major consumable company results <u>we're growing faster than the market and taking share</u> . . . I think we are very confident when we look at market data across all of our manufacturers where <u>we compete head-to-head with multiple people. We are more than holding our own and gaining share</u>. I think when you

> look at the consumable business, we've seen nice, sequential, steady growth going back to mid-summer. It's been very consistent across geography.

163. The statements in paragraphs 160-162 above were materially false and misleading when made and omitted material facts. Specifically, it was false and misleading for Defendant Anderson to state that growth was attributable to the Company's "unparalleled suite of value-added services" and "solid execution by our industry-leading sales force" as, in reality, those results were instead attributable to Patterson's price-fixing scheme with its largest competitors. Similarly, Patterson "growing faster than the market and taking share" was not attributable to the Company "holding [its] own" in "head-to-head" competition with its competitors, but to its collusive agreement with its purported largest competitors to illicitly freeze GPOs out of the dental industry.

**H. 2015 Fiscal Third Quarter**

164. On February 19, 2015, the Company issued its earnings press release for the fiscal 2015 third quarter ("Q3 2015"). Once again, the Company falsely attributed its positive results to its "strong" offerings and purportedly "industry-leading service and support," when in reality such results were due to Patterson's collusive price-fixing conduct. Indeed, Anderson stated in the earnings release that Dental "saw solid growth in consumables, which we believe indicates continued increased office visits and overall demand for dental services. In equipment, <u>our combination of strong core and technology offerings, industry leading service and support, and the trend toward digitization of the dental office will continue to make this market a strong one for us, and we believe in our ability to serve it better than anyone else</u>."

165. Also on February 19, 2015, the Company held its Q3 2015 earnings call, where Defendant Anderson stated that the Company's consumable side of Dental's "solid growth"

"reflects a combination of higher office visits and overall demand for dental services, and the ability of our industry-leading sales force to meet the needs of our dental customers."

166. The statements in paragraphs 164-165 above were materially false and misleading, and omitted material facts when made. Specifically, Patterson's success was not attributable to its "strong core and technology offerings, industry leading service and support," but to its collusive price-fixing scheme with Schein and Benco to shut GPOs out of the dental industry. Nor was the Company's positive consumables growth attributable to the ability of Patterson's "sales force to meet the needs of [its] dental customers"—in reality, it was due to Patterson's illegal anticompetitive conduct that artificially inflated its dental supply profit margins.

**I. Fiscal Year 2015**

167. On May 21, 2015, the Company issued its earnings press release for the fiscal 2015 fourth quarter ("Q4 2015") and held its Q4 2015 earnings call. In the press release, when discussing Patterson Dental's sales growth, Defendant Anderson stated: "We are pleased with the growth and share gains in technology-oriented sales, driven by Patterson's industry-leading sales, technical service and after-sales support . . .Our technology and expanding core dental equipment offerings, complemented by Patterson's high-touch service, position us well to capitalize on stable-to-steadily improving market dynamics."

168. During the Company's earnings call the same day, Defendant Anderson attributed the quarter's results "to just very strong execution at Patterson and high demand for the portfolio of products we sell, consistent execution."

169. The statements in paragraphs 167-168 above were materially false and misleading, and omitted material facts when made. Patterson's growth and market share gains

were not "driven by Patterson's industry-leading sales, technical service and after-sales support" but by Defendants' collusive price-fixing scheme. Defendants' representations to investors that Patterson's success in the quarter was attributable to Patterson's "strong execution" and "portfolio of products" was similarly materially false and misleading. In reality, Patterson's positive quarterly results were attributable to its illegal anticompetitive practices with Benco and Schein to illicitly maintain and grow Patterson's margins, profits, and market share while collusively shutting GPOs out of the dental market.

170. In the Company's 2015 Form 10-K, Defendants made the same misrepresentations made in the Company's 2013 Form 10-K and 2014 Form 10-K, as described above in paragraphs 142-144, and 146. These statements continued to be materially false and misleading for the reasons described above in paragraphs 145 and 147.

### J. 2016 Fiscal First Quarter

171. On August 27, 2015, the Company issued its earnings press release for the fiscal 2016 first quarter ("Q1 2016"). Defendant Anderson attributed "sustained growth in the consumables category" to "<u>stable-to-steadily improving dynamics in the dental market</u>."

172. Also on August 27, 2015, Patterson held its Q1 2016 earnings call. During the call, Defendant Anderson discussed that Patterson's "<u>offerings and the continued healthy conditions of the dental market position us well for continued growth and market share gains</u>," and asserted that "<u>North American Markets are very stable,</u>" including "<u>stability in the U.S. consumables</u>."

173. The statements in paragraphs 171-172 above were materially false and misleading, and omitted material facts when made. To the extent Defendants attributed positive results to "stability" in the dental market, these statement were false because, in reality,

Defendants were manufacturing such "stability" by virtue of their illicit price-fixing scheme with Patterson's two main competitors. Indeed, as numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was involved in multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**K. 2016 Fiscal Second Quarter**

174. On November 24, 2015, the Company issued its earnings press release for the fiscal 2016 second quarter ("Q2 2016") and held its Q2 2016 earnings call. In the press release, Defendant Anderson attributed Dental sales growth to "stable-to-steadily improving dynamics in the North American dental market."

175. During the Q2 2016 earnings call, Defendant Gugino also stressed stability, stating: "In our Dental segment, organic sales improved 3.1% on a constant currency basis. On the same basis, consumables grew 3.3% reflecting continued stability in this end market."

176. The statements in paragraph 174-175 above were materially false and misleading, and omitted material facts when made. Defendants' statements touting the "stability in the dental market" were false because, unbeknownst to investors, such stability was caused by and attributable to Defendants' collusive price-fixing scheme with Patterson's two principal competitors. Indeed, as numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was involved in multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

### L. 2016 Fiscal Third Quarter

177. On February 25, 2016, the Company issued an earnings press release announcing financial results for the fiscal 2016 third quarter ("Q3 2016"). In the Q3 2016 earnings release, Defendant Anderson stated: "A highlight for us was the solid growth in the consumables category this quarter . . . We continue to see stable to steadily improving dynamics in the North American dental market and believe we are increasingly well-positioned to capitalize on this trend - given our technology leadership and support infrastructure - across the full spectrum of dental customers."

178. During the Company's earnings conference call with investors the same day, Anderson similarly stated: "[t]he stable to steadily improving conditions we have experienced in the past several quarters largely continued in quarter three."

179. Further, Defendant Anderson, in response to a question about what the main drivers were behind the positive consumables growth, touted the "strong execution" of Patterson's sales force, stating: "[I]t was a strong execution. So we absolutely feel comfortable that we're growing faster than the market and are pleased with the performance of the Dental business."

180. The statements in paragraphs 177-179 above were materially false and misleading, and omitted material facts when made. Defendants' statements touting stability in the dental market were false because, unbeknownst to investors, such stability was caused by and attributable to Defendants' collusive price-fixing scheme with Patterson's two principal competitors. Defendants' representations to investors that Patterson's success in the quarter was attributable to Patterson's "strong execution" and "technology leadership" were similarly false; as in reality, the Company's success resulted from Defendants' collusive price-fixing scheme.

Indeed, as numerous internal documents—including emails, text messages and phone records—during the Class Period show, Patterson was involved in multiple illicit, anti-competitive, and collusive activities to prevent dental consumers' attempts to reduce dental supply costs by forming GPOs.

**M. 2016 Fiscal Fourth Quarter**

181. On May 26, 2016, the Company issued an earnings press release announcing financial results for the fiscal 2016 fourth quarter ("Q4 2016"). The Company reported sales for Patterson Dental, "which represent approximately 46 percent of total company sales," of "$662.1 million," and a 3.3% increase in consumable dental supplies sales.

182. The Q4 2016 press release also included guidance for Patterson's fiscal 2017 financial results of $2.60 to $2.70 per diluted share.

183. During the Company's earnings conference call with investors the same day, Defendant Anderson stated Patterson was "taking [market] share" from its competitors, and that the Company's growth was attributable to "an era of stability right now, in the dental market." Defendant Anderson further claimed, in response to an analyst's question, that the Company's growth in consumables was attributable to "really stable, consistent growth throughout our customer base both in our largest customers as well as our midsized and smaller customers."

184. The statements in paragraphs 182-183 above were materially false and misleading and omitted material facts. The "era of stability" in the dental market to which Defendants attributed the Company's growth was not a function of natural market forces, but was illicitly manufactured by Patterson's years-long collusive scheme with its main competitors to freeze GPOs out of the dental industry. Similarly, the Company's growth in consumables was not due to "stable, consistent growth" in Patterson's customer base, but to its illicit price-fixing scheme.

Moreover, Defendants' strong financial guidance for fiscal year 2017 had no reasonable basis in fact. By this time, Defendants were well aware that state and federal regulators were actively investigating Patterson's anticompetitive conduct—and that, as a result, Patterson would not be able to sustain the price-fixing scheme or its inflated financial results due to GPOs rendering its business model obsolete.

**N. 2016 Form 10-K**

185. On June 29, 2016, Patterson filed its Annual Report with the SEC on Form 10-K (the "2016 10-K"). The 2016 10-K was signed by Defendants Anderson and Gugino. The 2016 10-K explicitly discussed Patterson's competition in the dental supply market, stating:

> **Competition**
>
> Our industry is highly competitive. It consists principally of national, regional and local full-service distributors, mail-order distributors and, increasingly, Internet-based businesses.
>
> To differentiate ourselves from our competition we deploy a strategy of premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and fulfillment centers, and competitive pricing.

186. While warning of the effects of competition, the 2016 10-K touted Patterson's "broad product and service offerings at competitive prices" as the Company's core competitive strength:

> **Competitive Strengths**
>
> We have more than 130 years of experience in distributing products resulting in strong awareness of the Patterson brand. Although further information regarding these competitive strengths is set forth below in the discussion of our two strategic business units, our competitive strengths include:
>
> - *Broad product and service offerings at competitive prices*. We offer over 190,000 SKUs to our customers, including many proprietary

> branded products. We believe that our proprietary branded products and our competitive pricing strategy have generated a loyal customer base that is confident in our brands.

187. The 2016 10-K also claimed that another key "competitive strength" was its "[f]ocus on customer relationships and exceptional customer service," including "personal visits by field sales representatives."

188. The 2016 10-K further asserted that "we compete against Henry Schein, Inc." and "Benco Dental Supply Company."

189. The statements in paragraphs 185-188 above were materially false and misleading and omitted material facts. Specifically, Patterson was not operating in a "highly competitive" industry with Benco and Schein as its main competitors, nor was its financial success attributable to "competitive strengths" such as "value-added components," a "highly-trained and motivated sales force," a "competitive pricing strategy," "exceptional customer service," or Patterson's "proprietary branded products." To the contrary, Patterson's financial success was attributable to the fact that it had entered into an illegal anticompetitive agreement with Benco and Schein to collectively boycott GPOs and artificially preserve its high profit margins.

190. Moreover, even though GPOs had been in the dental market for years, Defendants attempted to warn investors for the first time in Patterson's 2016 Form 10-K of the specific risks that GPOs posed to Patterson's "competitive advantage"—while falsely claiming that Patterson was actively "seeking to obtain access to lower prices" in order to develop business relationships with GPOs:

> ***The formation of group purchasing organizations ("GPO") or provider networks may place us at a competitive disadvantage.***
>
> The formation of GPOs and provider networks may shift purchasing decisions to entities or persons with whom we do not have a historical relationship. This may threaten our ability to compete effectively, which would in turn negatively impact our financial results. Although we are seeking to obtain access to lower prices

> demanded by GPO contracts or other contracts, and develop relationships with provider networks and new GPOs, we cannot assure that such terms will be obtained or contracts will be executed.

191. The statements in paragraph 190 above were materially false and misleading and omitted material facts. Indeed, rather than "seeking to obtain access to lower prices" in order to do business with GPOs, Patterson viewed GPOs as an existential threat to its business model and had been doing exactly the opposite: actively colluding with its main competitors to freeze GPOs out of the dental industry. These statements were false for the additional reason that the material risk GPOs posed to Patterson's business was no longer a contingency—to the contrary, it had materialized years and years prior, as far back as 2011, prompting Patterson's illegal price-fixing scheme and resulting regulatory scrutiny.

**O. 2017 Fiscal First Quarter**

192. On August 25, 2016, the Company issued an earnings press release announcing financial results for the fiscal 2017 first quarter ("Q1 2017"). The Company reported sales for Patterson Dental, "which represents approximately 43 percent of total company sales," of "$555 million," a decrease of 3.5%.

193. The Q1 2017 press release also reaffirmed the Company's financial guidance for fiscal 2017 of $2.60 to $2.70 per diluted share.

194. During the Company's earnings conference call with investors held the same day, Defendant Gugino falsely attributed Patterson's decline in overall dental sales—the first in the Cass Period—to the Company's purportedly strategic "sales force realignment" instituted that quarter:

> As Scott said, dental purchasing patterns are evolving and we are adapting to meet these needs. <u>While we expect our dental sales force realignment will better position us for growth, it contributed, along with the extra selling week, in last year's first quarter to a 30 basis point contraction in dental operating margins</u> . . .

> Overall, we believe that our performance in the first quarter was strongly competitive relative to the industry.

195. When analysts directly questioned whether Patterson's "sales force realignment" was in fact a reaction to "changes in the competitive landscape," Defendant Anderson responded with an unequivocal "[n]o," claiming Patterson merely sought to "lead[] [the] market":

> *Nathan A. Rich (Goldman Sachs & Co.):* … I mean, have you seen any changes in the competitive landscape or the channels that your customers are buying through? And is that kind of what might have led to you taking these actions?
>
> *Scott P. Anderson (Patterson Cos., Inc.):* No. I think it's really about Patterson and our customers, and I think this is important. Let me give you a little context because I think it's important. Number one, we have a history of constantly evaluating the best way to leverage Patterson and our sales force in the most effective way for the customer . . . So this is really about the customer and leading a market, not reacting to a market. But I want to be really clear and don't want to have anyone misinterpret that our sales force and our service coverage today is our competitive advantage . . .

196. The statements in paragraphs 193-195 above were materially false and misleading and omitted material facts. First, the Company's decline in sales was not due to its "sales force realignment," but to GPOs gaining market share because of increasing state and federal government scrutiny of the Distributors' price-fixing scheme, making it more difficult for them to collude. Second, Defendants' efforts to "realign" Patterson's sales force was, contrary to Defendant Anderson's statements, indeed a "reaction" to significant "changes in the competitive landscape"—brought on by the growing prevalence of GPOs in the dental market—that Defendants were actively concealing from investors. For these reasons, Defendants' reaffirmation of Patterson's strong financial guidance for fiscal year 2017 had no reasonable basis in fact.

**P. 2017 Fiscal Second Quarter**

197. On November 22, 2016, the Company issued an earnings press release announcing financial results for the fiscal 2017 second quarter ("Q2 2017"). The Company

reported sales for Patterson Dental, "which represents approximately 43 percent of total company sales," of $601.6 million," flat with prior year, as well as a 2.5% decrease in consumable dental supplies—the first decline in that key metric during the Class Period.

198. As a result of the decrease in dental consumable sales, Defendants drastically lowered Patterson's fiscal 2017 guidance, explaining that, "in light of both external market factors and our strategic decisions, we have re-examined our financial outlook for the year." Defendants' amended guidance lowered its expected earnings from a range of $2.60 to 2.70 per diluted share to $2.25 to $2.35 per diluted share, a reduction of almost 15%, based on "softness in the U.S. dental market.".

199. During the Company's earnings call, Defendant Gugino blamed the 2.5% decline in dental consumables sales on the Company's sales force realignment:

> On the consumable side, the dental market continues to reflect somewhat slower than historic growth. Patterson sales of consumable dental supplies decreased 2.5% in the second quarter. <u>We believe, however, that the sales force realignment that we implemented in the first quarter primarily contributed to the consumables decline. While this initiative is important to better address the needs of the dental customer, it is causing some disruption in the channel.</u>
>
> Overall, we believe that the performance of our Dental business in the second quarter was competitive relative to the industry.

200. The statements in paragraphs 198-199 above were therefore materially false and misleading and omitted material facts. In attributing the lack of growth to the Company's "sales force realignment," Patterson obscured the underlying problem that GPOs had already successfully entered the market and had begun eroding margins by forcing the Distributors to lower dental supply prices, despite the Distributors' best efforts to illegally freeze GPOs out of the market. As discussed above, analysts still felt that Patterson had failed to provide a "convincing theory" for the slowing market and for Patterson's "self-inflicted" wounds.

201. On this news, Patterson's stock price plummeted by $7.95 per share, dropping 16.7% in a single day. However, while investors now understood the Company's financial results were being challenged by increased competition, they remained in the dark about Defendants' price-fixing scheme.

**Q. 2017 Fiscal Third Quarter**

202. On February 23, 2017, the Company issued an earnings press release announcing financial results for the fiscal 2017 third quarter ("Q3 2017"). Patterson reported sales for Patterson Dental, "which represents approximately 45 percent of total company sales," of "$626.3 million," a decrease of 1.8 percent from the same quarter a year earlier, as well as a 2.8% decrease in consumable dental supplies.

203. The Q3 2017 press release further provided fiscal 2018 earnings guidance of non-GAAP adjusted earnings of $2.27 to $2.33 per diluted share.

204. During the Company's earnings conference call with investors held the same day, Defendant Anderson attributed consumable sales decline to "softness in our performance that is unique to Patterson as a result of the disruption from our sales realignment initiative." Gugino similarly added: "The decline here reflects a combination of end market softness as well as disruption from our sales force realignment that we implemented in the first quarter of this fiscal year. We expect this effect to moderate over time."

205. Later on the call, in response to analyst inquiry, Defendant Anderson described the "strong long-term fundamentals of the dental market," stating: "the consumable market has very strong long-term fundamentals in it. We're still going through I think a bit of a patchy period in the industry where any green shoots people are saying that's a trend, but longer term, I think the market's in a very solid place."

206. Moreover, in response to analyst inquiry regarding how "[t]wo of the other larger dental players, specifically called out improved market conditions," Anderson stated: "we're in no way seeing the markets degrading at all. It's stable. There are signs of improvement." Anderson later stated: "we're in complete agreement with many of our industry partners in the long-term prospects as well as the stability of the market."

207. The statements in paragraphs 203-206 above were materially false and misleading and omitted material facts. The Company's decrease in its consumables sales was not due to its sales force realignment, but to GPOs gaining a firmer foothold in the dental industry due to increased state and federal government scrutiny of Defendants' price-fixing scheme with its main competitors. Moreover, Defendants' statements regarding the stability of the dental supply market had no reasonable basis in fact. By this time, Defendants were well aware that state and federal regulators were actively investigating Patterson's anticompetitive conduct—and that, as a result, Patterson would not able to sustain the price-fixing scheme or its inflated financial results due to GPOs rendering its business model obsolete.

**R. 2017 Fiscal Fourth Quarter**

208. On May 25, 2017, the Company issued an earnings press release announcing financial results for the fiscal 2017 fourth quarter ("Q4 2017"). Patterson reported sales for Patterson Dental, "which represents approximately 42 percent of total company sales," of "$607.3 million," a decrease of 8.3 percent from the same quarter a year earlier, as well as a 4.3% decrease in consumable dental supplies.

209. The Q4 2017 press release further provided fiscal 2018 adjusted earnings guidance of $2.25 to $2.40 per diluted share.

210. Defendants again sought to blame the decrease in its consumables on its sales force realignment initiative:

> In fiscal 2017, we took the important steps in our Dental segment to evolve our sales approach and broaden our future digital technology portfolio to respond to changing customer needs and serve a wider range of clinical environments. We are confident in these strategies, but recognize that they impacted near-term sales execution, Consumable sales during the fourth quarter were directly impacted by these actions.

211. During the Company's earnings conference call, Defendant Anderson again blamed the decline in dental sales on the sales force realignment, stating: "[o]ur sales force optimization initiatives have clearly created near-term disruption." Defendant Anderson otherwise claimed that Patterson's "sales force will continue to be a key competitive differentiator."

212. The statements in paragraphs 209-211 above were materially false and misleading and omitted material facts. The Company's decrease in its consumables sales was not due to its sales force realignment, but to GPOs gaining a firmer foothold in the dental industry due to increased state and federal government scrutiny of Defendants' price-fixing scheme with its main competitors. Additionally, Defendants knew full well that Patterson's sales force was not, and would not continue to be, "a key competitive differentiator" for the Company—indeed, GPOs had rendered the Company's oversized salesforce obsolete.

**S. 2017 10-K**

213. On June 28, 2017, just after the sudden departure of Defendant Anderson as CEO on June 1, 2017, Patterson filed its Annual Report with the SEC on Form 10-K (the "2017 10-K"). The 2017 10-K was signed by Defendant Gugino, Defendant Anderson as a Director of Patterson and Patterson's interim CEO, James Wiltz.

214. In the 2017 10-K, Defendants made the same misrepresentations made in Patterson's 2016 Form 10-K, as described above in paragraphs 185-188 and 190, regarding the competitive nature of the dental business and the purported "risk" regarding GPOs. These statements continued to be materially false and misleading for the reasons described above in paragraphs 189 and 191.

**T. 2018 Fiscal First Quarter**

215. On August 24, 2017, the Company issued an earnings press release announcing financial results for the fiscal 2018 first quarter ("Q1 2018"). The Company reported sales for Patterson Dental, which now represented only 40 percent of total company sales," of "$518.8 million," a decrease now of 6.5% and a decrease in consumable dental supply sales of 3.6% as well.

216. The Q1 2018 press release further provided fiscal 2018 adjusted earnings guidance of $2.25 to $2.45 per diluted share.

217. During the Company's earnings conference call with investors held the same day, analysts again pushed the Company for clarification on its "competitive landscape," and specifically whether Patterson had seen any "competition from online players." Significantly, the GPOs Defendants had collusively boycotted—including TDA Perks and the AZDA GPO—had partnered with online platforms to provide dental supplies. However, Defendant Wiltz falsely claimed Patterson had not yet experienced any online competition:

> *Michael R. Minchak (JPMorgan Securities LLC):* … So shifting gears a little bit, I was just wondering if you <u>could talk a little bit about competitive landscape and sort of competition from online players across both of your market segments</u>…
>
> *James W. Wiltz (Patterson Cos., Inc.):* Well, a couple of comments, <u>we don't really see any activity yet</u>. There's a lot of talk, but if you start looking at two things, I would suggest two things that you look at closely, number one, the size of this market that – and the level of interest that Amazon may have, once they

> figure out exactly what the size of the market is versus the other markets they're playing in. I think that's going to have some factor. And I don't know it's too early to tell. The internet play has been predicted for a long time but we've yet to see it happen, it's not moving very rapidly in that direction.

218. The statements in paragraphs 216-217 above were materially false and misleading and omitted material facts. In reality, Defendants had seen significant "competition from online players," including from SourceOne's partnerships with buying groups such as TDA Perks Supplies and the AZDA's buying group, and had attempted to head off this competition by illegally colluding to fix prices.

**U. 2018 Fiscal Second Quarter**

219. On November 21, 2017, one day after Mark Walchirk's first day as CEO, the Company issued an earnings press release announcing financial results for the fiscal 2018 second quarter ("Q2 2018"). The Company reported sales for Patterson Dental, which represented 40 percent of total company sales," of "$553.6 million," a decrease of 8% and a decrease in consumable dental supply sales of 4.4% as well.

220. Just one quarter after announcing adjusted earnings expectations in the range of $2.25 to $2.45 per diluted share, the Q2 2018 press release provided revised guidance of earnings in the range of $2.00 to $2.10 per diluted share, a reduction of over 10%.

221. During the Company's earnings conference call with investors held the same day, analysts pushed the Company for more information on Patterson's "leaking market share" and whether it would have to "give prices to win some of that volume back." Defendant Gugino responded by asserting that the Company did not need to reduce prices because it could win business back with its "value-added business model approach":

> *Stephen R. Hagan (Deutsche Bank Securities, Inc.)*: Hi. Good morning. Could we go back to the dental consumables sales? When we look at those sales, who's currently supplying these products to your customers and what will be required

> from Patterson to win that volume back? Do you think there will be a need to give prices to win some of that volume back?
>
> *Ann B. Gugino (Patterson Cos., Inc.)*: So, when you're looking at the market share, you're asking where it's leaking? I think that would be to a variety of competitors. And then, I think in terms of winning that back, certainly, price is one area, right? To get your foot in the door but I think there are multiple avenues to win that business back and we have a very value-added business model approach. So, I think a piece of it, frankly, is just getting the reps back in the system and darkening the doorway.

222. Similarly, when analysts pushed Defendant Gugino for her understanding of the company's "pricing discipline," she again responded by asserting the Company could achieve "profitable growth" through its "value-added services" without having to lower prices:

> *Sarah James (Wedbush Securities, Inc.)*: …And can you talk a little bit about pricing discipline?
>
> *Ann B. Gugino (Patterson Cos., Inc.)*: Our goal is profitable growth. And so, I think that is a mix, and it's hard to make a blanket statement because I think it depends on the customer segment and the situation. So, as we've talked about, if we're going in to win back market share, you might become more competitive on price. But as you work people up the value proposition, and people really do stick with us because of the value-added services whether that's practice management software or technical service, how do you garner enough value to grow your margins over time with the rest of the basket? So, certainly, we'll need to be competitive on price, but we're going to have to manage that with the cost structure and with the other value-added services to drive profitable growth.

223. The statements in paragraphs 221-222 above were materially false and misleading and omitted material facts. Defendants knew that they had not gained market share through Patterson's "value-added" business model, which was being rendered obsolete by GPOs' disruption of the dental market, but because of their collusive price-fixing scheme with Patterson's two main competitors. Defendants further knew that, absent that illegal collusion—which was becoming significantly harder due to increasing state and federal government scrutiny—the Company's existing sales model was unsustainable and Patterson would not be

able to maintain or grow its market share without lowering prices and providing discounts to GPOs.

## V. False Statements in the Company's Principles of Business Conduct and Code of Ethics

224. During the Class Period, Patterson maintained on its website the Company's "Principles of Business Conduct and Code of Ethics," which was expressly incorporated by reference in its Form 10-Ks filed during the Class Period. This document included a section entitled "Competing Ethically," which unequivocally stated:

> Patterson fully complies with the antitrust laws and fair trade practices of the United States and all other applicable jurisdictions.

225. The Company further claimed that it had instituted "specific guidelines that should be observed by all employees" to prevent anticompetitive behavior, including: (i) "[n]ever discuss pricing policy with competitors"; (ii) "[n]ever engage in a joint selling activity with a competitor"; (iii) "[n]ever ask a vendor to cease doing business with a competitor"; and (iv) "[a]void even the appearance of improper or collusive conduct when meeting with competitors or vendors at trade shows or trade association meetings."

226. The statements in paragraphs 224-225 above were materially false and misleading and omitted material facts. Patterson was decidedly not "fully compl[ying] with the antitrust laws," nor adhering to the Company's purported "specific guidelines" to prevent anticompetitive conduct. To the contrary, and as numerous emails, text messages and phone records during the Class Period show, Patterson and its most senior executives were actively and intentionally violating antitrust laws by engaging in a years-long collusive scheme with Schein and Benco to fix profit margins by collectively boycotting GPOs. This scheme included, contrary to Defendants' "specific guidelines" above, "discuss[ing] pricing policy with competitors" Benco and Schein, "engag[ing] in joint selling activity with [] competitor[s]" Benco and Schein,

"ask[ing] vendor[s] to cease doing business" with GPOs and any manufacturers or suppliers who supported GPOs, and, rather than "avoi[ding] even the appearance of improper or collusive conduct when meeting with competitors," actively and intentionally engaging in that conduct.

## VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

227. Numerous facts raise a strong inference that Defendants knew, or were deliberately reckless in disregarding, the true facts regarding Patterson's collusive price-fixing scheme when disseminating the false and misleading statements discussed herein. These facts include, in addition to the allegations set forth above:

228. *Numerous internal and inter-firm communications show that the Company's illicit price-fixing scheme was being perpetrated by Patterson's most senior officers*. The myriad of internal and inter-firm emails, phone calls and text messages set forth herein confirm that Defendants intentionally and illegally boycotted GPOs in the dental industry as part of a collusive price-fixing scheme that violated federal antitrust laws. This scheme directly contradicted Defendants' Class Period representations concerning Patterson's financial results and the Company's adherence to antitrust laws.

229. Significantly, these documents show that the Defendants' collusive price-fixing scheme was carried out not by low-level employees acting on their own, but by the senior-most executives at Patterson. *See* ¶¶53-107. For example, Patterson first agreed to join the price-fixing scheme in an email exchange in February 2013 between Patterson's President Paul Guggenheim and Benco's Managing Director Chuck Cohen, in which Cohen stated: "FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups." Guggenheim immediately forwarded Cohen's email to Patterson executives Misiak (Head of Sales) and Rogan (Head of Marketing) and, a few hours later, responded to Cohen by accepting

his invitation to collude: "We feel the same way about these." Numerous subsequent inter-firm and internal emails, text messages and phone calls confirm that top Patterson executives Guggenheim, Misiak, Rogan and McFadden—each of whom reported directly to Defendant Scott Anderson and acted under Anderson's authority and supervision—remained active perpetrators of the price-fixing scheme from this point on. *See e.g.* ¶64 (Rogan stated in an internal email to McFadden: "We don't need GPOs in the dental business. Schein, Benco and Patterson have always said no"); ¶72 (McFadden stated in a text message to a GPO: "[W]e've signed an agreement that we won't work with GPOs"); ¶59 (Misiak stated in an internal email to his team: "Confidential and not for discussion . . . our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me").

230. *Internal emails show Defendant Scott Anderson, Patterson's CEO, was directly involved in perpetrating and monitoring the price-fixing scheme.* For example, on June 10, 2013, Patterson's President Guggenheim emailed Benco's Managing Director Cohen to confirm that Benco's "position on buying groups [wa]s still as you articulated back in February" in light of Benco's recent deal with ADC, an entity Patterson suspected was a GPO. Cohen responded: "As we've discussed, we don't recognize buying groups." Guggenheim responded: "Just wanted to clarify where you guys stand," then forwarded this exchange to Defendant Anderson the same day, stating: "FYI…" Later in September 2013, Patterson Dental's Head of Sales Misiak alerted Anderson and Guggenheim via email of an article that had come out about Burkhart, the fourth largest dental supply distributor who had not joined the Distributors' conspiracy, doing business with a GPO. Misiak assured Anderson and Guggenheim that, in contrast, Patterson "said no [to GPOs] at every turn." Tellingly, Anderson did not question or reject Misiak's recitation of Patterson's anti-GPO policy, but commented that the article showed

"how weak Burkhart is," and told Misiak and Guggenheim that "[w]e need to watch [Burkhart]" lest its actions undermine the Distributors' conspiracy. *See* ¶¶62, 66-68.

231. *Internal documents show that when state and federal regulatory authorities began investigating Defendants' anti-competitive conduct, Defendants did not cease the conduct or come clean—to the contrary, they tried harder to conceal it.* Three days after Patterson received a CID from the Texas AG regarding its collusive boycott of TDA Perks and the annual TDA convention with co-conspirators Benco and Schein, Patterson's Head of Sales, Misiak, explicitly told his team as they discussed a boycott of another state-run GPO: "Please discuss live and no more emails on this topic"—implicitly acknowledging that Patterson's email communications evidenced an illegal price-fixing scheme. Similarly, soon after Patterson was informed that the FTC had begun its investigation of the Company in mid-2015, Patterson's President Guggenheim texted Benco's President Cohen, asking him to meet with him at an upcoming trade convention in New York. Cohen responded: "Paul, sorry for the delayed response. Spoke with our attorney this week and I think we should pass on any conversations until current antitrust issues are resolved." Furthermore, even before the investigations began, the Distributors were aware that their conduct violated antitrust laws, as they were conscious that their communications "could be construed as price-fixing."

232. *Defendants were highly motivated to perpetrate the illicit price-fixing scheme because they viewed GPOs as an existential threat to Patterson's business*. The onset of GPOs, which fundamentally changed the way dentists purchased their supplies, threatened to render Patterson's business model obsolete. Indeed, numerous internal documents confirm the Distributors' view that GPOs posed an existential threat to their historically dominant position in the dental industry. *See, e.g.* ¶64 ("We don't need GPOs in the dental business"); ¶72

("Patterson has historically never done business with GPOs and culturally we do not feel it is a long term strategy for our company."); ¶46 ("GPOs are what ruined the medical supply business . . . [i]f this door is ever opened in dental, it's all over for all of us.") ¶74 ("[GPOs are] death to dealers"). Defendants were therefore highly motivated to engage in a collusive scheme with its main competitors to collectively shut GPOs out of the dental industry.

233. *The magnitude and duration of Patterson's top-down illicit price-fixing scheme is indicative of scienter*. Defendants perpetrated their illicit, collusive anticompetitive scheme during the four-and-a-half-year Class Period. Moreover—as shown by internal corporate documents, testimony from former employees, and Class Period investigations and lawsuits—the the price-fixing scheme by the three largest dental supply distributors in the country was explicit, unambiguous, and permeated the entire dental industry, impacting dental suppliers, dental supply manufacturers, dentists, and multiple state dental associations. Moreover, as Judge Cogan found in his opinion denying Patterson's motion for summary judgment in SourceOne's 2015 action against the Distributors, the "pervasive" nature of the inter-firm communications between Patterson, Schein and Benco, which "involved people at many levels of the companies, from salespeople to managers and decision-makers and vice presidents," is probative of the conspiracy. The magnitude of Defendants' scheme, which permeated Patterson and its competitors' companies and dental market segments at the highest levels—and the years-long duration of the scheme—support a strong inference of scienter.

234. *The multiple state and federal government investigations of Patterson and its top competitors' anticompetitive conduct are probative of scienter*. In 2014, both the Texas Attorney General and Arizona Attorney General opened investigations of Patterson, Schein and Benco regarding their collusive boycotts of the TDA and AZDA annual conventions,

respectively. On April 19, 2018, the Texas AG filed a formal complaint against Patterson, alleging that Patterson had "participated in a group boycott by dental supply distributors to suppress the entry of a new market participant in the dental supply distribution market" in violation of state antitrust laws. Tellingly, Patterson settled the complaint the same day, agreeing to cease its anticompetitive conduct, pay $200,000 in costs, and provide logs of oral and written communications of its most senior executives regarding dental supply sales. In 2015, the FTC began investigating Patterson and its co-conspirators for anticompetitive conduct. On February 12, 2018, the FTC filed an administrative complaint against the Distributors, setting forth in detail the Distributors' numerous internal and inter-firm communications between and among their top executives evidencing their collusive scheme to fix profit margins by collectively boycotting GPOs in violation of antitrust laws. The FTC's action is ongoing. These extensive investigations by multiple state and federal regulators, resulting in formal complaints filed against Patterson, are probative of scienter.

235. *Defendants made repeated public statements about the "highly competitive" U.S. dental market and how it "deploy[ed] a strategy" of "competitive pricing" to specifically compete with Benco and Schein—while flatly denying that Patterson and its employees were violating antitrust laws.* In the Company's Form 10-Ks filed with the SEC, Defendants repeatedly asserted that the United States dental market was "highly competitive," and that Patterson successfully operated in that industry against top competitors Benco and Schein by, among other things, "deploy[ing] a strategy of . . . competitive pricing." Defendants further stated in the Company's "Principles of Business Conduct and Code of Ethics," incorporated by reference in its Form 10-Ks and available continuously on its website, that the Company and its employees "fully compli[ed] with the antitrust laws." Defendants' emphatic and repeated

statements about the high level of competition in the dental industry and Patterson's use of "competitive pricing" to compete with Benco and Schein, coupled with their unequivocal averment that the Company and its employees "fully compli[ed]" with the antitrust laws—when at the same time Patterson and its most senior executives were doing exactly the opposite by actively colluding with Benco and Schein to engage in an illicit price-fixing scheme to artificially inflate the Company's profit margins—raise a strong inference of scienter.

236. *Defendant Anderson and Gugino's abrupt resignations are probative of scienter.* On June 1, 2017, Defendant Anderson abruptly resigned from his position as CEO and Chairman of the Board, effective immediately. As stated by Seeking Alpha, "[n]o reason was given why Mr. Anderson abruptly stepped down from his position (i.e., family obligations, health or retirement)," and "there was not even a hint of such resignation during the [recent] earnings conference call." Then, on March 1, 2018, the same day investors learned the truth about the devastating impact of Patterson's illicit price-fixing scheme on the Company's financial results, Defendants announced the surprising and immediate resignation of Defendant Gugino from her post as CFO of Patterson, effective immediately. These executives' sudden and unexplained departures—under highly suspicious circumstances—raise a strong inference that they knew about the Company's collusive price-fixing scheme during their tenure with the Company.

237. *The manner in which Defendants' illicit price-fixing scheme came to light supports scienter*. Significantly, Patterson did not voluntarily report Defendants' illicit price-fixing scheme. Instead, it was revealed by the FTC's extraordinarily detailed February 12, 2018 complaint, which resulted from its extensive three-year investigation of the Company, and included excerpts from a plethora of internal and inter-firm emails, phone calls, and text messages between Patterson's most senior executives. Defendants' failure to report and admit to

the price-fixing scheme, and their denial to this day that any such scheme occurred, is highly probative of scienter.

## VII. LOSS CAUSATION

238. During the Class Period, shares of Patterson's publicly traded common stock traded on the NASDAQ under the ticker symbol PDCO. The market for Patterson's common shares was open, well-developed, and efficient at all relevant times.

239. As detailed herein, Defendants misled investors about Patterson's financial health and performance and its prospects for future financial success by failing to disclose that Patterson's financial condition was dependent upon an illegal years-long price-fixing with its two main competitors. Defendants meanwhile falsely and repeatedly represented to the market that the dental industry was highly competitive, that the Company deployed a strategy of competitive pricing to differentiate itself from the competition, and that the Company and its employees fully complied with antitrust laws. By artificially inflating and manipulating Patterson's stock price, defendants deceived plaintiffs and the class and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, it caused Patterson's stock price to fall precipitously as the prior artificial inflation came out of the stock price.

240. As a result of their purchases of Patterson's common stock during the Class Period based on Defendants' material misstatements and omissions, Plaintiffs and other members of the Class suffered economic loss. *i.e.*, damages, under the federal securities laws.

241. Indeed, Defendants' false and misleading statements had the intended effect, and caused Patterson common stock to trade at artificially inflated levels throughout the Class Period, with Patterson common stock reaching as high as $51.55 on August 18, 2015. Just prior to the

first partial disclosure of the truth, analysts still considered Patterson to be well-positioned (and acting legally) in the market. A Morningstar analyst on November 10, 2016, for example, noted that Patterson was a "critical intermediary between a highly fragmented base of customers and suppliers, which helps protect the company's pricing power."

242. On November 22, 2016, however, the truth began to emerge. For the first time during the Class Period, Defendants reported a 2.5% decrease in Patterson's dental consumable sales, a key financial metric for the company. Defendants further announced a reduction in annual guidance by almost 15%. Although this disclosure hinted at Patterson's inability to keep pace with a changing dental supply market, it did not disclose to the market the Distributors' systemic conspiracy to exclude GPOs in order to maintain artificially high profit margins. Defendants attributed the disappointing growth and sales numbers to the Company's June 2016 sales force "restructuring," in which the Company terminated roughly 200 sales people, in addition to "softness in the U.S. dental market." Significantly, Defendants did not explain the company's reasoning for "restructuring" its sales force, which was in fact because there was less need for sales people in a market that had a growing GPO presence. Indeed, Defendants were cognizant of the potential effect of buying groups on their salesforce given their statements in the Company's 2016 10-K with respect to its animal services market in the UK: "Our need for a large dedicated sales force in the U.K. is reduced due to the presence of buying groups . . ."

243. On this poor financial news, Patterson's stock dropped significantly by over $7.95 per share, or 16.7%, on unusually heavy trading volume of nearly 15 million shares, closing at $39.56 on November 22, 2016 from a prior-day close of $47.51. Analysts connected the financial results to changes in the dental industry. Evercore ISI, for example, stated on the day of the quarterly results that "PDCO's management is being proactive in managing the longer-term

transitions in dentistry as practice models evolve, digital dentistry continues to grow, and customer needs change" but expressed pessimism on the basis of factors including a "softer dental market" and "dental sales force realignment." A day later, J.P. Morgan noted Patterson management's prediction that the updated guidance was "conservative," but J.P. Morgan worried about future performance "given the lack of visibility into the timing of improvement." That same day, a William Blair analyst confirmed the lack of information on the market's slowdown: "we have yet to hear a convincing theory about the underlying cause, other than more cautious consumer spending. A similar pause in 2014 was short lived, but if we see the slowdown extend into 2017, then we will become increasingly concerned about equipment demand as well." On November 29, 2016, a Jeffries analyst noted that "the vast majority of the deceleration (relative & absolute) [in consumables sales] is largely self-inflicted, owing to [Patterson's] sales force realignment." Analysts and the market thus realized that Patterson was changing its business model in seemingly counter-intuitive ways, but they did not know why.

244. Patterson's stock therefore continued to trade at artificially inflated levels as Defendants failed to disclose the Company's illicit collusion or its mounting inability to adapt to the pressures of buying groups entering the market and decreasing margins.

245. On February 12, 2018, the nature of the distributors' conspiracy to block GPOs emerged when the FTC filed a formal complaint against Patterson and its co-conspirators. The complaint alleged that the distributors were engaged in a years-long collusive price-fixing scheme to collectively boycott GPOs in violation of federal antitrust laws. The FTC's complaint set forth new facts about the overtness and scope of the scheme in extraordinary detail, excerpting numerous internal and inter-firm emails, text messages, and phone calls that showed the scheme was perpetrated by Patterson's most senior executives.

246. In response to this news, the price of Patterson's common stock declined by 5%, from $32.92 per share to $31.21 per share, on unusually high trading volume of 5.5 million shares (more than three times the Company's average trading volume of just 1.8 million shares)—resulting in a market cap loss of $160 million.

247. On March 1, 2018, Patterson announced its third quarter results for fiscal year 2018, and stunned the market by reporting a 26% decline in overall earnings, a 236 basis point contraction in profit margins, and an 18% reduction in annual guidance. Patterson further announced the unexpected and immediate resignation of Defendant Gugino, the Company's CFO. The market and analysts understood this news to mean that the FTC's scrutiny of Patterson's anticompetitive conduct, and Patterson's resulting inability to continue to collude with its main competitors in order to protect its historically high profit margins, would have a long-lasting and devastating impact on Patterson's financial results. For example, a March 1, 2018 Evercore ISI report commented: "[I]t is obvious to us now that the dental channel is challenged and given FTC review we don't see multiple relief in sight." Similarly, on March 1, 2018, Morgan Stanley commented that "end market focus on pricing is more acute with FTC coverage intense," and "the market's deterioration appears to be ongoing" due to its "accelerating" shift away from small practices to larger practices." J.P. Morgan put the dire news in context in a March 2, 2018 report, noting that "broader industry concerns that continue to persist (sustained weak U.S. dental consumables trends, potential for margin compression, and overhangs to sentiment around the potential threat from Amazon as well as the more recent FTC suit)."

248. Upon this news, Patterson's stock price plunged by $7.47 per share—from $31.58 per share on the close of February 28, 2018, the prior trading day, to $24.11 per share on the

close of March 1, 2018—resulting in the stock losing nearly a quarter of its value, or 24%, in a single day. This precipitous decline occurred on extraordinarily heavy trading volume of over 15 million shares, more than eight times higher than Patterson's average trading volume, and represented a market cap loss of nearly $700 million.

249. The drastic and continuing decline in Patterson's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII. PRESUMPTION OF RELIANCE

250. At all relevant times, the market for Patterson common stock was efficient for the following reasons, among others:

a. Patterson's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Patterson filed periodic public reports with the SEC and the NASDAQ;

c. Patterson regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Patterson was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the market place;

251. As a result of the foregoing, the market for Patterson's common stock reasonably and promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the Company's common stock price. All purchasers of Patterson's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

252. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Patterson's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

253. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all

relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

254. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Patterson who knew that such statement was false when made.

## X. <u>CLASS ACTION ALLEGATIONS</u>

255. Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired (1) any of the publicly-traded securities of Patterson from June 26, 2013 through February 28, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Patterson at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

256. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Patterson shares were actively traded on the NASDAQ. As of November 30, 2017, there were over 94.82 million shares of Patterson common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased Patterson common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

257. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

258. Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

259. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b. whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c. whether Defendants acted with scienter; and

d. the proper way to measure damages.

260. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against All Defendants)

261. Lead Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

262. This Count is asserted on behalf of all members of the Class against Defendants Patterson, Armstrong, Anderson, Gugino, and Wiltz for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

263. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or were deliberately reckless in disregarding, were misleading because the statements contained misrepresentations and failed to disclose material facts necessary to make the statements made not misleading in light of the circumstances.

264. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Patterson common stock during the Class Period.

265. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Patterson shares, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Patterson's business and operations; (b) artificially inflate and maintain the market price of Patterson shares; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

266. Defendants Patterson, Armstrong, Anderson, Gugino, and Wiltz are liable for all materially false and misleading statements made during the Class Period, as alleged above.

267. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Patterson common stock, were either known to the Defendants, or were so obvious that Defendants should have been aware of them.

268. Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Patterson common stock. This inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Patterson common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

269. Defendants' failure to disclose that its profits, margins and revenues were at risk due to the pressure to allow competition, which would decrease margins; allow for additional competition that would reduce revenue; and reduce its market share if and when the Company was forced to, or chose to, cease engaging in the collusive and anticompetitive conduct (as alleged above) that was inflating its Class Period results, also violated Regulation S-K Item 303(a)(3)(ii), which requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations."

270. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Patterson common stock during the Class Period.

## COUNT TWO

### For Violations Of Section 20(a) of the Exchange Act<br>(Against the Individual Defendants)

271. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

272. This Count is asserted on behalf of all members of the Class against Defendants Armstrong, Anderson, Gugino, and Wiltz for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

273. During their tenures as officers and/or directors of Patterson, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶26-34. By reason of their positions of control and authority as officers and/or directors of Patterson, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Patterson during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

274. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Armstrong, Anderson, Gugino, and Wiltz had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Armstrong, Anderson, Gugino, and Wiltz signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Patterson during the Class Period. Defendants Anderson, Gugino, and Wiltz were also directly involved in providing false information, and Defendants Armstrong, Anderson, Gugino, and Wiltz certified and approved the false statements disseminated by Patterson during the Class Period. As a result of the foregoing, Defendants Armstrong,

Anderson, Gugino, and Wiltz, together and individually, were controlling persons of Patterson within the meaning of Section 20(a) of the Exchange Act.

275. As set forth above, Patterson violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

276. By virtue of their positions as controlling persons of Patterson, and as a result of their own aforementioned conduct, Defendants Armstrong, Anderson, Gugino, and Wiltz are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Patterson common stock. As detailed above in ¶¶26-34, during the respective times these Defendants served as officers and/or directors of Patterson, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

277. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Patterson common stock.

## XII. <u>PRAYER FOR RELIEF</u>

278. Wherefore, Lead Plaintiffs pray for relief and judgment as follows:

a. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding Lead Plaintiffs and the class members damages, including interest;

c. Awarding Lead Plaintiffs reasonable costs, including attorneys' fees and expenses; and

d. Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XIII. JURY DEMAND

279. Lead Plaintiffs demand a trial by jury.

DATED: November 9, 2018

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*

Maya Saxena (admitted *pro hac vice*)
Joseph E. White, III (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Dianne Anderson (*pro hac vice forthcoming*)
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

Steven B. Singer (admitted *pro hac vice*)
Kyla Grant (*pro hac vice forthcoming*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com

***Co-Lead Counsel for the Class***

**ROBBINS GELLER RUDMAN & DOWD LLP**

*/s/ Lucas Olts*

Lucas Olts (admitted *pro hac vice*)
Alexi Pfeffer-Gillett (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101

Telephone: 619/231-1058
619/231-7423 (fax)

***Co-Lead Counsel for the Class***

**ROBINS KAPLAN LLP**
Anne M. Lockner (295516)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone**:** 612.349.8500
Facsimile**:** 612.339.4181
ALockner@RobinsKaplan.com

***Co-Liaison Counsel for the Class***

**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield, Jr. (#209855)
Brant D. Penney (#316878)
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: 651/287-2100
651/287-2103 (fax)

***Co-Liaison Counsel for the Class***

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Pembroke Pines Pension Fund for Firefighters and Police Officers*