## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Plymouth County Retirement System, *individually and on behalf of all others similarly situated,* | Case No. 18-cv-871 (MJD/SER) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Patterson Companies, Inc., Scott P. Anderson, Ann B. Gugino, R. Stephen Armstrong, and James W. Wiltz, | |
| Defendants. | |

Lucas F. Olts and Alexi Pfeffer-Gillett, **Robbins Geller Rudman & Dowd LLP**, Anne M. Lockner, **Robins Kaplan LLP**, and Lester R. Hooker, **Saxena White P.A.** (for Plaintiff), and

Patrick S. Williams, Aaron G. Thomas, and Jordan Weber, **Briggs & Morgan, PA** (for Defendants).

This matter is before the Court on Defendants' Motion to Dismiss the Amended Class Action Complaint. (ECF No. 89). This motion was referred to the undersigned for a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. (ECF No. 95). This Court recommends the motion be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, led by Plymouth County Retirement System and other institutional investors, seek remedies under the Securities Exchange Act against Defendant Patterson Companies, Inc., and various executives of Patterson. Plaintiffs assert Patterson conspired

with its principal competitors, Henry Schein, Inc., and Benco Dental Supply Company to boycott Group Purchasing Options ("GPOs") and fix dental supply prices.

GPOs are membership organizations that aggregate the buying power of solo dentists and small group dental practices. (Compl. ¶¶ 3, 42, 44). In aggregating their purchasing power, GPOs provide dentists power to negotiate lower prices on dental supplies. (Compl. ¶ 3). GPOs further save costs by using online sales rather than the door-to-door sales force relied upon by Patterson, Schein, and Benco. (Compl. ¶ 3). These discounts cut into the traditionally "significantly marked-up prices" that Patterson, Schein, and Benco charge independent dentists. (Compl. ¶¶ 3, 41–43). GPOs also introduced competition to Patterson, Schein, and Benco by providing sales opportunities to smaller distributors. (Compl. ¶ 44).

Patterson, a Minnesota company, is "the second largest distributor of dental supplies in the United States." (Am. Class Action Compl. ¶¶ 1, 19, 25) (hereinafter "Compl.").[1] Patterson supplies consumable products and basic and advanced dental equipment to dentists, dental laboratories, and other healthcare professionals. (Compl. ¶ 39). Patterson and its competitors, Schein and Benco, are full-service distributors for the dental supply market. (*See* Compl. ¶ 3). Combined, Patterson, Schein, and Benco control about 85% of the dental supply market. (Compl. ¶¶ 1, 40).

---

[1] Patterson distributes its products through three subsidiaries, Patterson Dental, Patterson Animal Health, and Patterson Medical. (Compl. ¶¶ 25, 39). Patterson Dental makes up approximately 60% of Patterson's business, generating sales in excess of $2billion. (Compl. ¶ 39). Unless specifically noted, references to "Patterson" herein are to Patterson and Patterson Dental.

## A. Procedural Posture

Plaintiffs initially brought suit on March 28, 2018 against Patterson, Scott Anderson,[2] and Ann Gugino.[3] (ECF No. 1). Afterwards the parties, including various competing plaintiffs, stipulated to the appointment of lead plaintiffs and lead counsel. (ECF Nos. 58, 63, 64). Plaintiffs then filed the operative complaint against Patterson, Anderson, Gugino, Stephen Armstrong,[4] and James Wiltz.[5] (Compl., ECF No. 74). Count One asserts a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). (Compl. ¶¶ 261–70). Count Two asserts a violation of Section 20(a) of the Exchange Act. (Compl. ¶¶ 271–77). Plaintiffs propose a class of those who purchased or acquired Patterson stock from June 26, 2013 through February 28, 2018. (Compl. ¶ 255).

Defendants moved to dismiss the complaint. (ECF No. 89). The parties fully briefed the motion. (ECF Nos. 91, 100, 101). The motion was referred to the undersigned, (ECF No. 95), and argued at a motion hearing held May 13, 2019, (ECF No. 103; *see* ECF No. 107). Plaintiffs submitted supplemental authority on June 14, 2019, (ECF No. 110), and Defendants responded, (ECF No. 111). The motion to dismiss is now ripe for determination.

---

[2] Anderson served as Patterson's CEO and president from April 25, 2010 through June 1, 2017. (Compl. ¶ 26). Prior to that, Anderson served as president of Patterson Dental from June 2006 through April 2010. (Compl. ¶ 26).

[3] Gugino served as Patterson's CFO from November 2014 through her resignation on March 1, 2018. (Compl. ¶¶ 12, 30, 123). Before that, she served as Patterson's vice president of finance and operations and vice president of strategy and planning. (Compl. ¶ 30).

[4] Armstrong served as Patterson's executive vice president, CFO, and treasurer from July 1999 through October 2014. (Compl. ¶ 28).

[5] Wiltz served as Patterson's interim CEO from June through November 2017. (Compl. ¶¶ 32, 213).

### B. Factual Background[6]

Sometime around February 2013, a newly formed GPO in New Mexico announced it had partnered with Patterson "to provide the individual office the same opportunities as the larger corporations." (Compl. ¶ 54). On February 8, 2013, Benco's managing director, Chuck Cohen, forwarded the New Mexico GPO's email announcement to Patterson's president, Paul Guggenheim,[7] stating: "Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy." (Compl. ¶¶ 5, 55). Guggenheim forwarded this email to Patterson's head of sales, David Misiak,[8] and Patterson's head of marketing, Tim Rogan.[9] (Compl. ¶¶ 5, 56). Guggenheim then responded to Cohen: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these." (Compl. ¶¶ 5, 56). Cohen then sent a text message to a Benco regional manager: "I just sent Paul [Guggenheim] a note about it. Don't want to call

---

[6] Because this matter is before the Court on Defendants' Rule 12(b)(6) motion, "the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true." *City of Lake Elmo v. 3M Co.*, 237 F. Supp. 3d 877, 885 (D. Minn. 2017) (citing *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir. 1994)). Thus, these facts are derived solely from the complaint or materials embraced by the complaint. *See Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (noting that, on a motion to dismiss, courts may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record).

[7] Guggenheim served as president of Patterson Dental from April 2010 through June 15, 2016, at which point he was appointed chief innovation officer of Patterson, where he served until June 1, 2017. (Compl. ¶ 35). Guggenheim reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

[8] Misiak served as Patterson's head of sales from 2010 to until November 1, 2016, when he became president of Patterson Dental. (Compl. ¶ 36). Misiak served as president of Patterson Dental through May 3, 2018. (Compl. ¶¶ 36, 132). Misiak reported directly to Anderson, Patterson's CEO. (Compl. ¶¶ 132, 229).

[9] Rogan served as Patterson Dental's head of marketing from 2010 through 2017, when he was appointed as vice president and general manager of North America. (Compl. ¶ 37). Rogan reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

because it might be construed as price fixing." (Compl. ¶¶ 5, 57). Three days later, Patterson informed the New Mexico GPO it would not be partnering with it. (Compl. ¶ 58).

On February 27, 2013, Misiak emailed Anthony Fruehauf, Patterson's mid-Atlantic regional manager, instructing him to reject Atlantic Dental Care, a suspected GPO, even though Fruehauf believed Patterson would "los[e] a big chunk of business." (Compl. ¶ 59). Misiak instructed Fruehauf to inform his sales staff that it was in "their best interest long term . . . not to take our business in that direction." (Compl. ¶ 59). Misiak further stated: "Confidential and not for discussion . . . our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me." (Compl. ¶¶ 6, 59).

After Benco did business with Atlantic Dental Care, Guggenheim emailed Cohen on June 6, 2013 using the same email thread from February 2013. (Compl. ¶ 60). Guggenheim stated:

> Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? . . . I'm wondering if your position on buying groups is still as you articulated back in February? . . . Sometimes these things grow legs without our awareness!

(Compl. ¶¶ 8, 60). Cohen responded on June 10, 2013: "As we've discussed, we don't recognize buying groups." (Compl. ¶¶ 8, 61). Cohen explained how Atlantic Dental Care was not a GPO, even noting that Benco had asked to see various business documents for confirmation. (Compl. ¶ 61). Guggenheim responded: "Sounds good Chuck [Cohen], Just wanted to clarify where you guys stand." (Compl. ¶¶ 8, 62). Guggenheim then forwarded

the email conversation to Anderson, Patterson's CEO, with an accompanying message of "FYI." (Compl. ¶¶ 8, 62).

On June 26, 2013, Patterson filed its 2013 Form 10-K with the SEC, for fiscal year ending April 27, 2013. (Compl. ¶¶ 63, 141). The 2013 Form 10-K contained certifications from Defendants Anderson and Armstrong. (Compl. ¶ 141). The 2013 Form 10-K included statements that Patterson was a "market leader with a strong competitive position," that the United States dental products distribution industry was "highly competitive," and Patterson used "competitive pricing" to differentiate itself from competitors. (Compl. ¶ 142). Patterson described the dental supply market as "highly fragmented and competitive," noting that industry consolidation among suppliers, price competition, and new competitors could increase competition. (Compl. ¶ 143). Patterson attributed its success to "value-added, full-service capabilities, using technology to enhance customer service, continuing to improve [their] operating efficiencies, and growing through internal expansion and acquisitions." (Compl. ¶ 144). Patterson indicated the healthcare industry was "experiencing substantial changes which are causing uncertainty in the market and may adversely affect" the dental supply business. (Compl. ¶ 146). The healthcare industry "has undergone significant change driven by various efforts to reduce costs," including "collective purchasing arrangements and consolidation among office-based healthcare practitioners that may enable purchasing at more favorable prices . . . ." (Compl. ¶ 146). Patterson warned that its profit margins, as well as those of its competitors, "may be adversely affected by industry changes." (Compl. ¶ 146).

In August 2013, Neal McFadden,[10] Patterson's division head for special markets, contacted Misiak and Rogan regarding whether to consider doing business with GPOs, asking: "Is it worth it to explore GPO???????" (Compl. ¶¶ 7, 64). Rogan responded: "We don't need GPOs in the dental business. Schein, Benco and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry." (Compl. ¶¶ 7, 46, 64).

Patterson issued its fiscal year 2014 first quarter earnings on August 22, 2013 and held an earnings call. (Compl. ¶ 148). Anderson indicated that Patterson's consumable dental supplies sales had experienced "six months of solid growth" attributable to "stability in the dental market." (Compl. ¶ 148).

Misiak emailed Anderson and Guggenheim on September 3, 2013, forwarding an article entitled "GPOs Expand Their Reach" (Compl. ¶ 66). The article described the relationship between a GPO and Burkart—Patterson's competitor and the dental supply market's fourth largest distributor. (Compl. ¶¶ 8, 66). Misiak stated:

> I would not currently classify [GPOs] as a big threat to the business but the GPO noise has been pretty loud from the field. We have said no at every turn, including to Delta Dental. Benco has also crept into a few of these. My guidance has been to politely say no and weather the storm with these. Incredible to me that Burkhart has bit this apple and they are broadcasting it.

(Compl. ¶¶ 67, 8). Anderson responded that "We need to watch this" and the article "shows how weak Burkhart is." (Compl. ¶¶ 67, 8). The next day, Misiak and McFadden

---

[10] McFadden served as president of Patterson Dental's special markets division beginning June 2013, when that division was formed. (Compl. ¶¶ 38, 64). McFadden reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

distributed a memo to all of Patterson's regional and branch managers stating that the special markets division would not work with GPOs as a "guiding principle." (Compl. ¶¶ 7, 65).

The Texas Dental Association formed TDA Perks Supplies in October 2013. (Compl. ¶ 78). TDA Perks Supplies, a state-run GPO, planned to sell discounted dental supplies to member dentists via an online sales platform, in collaboration with SourceOne. (Compl. ¶ 78). Sometime thereafter, Benco's regional manager for Texas, Ron Fernandez, called John Hyden, Patterson's regional manager for San Antonio, to discuss whether their companies would attend the Texas Dental Association's annual trade convention in light of its partnership with SourceOne. (Compl. ¶ 81). Hyden discussed the conversation with Clint Edens, his supervisor and Patterson's south central regional manager. (Compl. ¶ 81). Edens emailed Misiak and Rogan, stating that TDA had "flooded the market with advertisements offering 35% savings" and that he was "committed to pulling from the TDA if they do not discontinue competing with us via TDA Perks." (Compl. ¶ 82). Rogan responded: "This one has royally pissed me off." (Compl. ¶ 82). Rogan instructed Edens to generate a presentation for TDA of "[a]ll things Patterson does in state" and to "spin it to our mantra about helping our customers grow and not trying to decrease their supply bill." (Compl. ¶ 82).

On November 20, 2013, Misiak told Andy Goldsmith, a representative from Smile Source, a GPO, that Patterson was "currently not interested but will keep the strategy and Smile Source on the 'idea board' and get back to you should things change." (Compl. ¶ 70). Benco and Schein had similarly rejected doing business with Smile Source in

October 2013. (Compl. ¶ 69). That same day, a Patterson sales representative emailed Rogan to inquire how to respond to a GPO that had reached out to her. (Compl. ¶ 71). Rogan responded: "We don't sell to buying groups" and "Let's talk live." (Compl. ¶ 71).

Patterson issued its fiscal year 2014 second quarter earnings on November 21, 2013 and held an earnings call. (Compl. ¶¶ 151–52). Anderson attributed Patterson's performance to "industry-leading technology wrapped by a suite of value-added services." (Compl. ¶¶ 151–52).

On December 13, 2013, Patterson announced it would not attend the Texas Dental Association's 2014 convention. (Compl. ¶¶ 84, 78). On January 6, 2014, Misiak called Dave Steck, Schein's head of sales, to discuss whether Schein was also boycotting the 2014 TDA convention. (Compl. ¶ 85). Less than a week later, Steck emailed Misiak: "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days." (Compl. ¶ 86). The email subject line was "Texas." (Compl. ¶ 86). Misiak forwarded the email to Rogan, adding: "He already told me they were out. Full blown!" (Compl. ¶ 86). Rogan replied to Misiak: "That sucks. You should call him. 'Thought I could trust you' type of conversation." (Compl. ¶ 86).

About five weeks after their previous communications, on December 30, 2013, Smile Source again reached out to Misiak and McFadden indicating it was "odd" that he "never heard back" because Smile Source "purchase[s] over $14MM annually in supplies, and that number continues to double every year. Dr. Goldsmith advised me that you are not interested in working with us." (Compl. ¶ 70).

Per the Complaint, McFadden was omnipresent when it related to Patterson's relationship with GPOs. McFadden informed another GPO, Lighthouse Dental Buying Group, LLC, on February 10, 2014 that "[a]t the advice of our legal department and our executive leadership team I am respectfully declining your offer to participate further in your RFP. Patterson has historically never done business with GPOs and culturally we do not feel it is a long term strategy for our company." (Compl. ¶ 72). On April 23, 2014, McFadden informed Guggenheim that he instructed Patterson sales staff "should pass on [GPOs]" given they are a "slippery slope" and "tout a 20% saving to the dentists on supplies." (Compl. ¶ 72).

Patterson issued its fiscal year 2014 third quarter earnings on February 20, 2014 and held an earnings call. (Compl. ¶ 154). Anderson stated Patterson's "strong growth" was attributed to its "dental team execut[ing] well with equipment and software sales increasing 5.6% from the year earlier level and all major categories posting gains." (Compl. ¶ 154).

Sometime in March 2014, Patterson met with the Texas Dental Association to demand that it end its contractual relationship with SourceOne. (Compl. ¶ 88). Patterson asserted that if the relationship continued, Patterson would no longer attend the Texas Dental Association's convention or advertise in its publications. (Compl. ¶ 88). On April 16, 2014, Cohen forwarded an article from the Texas Dental Association entitled "Texas Private Practices Gain the Volume Purchasing Power of Corporate Practices" to Guggenheim and Tim Sullivan, Schein's president. (Compl. ¶ 91). The article noted that large distributors "rarely provide the best deal" and TDA Perks could save an average of

35% on dental supplies. (Compl. ¶ 91). Cohen commented in the forwarded email: "Thought you'd be interested in this 'essay' from our friends at the TDA. Not only are they our new competitor, but they basically tell their members that dental distributors rip off their dentists. Nice!" (Compl. ¶ 91).

A Patterson sales representative in Atlanta informed McFadden that Smile Source was "really growing." (Compl. ¶ 72). McFadden responded on May 8, 2014, calling Smile Source "very sleazy . . . Basically giving small dentists better buying power. Most dealers are not working with them except small desperate ones. I'm sorry you're experiencing this." (Compl. ¶ 72). About a week later, on May 19, McFadden told another sales representative who inquired about GPOs: "I am electing not to participate with these groups—we have said no already." (Compl. ¶ 72). On June 12, 2014, McFadden asked a former colleague, who now worked with a GPO, via text message: "Is Choice One a GPO or are you all actually acquiring practices? The reason I'm asking is we've signed an agreement that we won't work with GPOs." (Compl. ¶¶ 72, 7).

On June 25, 2014, Patterson filed its 2014 Form 10-K with the SEC, for fiscal year ending April 26, 2014. (Compl. ¶ 156). The 2014 Form 10-K contained certifications from Anderson and Armstrong. (Compl. ¶ 156). The 2014 Form 10-K included statements similar to the 2013 Form 10-K. (Compl. ¶ 156).

On July 18, 2014, the Texas Attorney General sent a civil investigation demand to Patterson regarding Patterson, Schein, and Benco's collective boycott of the Texas Dental Association's GPO and annual convention. (Compl. ¶ 9).

Like in Texas, the Arizona Dental Association ("AZDA") created a GPO in partnership with SourceOne. (Compl. ¶ 92). On July 21, 2014, Mike Wade, Benco's regional manager for Arizona, emailed Chad Bushman, Patterson's regional manager for Arizona. (Compl. ¶ 94). Wade stated:

> I wanted to catch up and get your take on our friends at the AZDA becoming our competitors? I am sure you are hearing plenty from your reps about the AZDA partnership with SourceOne selling supplies. Needless to say we are not real happy and we are looking at pulling our sponsorship including the AZDA meeting. I know that Patterson, Schein and Benco boycotted the [TDA] meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ.

(Compl. ¶ 94). Bushman, copying his supervisor Dan Reinhardt, responded: "Mike, thank you for reaching out. If the AZDA has in fact signed with SourceOne (which it looks like they have) we will be pulling our sponsorship and attendance of the state meeting as they will have positioned themselves as a competitor." (Compl. ¶ 95). Wade replied: "Thanks for the quick reply. We are of the same mindset. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea to become a distribution competitor." (Compl. ¶ 95).

Later that day, Reinhardt then emailed Edens and Misiak regarding Patterson's boycott of the TDA convention. (Compl. ¶ 96). Misiak responded promptly: "Please discuss live and no more emails on this topic." (Compl. ¶¶ 9, 96). Reinhardt then passed this message along to Bushman regarding the AZDA meeting: "Please discuss live and no further emails." (Compl. ¶ 96). In September 2014, Patterson, Schein, and Benco announced they would not attend AZDA's annual trade show. (Compl. ¶ 98).

On August 21, 2014, Patterson issued its fiscal year 2015 first quarter earnings and held an earnings call. (Compl. ¶ 158). Anderson stated Patterson saw "positive trends" in sales of dental consumables, making Patterson a "proven leader in the dental equipment market" due to "best-in-class technology and basic equipment that is wrapped with Patterson's industry leading after-sales support platform." (Compl. ¶ 158).

On October 11, 2014, a Patterson sales representative received an email from a dentist indicating he was switching from Patterson to the Kois Buying Group. (Compl. ¶ 72). The sales representative forwarded this message to another Patterson customer, adding: "Patterson corporate has concluded 'we will NOT be entertaining participating in any buying group of this nature.'" (Compl. ¶ 72). On October 23, 2014, a Patterson branch manager informed McFadden that a customer indicated they were "trimming back on their orders with Patterson" pending information concerning a new pricing structure from Kois Buying Group. (Compl. ¶ 72). McFadden responded: "As a rule we are trying our best to steer clear of all buying groups. As far as 'Kois Group through Patterson'— that's news to me. Special Markets has had no communications with [Kois]." (Compl. ¶ 72).

In October 2014, the Arizona Attorney General began its own investigation of Patterson and coordinated with the Texas Attorney General. (Compl. ¶ 98).

Patterson issued its fiscal year 2015 second quarter earnings on November 20, 2014 and held an earnings call. (Compl. ¶ 160). Anderson attributed Patterson's success to an "unparalleled suite of value-added services" and "solid execution by [its] industry-leading sales force." (Compl. ¶¶ 160–61). In response to an analyst's question regarding

Schein's apparent market share growth, Anderson reported Patterson was "growing faster than the market and taking share" and were "compet[ing] head-to-head with multiple people. We are more than holding our own and gaining share." (Compl. ¶ 162).

Patterson's southeast regional manager emailed McFadden on January 14, 2015 asking about a GPO formed in Florida. (Compl. ¶ 72). McFadden responded: "If he calls I will ask him for financials. – does [the dentist] own all these offices – if not he is a GPO – we don't deal with GPOs." (Compl. ¶ 72). On March 26, 2015, McFadden told a sales representative: "[W]e have said no to Smile Source. It is a direct competitor to ours sales reps. They are a buying club and have agreements with study clubs, state institutions, and everybody they can connect with." (Compl. ¶ 72). On July 29, 2015, McFadden was informed by Bill Neal, Patterson special markets executive, that he met with a GPO named Dentistry Unchained and told them "that we [Patterson] have not elected to participate in these types of programs in the past." (Compl. ¶ 72).

Patterson issued its fiscal year 2015 third quarter earnings on February 19, 2015 and held an earnings call. (Compl. ¶ 164). Anderson attributed growth to "strong core and technology offerings, industry leading service and support, and the trend toward digitization of the dental office," as well as the ability of its "industry-leading sales force to meet the needs of [its] dental customers." (Compl. ¶¶ 164–65).

Patterson, as well as Schein and Benco, continued boycotting state dental associations' conventions and meetings where those state dental associations partnered with SourceOne or other entities to establish GPOs. (Compl. ¶¶ 100–104). In April 2015, Patterson informed the Louisiana Dental Association it would boycott its annual

convention unless it abandoned its relationship with SourceOne, which had begun in January 2015. (Compl. ¶ 101). Patterson also did not attend trade meetings of the Colorado Dental Association and Maryland State Dental Association. (Compl. ¶¶ 102, 104).

Patterson issued its fiscal year 2015 fourth quarter earnings on May 21, 2015 and held an earnings call. (Compl. ¶¶ 167–68). Anderson attributed growth and share gains to "technology-oriented sales driven by Patterson's industry-leading sales, technical service and after-sales support." (Compl. ¶ 167). Anderson also attributed the results to "just very strong [and consistent] execution at Patterson and high demand for the portfolio of products [it] sell[s]." (Compl. ¶ 168). Around the same time, Patterson filed its 2015 Form 10-K with the SEC. (Compl. ¶ 170). The 2015 Form 10-K included statements similar to the 2013 Form 10-K and 2014 Form 10-K. (Compl. ¶ 170).

On August 7, 2015, Patterson received a letter from the Texas AG informing it that the Federal Trade Commission began an investigation of the alleged price-fixing scheme between Patterson, Schein, and Benco and that the Texas AG planned to share its own investigative materials with the FTC. (Compl. ¶¶ 72, 110).

Patterson issued its fiscal year 2016 first quarter earnings on August 27, 2015 and held an earnings call. (Compl. ¶¶ 171–72). Anderson attributed "sustained growth in the consumables category" to "stable-to-steadily improving dynamics in the dental market." (Compl. ¶ 171). Anderson discussed that the "continued healthy conditions of the dental market position [Patterson] well for continued growth and market share gains," and noted

that the "North American Markets are very stable," including consumables. (Compl. ¶ 172).

On September 1, 2015, SourceOne commenced suit in the United States District Court for the Eastern District of New York against Patterson, Schein, and Benco alleging a violation of the Sherman Act were they "conspired to exclude it from the market and took overt acts in furtherance of that conspiracy by boycotting the Texas and Arizona Dental Associations' annual meetings and by pressuring manufacturers and individual dentists not to do business with SourceOne." *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 310 F. Supp. 3d 346, 352–53 (E.D.N.Y. 2018); (*see* Compl., at 2).

In September 2015, the Georgia Dental Association ("GDA") contacted Patterson about an RFP for its newly formed buying group. (Compl. ¶ 103). Peter Cousins, Patterson sales manager, responded: "After careful consideration Patterson Dental has made the decision not to respond to the RFP at this time." (Compl. ¶ 103). Frank Capaldo, executive director of the GDA, replied: "I am confused as your immediate prior email indicated you were setting up dates to sit down and talk with us and include your president!" (Compl. ¶ 103). Cousins forwarded Capaldo's email to Fruehauf and McFadden: "The sooner the better on some sort of positioning statement that I can give to the sales team . . . my phone is ringing today b/c Frank took my email reply and relayed it to the board last night." (Compl. ¶ 103). Cousins also told Fruehauf: "I think we just say the company has chosen not to participate in GPOs at this time." (Compl. ¶ 103).

On November 10, 2015, Guggenheim texted Cohen, requesting that the two meet at an upcoming trade convention in New York. (Compl. ¶¶ 9, 72). After receiving no

response, Guggenheim texted again two days later. (Compl. ¶ 72). Cohen responded: "Paul, sorry for the delayed response. Spoke with our attorney this week and I think we should pass on any conversations until current antitrust issues are resolved." (Compl. ¶¶ 9, 72).

Patterson issued its fiscal year 2016 second quarter earnings on November 24, 2015 and held an earnings call. (Compl. ¶¶ 174–75). Anderson attributed dental sales growth to "stable-to-steadily improving dynamics in the North American dental market." (Compl. ¶ 174). On the earnings call, Gugino reported "organic sales [in the dental segment] improved 3.1% on a constant currency basis" and "consumables grew 3.3% reflecting continued stability in this end market." (Compl. ¶ 175).

On February 11, 2016, a group of dental practices and dentists sued Patterson, Benco, and Schein in the Eastern District of New York under Section 1 of the Sherman Act alleging they "engaged in conduct that has led to higher prices for dental supplies, eliminating competition between themselves, and thereby keeping their profit margins artificially high." *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *1 (E.D.N.Y. Sept. 28, 2016); (*see* Compl., at 2).

Patterson issued its fiscal year 2016 third quarter earnings on February 25, 2016 and held an earnings call. (Compl. ¶¶ 177–78). Anderson highlighted "solid growth in the consumables category" due to "stable to steadily improving dynamics in the North American dental market" and that Patterson was "increasingly well-positioned to capitalize on this trend" due to technology leadership and support infrastructure. (Compl. ¶ 177). In response to an analyst's question, Anderson also attributed growth to the

"strong execution" of its sales force and that Patterson felt it was "growing faster than the market." (Compl. ¶ 179).

Patterson issued its fiscal year 2016 fourth quarter earnings on May 26, 2016 and held an earnings call. (Compl. ¶¶ 181–83; Aff. of Aaron G. Thomas, Ex. C, ECF No. 92). Sales for Patterson's dental unit, representing approximately 46% of total company sales, were $662.1 million and a 3.3% increase in consumable dental supplies. (Compl. ¶ 181). Anderson stated Patterson was taking market share from its competitors and growth was due to "an era of stability" in the dental market. (Compl. ¶ 183). Anderson further stated, in response to an analyst's question, that growth in consumables was attributable to "really stable, consistent growth throughout our customer base both in our largest customers as well as our midsized and smaller customers." (Compl. ¶ 183).

On June 29, 2016, Patterson filed its 2016 Form 10-K with the SEC. (Compl. ¶ 185). The 2016 Form 10-K contained certifications from Anderson and Gugino. (Compl. ¶ 185). The 2016 Form 10-K discussed Patterson's competition in the dental supply market, noting the "industry is highly competitive" and explained Patterson's strategy of differentiating itself from competition through

> premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and fulfillment centers, and competitive pricing.

(Compl. ¶ 185). Patterson touted "competitive strengths" that included broad product offerings at competitive prices, proprietary branded products, and a "[f]ocus on customer

relationships and exceptional customer service," including "personal visits by field sales representatives." (Compl. ¶¶ 186–87). Patterson noted it competed with Benco and Schein. (Compl. ¶ 188). Patterson warned that GPOs "may place [it] at a competitive disadvantage." (Compl. ¶ 190). Patterson noted the formation of GPOs "may shift purchasing decisions to entities or persons with whom we do not have a historical relationship" which may threaten its ability to compete effectively. (Compl. ¶ 190). Patterson noted it was "seeking to obtain access to lower prices demanded by GPO contracts or other contracts, and develop relationships with provider networks and new GPOs" but it "cannot assure that such terms will be obtained or contracts will be executed." (Compl. ¶ 190).

Patterson issued its fiscal year 2017 first quarter earnings on August 25, 2016 and held an earnings call. (Compl. ¶¶ 192–95). Sales for Patterson's dental unit, representing approximately 43% of total company sales were $555 million, a 3.5% decrease. (Compl. ¶ 192). Gugino attributed Patterson's sales decline to strategic "sales force realignment." (Compl. ¶ 194). Anderson responded to an analyst's question, indicating that the sales force realignment was not a reaction to changes in the competitive landscape, but rather about finding effective ways to serve its customers and lead the market. (Compl. ¶ 195).

Patterson issued its fiscal year 2017 second quarter earnings on November 22, 2016 and held an earnings call. (Compl. ¶¶ 197–99). Sales for Patterson's dental unit, representing approximately 43% of total company sales were $601.6 million, flat with the previous year and a 2.5% decrease in consumable dental supplies. (Compl. ¶ 197).

Gugino again attributed the decline to the sales force realignment. (Compl. ¶ 199). Patterson's stock dropped $7.95 per share, a 16.7% decline. (Compl. ¶¶ 201, 242–43).

Patterson issued its fiscal year 2017 third quarter earnings on February 23, 2017 and held an earnings call. (Compl. ¶¶ 202–06). Sales for Patterson's dental unit, representing approximately 45% of total company sales were $626.3 million, a 1.8% decrease from the previous year and a 2.8% decrease in consumable dental supplies. (Compl. ¶ 202). Anderson and Gugino attributed the decline to "disruption from [Patterson's] sales force realignment initiative." (Compl. ¶ 204). Anderson touted the "very strong long-term fundamentals" and stability of the consumables market. (Compl. ¶¶ 205–06).

In March 2017, Travis Almquist, Patterson's team lead for products and pricing, emailed his supervisor, Joseph Lepley, Patterson's director of strategic pricing and forwarded a contract from Schein that appeared to show it was instituting a discount program for GPOs. (Compl. ¶ 107). Almquist's email said: "Normally I would send this back to the GM (or have the pricing desk send something) stating that we do not participate in buying groups for multiple reasons, but I wanted your feedback on it since so many things are changing in that MidMarket space." (Compl. ¶ 107). Lepley forwarded the email to Rogan, adding: "Attached is some competitive intel from Schein on a program on Buying Groups . . . Given our recent discussions with Smile Source are we looking at talking with Buying Groups now?" (Compl. ¶ 107).

Patterson issued its fiscal year 2017 fourth quarter earnings on May 25, 2017 and held an earnings call. (Compl. ¶¶ 208–11). Sales for Patterson's dental unit, representing

approximately 42% of total company sales were $607.3 million, an 8.3% decrease from the previous year and a 4.3% decrease in consumable dental supplies. (Compl. ¶ 208). Patterson and Anderson attributed the decline to the sales force realignment. (Compl. ¶¶ 210–11). Anderson believed Patterson's sales force would "continue to be a key competitive differentiator." (Compl. ¶ 211).

On June 1, 2017, Anderson "abruptly resigned" as CEO and Chairman of the Board. (Compl. ¶ 236). There was no reason proffered and it was not noted in the earnings call that took place less than one week prior. (Compl. ¶ 236).

On June 28, 2017, Patterson filed its 2017 Form 10-K with the SEC. (Compl. ¶ 213). The 2017 Form 10-K contained certifications from Gugino, Anderson, and James Wiltz, Patterson's interim CEO. (Compl. ¶ 213). The 2017 Form 10-K included statements similar to the 2016 Form 10-K. (Compl. ¶ 214).

On August 17, 2017, IQ Dental Supply, Inc., sued Patterson, Benco, and Schein in the Eastern District of New York under the Sherman Act, state antitrust laws, and common law. *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019); (*see* Compl., at 2). IQ alleged Patterson, Benco, and Schein "engaged in [a] campaign to force SourceOne out of business by conspiring to organize a boycott" and a price-fixing conspiracy. *IQ Dental Supply, Inc.*, 924 F.3d at 61.

Patterson issued its fiscal year 2018 first quarter earnings on August 24, 2017 and held an earnings call. (Compl. ¶¶ 215–17). Sales for Patterson's dental unit, representing approximately 40% of total company sales were $518.8 million, an 6.5% decrease from the previous year and a 3.6% decrease in consumable dental supplies. (Compl. ¶ 215).

Wiltz, in response to an analyst's question, stated that Patterson had not yet seen competition from the online marketplace, specifically referencing Amazon. (Compl. ¶ 217).

Patterson issued its fiscal year 2018 second quarter earnings on November 21, 2017 and held an earnings call. (Compl. ¶¶ 219–22). Sales for Patterson's dental unit, representing approximately 40% of total company sales were $553.6 million, an 8% decrease from the previous year and a 4.4% decrease in consumable dental supplies. (Compl. ¶ 219). In response to analysts questioning Patterson's "leaking market share," Gugino asserted it was due to "a variety of competitors" and could "win[] it back" with competitive prices but also a "value-added business model approach." (Compl. ¶¶ 221–22).

Following its three-year investigation, the FTC filed a formal complaint against Patterson, Benco, and Schein on February 12, 2018, alleging they "entered into an agreement refusing to provide discounts to or compete for the business of buying groups," constituting a *per se* violation of Section 5 of the Federal Trade Commission Act. (Compl. ¶¶ 2, 12, 117).

Once the FTC complaint was filed, several financial investment reports issued drawing attention to the magnitude of the FTC's action. (Compl. ¶ 119–20). A February 13, 2018 report from Jeffries commented that "the FTC move should be taken seriously & could have negative [long term] implications for margin." (Compl. ¶ 120). The report continued, noting that the "core tenets of the FTC's case" were "levied in other lawsuits" against Patterson, "[b]ut the FTC's move here is very serious & much more severe, in our

view." (Compl. ¶ 120). Patterson's stock price fell, in one day, from $39.92 per share to $31.21 per share, on a trading volume of 5.5 million shares; a market cap loss of $160 million. (Compl. ¶¶ 12, 121, 246).

On March 1, 2018, Patterson announced their third quarter results from fiscal year 2018, disclosing a 26% drop in earnings. (Compl. ¶¶ 12, 123; Thomas Aff., Ex. B). Patterson announced dental sales had declined 7.7%. (Compl. ¶ 123). Gugino, Patterson's CFO, resigned. (Compl. ¶¶ 12, 123). Reports from financial investment research firms were bleak. (Compl. ¶¶ 125–26). Patterson's stock dropped 24% on March 1, from $31.58 per share to $24.11 on a trading volume of 15 million shares; a market cap loss of approximately $700 million. (Compl. ¶¶ 14, 127, 247–48).

The Texas AG filed a formal complaint against Patterson on April 19, 2018—it had already brought complaints against Benco in 2015 and Schein in 2017. (Compl. ¶ 131). The Texas AG alleged Patterson "participated in a group boycott by dental supply distributors to suppress the entry of a new market participant in the dental supply distribution market" in violation of Texas antitrust laws. (Compl. ¶¶ 15, 131). Benco, Schein, and Patterson all settled with the Texas AG the day the respective complaints were filed against them. (Compl. ¶¶ 15,131). Patterson agreed to cease its anticompetitive conduct, pay $200,000, and provide the Texas AG an ongoing log of all oral and written communications between its senior executives and other dental supply distributors for one year. (Compl. ¶¶ 15,131).

On May 3, 2018, Misiak resigned. (Compl. ¶ 132).

On August 30, 2018, Patterson reported that its earnings missed expectations. (Compl. ¶¶ 15, 133). Mark Walchirk, Patterson's new CEO, explained that Patterson fell short of earnings expectations because of "competitive pricing pressures at the point of sale." (Compl. ¶ 133). In respond to an analyst's question, Walchirk stated that the source of the competitive pricing pressure was a changing customer base that "purchases a larger volume of products, and obviously, commands an improve price position." (Compl. ¶ 134). Patterson's stock fell 5%. (Compl. ¶¶ 15, 134).

On September 7, 2018, Patterson, Benco, and Schein reached an agreement to pay $80 million to settle the consumer antitrust class action pending in the Eastern District of New York entitled *In re Dental Supplies Antitrust Litig.* (Compl. ¶ 135). Patterson expected to contribute $28.5 million towards the settlement. (Compl. ¶ 135).

Throughout the relevant time period, Patterson maintained on its website its "Principles of Business Conduct and Code of Ethics." (Compl. ¶ 224). Patterson expressly incorporated it by reference into its Form 10-K filings. (Compl. ¶ 224). One section is entitled "Competing Ethically," and it states: "Patterson fully complies with the antitrust laws and fair trade practices of the United States and all other applicable jurisdictions." (Compl. ¶ 224). Patterson claimed it instituted "specific guidelines that should be observed by all employees," including:

> (1) "[n]ever discuss pricing policy with competitors"; (2) "[n]ever engage in a joint selling activity with a competitor"; (3) "[n]ever ask a vendor to cease doing business with a competitor"; and (4) "[a]void even the appearance of improper or collusive conduct when meeting with competitors or vendors at trade shows or trade association meetings."

(Compl. ¶ 225).

## II.    ANALYSIS

### A.  Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sletten & Brettin Orthodontics v. Cont'l Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Facial plausibility of a claim exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Although a sufficient complaint need not be detailed, it must contain "[f]actual allegations . . . enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted); *see id.* ("The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion of a legally cognizable right of action.") (quotations and citation omitted). Additionally, complaints are insufficient if they contain "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "SEC Rule 10b–5 implements [§ 10(b)] by making it unlawful to, among other things, 'make any untrue statement of a material fact

or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). Section 10(b) and Rule 10b–5 claims require the claimant to show:

> (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss.

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 760 (8th Cir. 2009) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002). Section 20(a) imposes secondary liability on every person "who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder . . . ." 15 U.S.C. § 78t(a).

"The [Private Securities Litigation Reform Act ("PSLRA")] imposes heightened pleading requirements on private securities actions 'to curb perceived abuses' of such actions, including 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Horizon Asset Mgmt. Inc.*, 508 F.3d at 761 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007)). The PSLRA requires a securities plaintiff to satisfy two heightened pleading standards. 15 U.S.C. § 78u-4(b)(3); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005).

> First, the plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading. 15

U.S.C. § 78u–4(b)(1). If falsity is alleged based upon information and belief, the complaint must state with particularity all facts on which the belief is formed. *Id.* In addition, the plaintiff must plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

*In re Cerner Corp. Sec. Litig.*, 425 F.3d at 1083; *Little Gem Life Sci., LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916–17 (8th Cir. 2008) (quoting *In re NVE Corp. Sec. Litig.*, 527 F.3d 749, 751 (8th Cir. 2008)).

"On a motion to dismiss an action covered by the Reform Act, the Court views factual allegations in the light most favorable to the plaintiff . . . and assumes the truth of particularly pleaded allegations." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1022 (D. Minn. 2009) (internal citations omitted), *aff'd sub nom Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *Little Gem Life Sci., LLC*, 537 F.3d at 917. "The complaint is construed liberally, all factual allegations taken as true, but 'conclusory or catch-all assertions of law and unwarranted inferences' are rejected." *Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016) (quoting *In re K-tel Int'l*, 300 F.3d at 889). The court may consider the pleadings, materials embraced by the pleadings, and public records. *Rand-Heart of New York, Inc.*, 812 F.3d at 1176.

## B. Misrepresentations of Material Fact

To allege a securities-fraud claim, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). "A misrepresentation or omission is material if there is 'a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *Detroit Gen. Ret. Sys.*, 621 F.3d at 805. "The trier of fact is uniquely competent to determine materiality, as that inquiry requires 'delicate assessments of inferences a [reasonable investor] would draw from a given set of facts.'" *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 621 (8th Cir. 1991) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). But "[w]here a reasonable investor could not have been swayed by an alleged misrepresentation, however, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546.

Here, Plaintiffs allege Defendants proffered various misrepresentations or omissions of material fact. For ease of analysis, these alleged misrepresentations can be grouped into categories: (1) 2013–15 Form 10-K filings; (2) Patterson's code of ethics incorporated into its Form 10-K filings; (3) quarterly earnings reports and accompanying earnings calls; and (4) 2016–17 Form 10-K filings.

### 1.    2013, 2014, and 2015 Form 10-K Filings

Plaintiffs assert the 2013, 2014, and 2015 Form 10-K filings are all similar. Patterson touted itself as a market leader with a strong *competitive* position, that the dental supply industry was *highly competitive* and *fragmented*, that Patterson used *competitive* pricing to beat out its *competitors*, and new *competitors* increased *competition*, but that Patterson's value-added services, technology, and operational

efficiencies placed it in a strong market position. Plaintiffs assert Defendants violated Section 10(b) and Rule 10b-5 by not disclosing their alleged anti-competitive behavior and the ongoing government investigations into that behavior.

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Sofamor Danke Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)); *Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). Under Regulation 2-K Item 103, a company must "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant" is subjected, as well as "any such proceedings known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. "An investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) (quoting *ABA Disclosure Obligations under the Federal Securities Laws in Government Investigations—Part II.C.*) (holding that a Wells Notice issued by the SEC falls "well short of litigation" and thus is not required to be disclosed under Item 103); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) (SEC investigation not a "pending legal proceeding" or a "proceeding known to be contemplated by governmental authorities" until the agency brings charges). Courts have likewise held that state investigations are not "pending legal proceedings" subject to Item 103 disclosure. *City of Westland Police & Fire Ret. Sys. v.*

29

*MetLife, Inc.*, 928 F. Supp. 2d 705, 718 (S.D.N.Y. 2013) (Item 103 did not render a duty to disclose more than thirty state investigations into MetLife's compliance with unclaimed property laws).

The Texas AG initiated its investigation in July 2014. The Arizona AG initiated its investigation in October 2014. The FTC started investigating Patterson sometime before August 2015. These investigations dragged on for several years, not materializing into complaints until the FTC brought suit on February 12, 2018. The Texas AG followed by filing suit on April 19, 2018, which was instantly settled by Patterson. There is no indication that the Arizona AG ever commenced suit or an enforcement action. Thus, the only reporting requirement under Item 103 during the class period—June 26, 2013 to February 28, 2018—would be the FTC's complaint. But Patterson had no public statements between February 12, 2018 and February 28, 2018, let alone any to which this duty to disclose attached. Accordingly, something beyond the mere existence of governmental investigations must trigger a disclosure obligation to beget liability for non-disclosure.

Plaintiffs argue that where Defendants touted their success in the "highly competitive" dental supply market, they were required to disclose their anticompetitive scheme to render those statements not misleading. As the Eighth Circuit has noted, "even absent a duty to speak, a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *Kushner*, 317 F.3d at 831 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 541, 561 (6th Cir. 2001) (en banc)). Thus, "[e]ven where a party does not otherwise have an affirmative

duty to disclose certain information, once a material topic has been broached, the party has an affirmative duty to disclose sufficient additional information to prevent the original disclosure from being misleading." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1057 (D. Minn. 2003). This is because "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc.*, 563 U.S. at 45.

This Court is not convinced that merely speaking about competitiveness renders a duty to report all anti-competitive behavior. There is no "duty to disclose 'soft information,' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions." *Kushner*, 317 F.3d at 831. The "federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotations, alterations, and citations omitted). "Rule 10b–5 was not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement," thus illegal conduct does not establish a Rule 10b–5 violation unless made in conjunction with a misleading statement. *Galati v. Commerce Bancorp, Inc.*, 2005 WL 3797764, at *8 (D.N.J. Nov. 7, 2005), *aff'd* 220 F. App'x 97 (3d Cir. 2007). Thus, there was no automatic duty for Defendants to disclose their alleged anticompetitive behavior in the 2013, 2014, and 2015 Form 10-K filings.

*But see Utesch v. Lannett Co., Inc.*, 2019 WL 2136467, at \*6–\*8 (E.D. Pa. May 15, 2019) (finding plaintiff appropriately pled a misleading statement where generic drug manufacturer stated it "face[d] strong competition" but allegations showed the market was not competitive as it would have misled a reasonable investor).

### 2.    Code of Ethics

Plaintiffs assert Patterson's code of ethics, incorporated into all of its Form 10-K filings, was a misstatement because it averred compliance with antitrust laws while Defendants conspired with their competitors to violate those same laws. Defendants point this Court to various cases that hold particular companies' ethics codes constituted puffery sufficient to render them immaterial. For example, in *Singh v. Cigna Corp.*, Cigna "published a pamphlet titled 'Code of Ethics and Principles of Conduct'" that included "statements from senior Cigna executives affirming the importance of compliance and integrity." 918 F.3d 57, 61 (2d Cir. 2019). The pamphlet stated "'it's so important for every employee . . . to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations,' and that 'we have a responsibility to act with integrity in all we do, including any and all dealings with government officials.'" *Id.* (alterations in original). The Second Circuit concluded that a reasonable stockholder would not consider these statements as important in deciding whether to buy or sell shares of stock because they amounted to "general declarations about the importance of acting lawfully and with integrity." *Id.* at 63.

Unlike *Singh*, however, Patterson's code of ethics went further than simply touting compliance with "all laws and regulations." *See In re Signet Jewelers Ltd. Sec. Litig.*,

2019 WL 2428529, at *8 (S.D.N.Y. June 11, 2019) ("Cigna's code of conduct statements were not actionable, because they were exceptionally vague and aspirational."). Indeed, it went even further than touting compliance with antitrust laws. Patterson's code of ethics instituted specific guidelines for compliance with antitrust laws: no discussions of policy with competitors, no joint selling with competitors, no asking vendors to boycott a competitor, and avoiding appearances of improper or collusive conduct when meeting with competitors at trade shows. This Court finds the distinction important; this is not a code of ethics that merely aspires to be "open, honest, and direct in all our dealings," or something similarly fuzzy. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1135–1140 (N.D. Cal. 2013) (declining to find such language in a code of ethics to constitute a material statement because doing so would "render every code of ethics materially misleading whenever an executive commits an ethical violation following a scandal"). Rather, this is a code of ethics that outlines specific guidance for compliance with a specific subset of laws.

"Absent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose." *Kushner*, 317 F.3d at 831. Here, there are allegations that various Patterson employees knew their collusive scheme with Benco and Schein was illegal. After letting Reinhardt know of the fallout from the Texas Dental Association boycott—an antitrust investigation by the Texas AG—Misiak informed him to discuss the matter "live" and send no more emails about the proposed Arizona Dental Association boycott. Misiak, alongside McFadden, is a key player in Patterson's

misconduct. Misiak reported directly to Anderson and there are allegations showing a line of communication between Misiak, Anderson, and Guggenheim. For example, Misiak emailed Anderson and Guggenheim on September 3, 2013, noting he has told his staff to reject GPOs. Anderson did not refute that plan of action but instead suggested further monitoring. The next day, Misiak and McFadden distributed a memo telling their sales managers not to work with GPOs. Anderson was informed in June 2013 of Guggenheim's conversations with Benco's Cohen concerning an agreement to reject GPOs. While Anderson received only a "FYI" email, there is no indication he repudiated Guggenheim's conduct. Like Misiak, Guggenheim directly reported to Anderson. Thus, starting with the June 2013 discussion forwarded to Anderson, Plaintiffs have sufficiently alleged Anderson knew the incorporated code of ethics statements to be false.

Compared to Anderson, there is no clear allegation that other certifiers of the Form 10-K filings—Armstrong, Gugino, and Wiltz—knew the incorporated code of ethics statements to be false. Rather, their inclusion is based on their certifications as high-ranking members of Patterson. Indeed, these three named defendants only appear in the complaint with respect to quarterly reports, earnings calls, and Form 10-K filings; there are no particular allegations lodged against them with respect to the underlying anticompetitive conduct. As such, this Court concludes the incorporation of the code of ethics into the Form 10-K filings are not attributable to Armstrong, Gugino, and Wiltz as misstatements.

### 3.    Quarterly Earnings and Earnings Calls

In Patterson's various earnings reports and follow-up earnings calls conducted by Anderson and Gugino, Patterson's performance was attributed to various factors, including: the stability or growth of the dental market (FY2014 Q1, FY2015 Q4, FY2016 Q1, FY2016 Q2, FY2016 Q3, FY2016 Q4); industry-leading technology wrapped by a suite of value-added services (FY2014 Q2, FY2015 Q1, FY2015 Q2, FY2015 Q3, FY2015 Q4, FY2016 Q3); a strong sales force (FY2014 3Q, FY2015 Q2, FY2015 Q3, FY2015 Q4, FY2016 Q3); and the digitalization of dental offices (FY2015 Q3). When Patterson's performance faltered in FY2017, Anderson and Gugino, attributed it to a sales force realignment. Anderson emphasized that the sales force alignment was not due to competitive changes to the market, but about effective customer service. Starting in FY2018, with Wiltz at the helm, the decline in Patterson's performance was no longer attributed to sales force realignment, but due to various competitors, but not yet competition from online marketplaces (FY2018 Q1, FY2018 Q2).

"A statement is not material and is mere puffery if it is 'so vague and such obvious hyperbole that no reasonable investor would rely upon them.'" *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (quoting *Parnes*, 122 F.3d at 547). "No reasonable investor would rely on 'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrases used to champion the company but devoid of any substantive information.'" *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d at 882 (quoting *Parnes*, 122 F.3d at 547). "Optimistic statements are not actionable if they

cannot be supported by objective data or otherwise subject to verification by proof." *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d at 882 (quotation omitted).

Defendants' statements during these quarterly earnings reports and earnings calls are vague and unverifiable. None of these statements relate to GPOs and, despite the Plaintiffs' desire to read in things left unsaid, they do not relate to Patterson's compliance with antitrust law. These corporate statements amount to little more than corporate gobbledygook self-justifying Patterson's existence and place in the dental supply economy—"industry-leading technology" and "value-added services." These constitute "optimistic rhetoric" and "promotional phrases used to champion the company," but they are "devoid of any substantive information" and constitute puffery.

Certainly, Plaintiffs would have this Court read in added language to some of these earnings statements: the dental market was stable or grew *due to an anticompetitive agreement to keep out GPO competition*; a strong sales force *due to an anticompetitive agreement that kept out GPO competition*; the sales force realignment *was required due to an unraveling anticompetitive agreement*. But this reading would stretch these statements too far, as there is no clear link between the illegal conduct and these statements. *See Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2015) ("Courts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have required a connection between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line.") (collecting cases). The connection is

too attenuated here. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006) ("The connection between the alleged inaccurate statement and the underlying conduct may not be too attenuated, and, again, must be pled with sufficient specificity."). The statements here are generic descriptions of the state of the market and a recitation of Patterson's supposedly unique operations. *See Menkes*, 2005 WL 3050970, at *8.

### 4.    2016 and 2017 Form 10-K Filings

The 2016 Form 10-K indicated that Patterson competed with Benco and Schein and that GPOs may place it at a competitive disadvantage. Patterson noted it was seeking to obtain access to lower prices demanded by GPO contracts and develop relationships with GPOs. Although the language is not provided in the complaint, Plaintiffs allege the 2017 Form 10-K contains similar representations. The allegations show Patterson was actually doing the opposite; Patterson was not competing with Benco and Schein, at least with respect to GPOs, and Patterson was not seeking to develop relationships with GPOs, but was seeking to choke off GPOs from the market. The parties appear to agree Patterson made no misrepresentation when it stated that GPOs could put it at a competitive disadvantage.

Defendants argue that there are no misrepresentations in these Form 10-K filings. This Court disagrees. While Patterson added the caveat that it could not guarantee obtaining access to lower prices demanded by GPO contracts or that any such contracts would be executed, it clearly stated it was already in the process of seeking out such contracts. "Seeking to obtain access" does not equal "will seek to obtain access." It

indicates present, current action and Defendants cannot paint this as a purely forward-looking statement. By June 2016, Patterson was waist-deep in its alleged anticompetitive agreement; indeed, it was under investigation by the FTC, Texas, and Arizona by that time.

As noted with the code of ethics, there is no clear allegation that the certifiers other than Anderson—Gugino and Wiltz—knew these statements to be false. Rather, their inclusion is based on their certifications as high-ranking members of Patterson. Thus, this Court concludes the 2016 Form 10-K and 2017 Form 10-K are not attributable to Gugino and Wiltz as misstatements.

### C. Scienter

"'Rote allegations that the defendants knowingly made false statements of material fact' fail to satisfy the heightened pleading standard of the Reform Act." *Kushner*, 317 F.3d at 827–28 (quoting *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002)). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). "The required state of mind for private securities fraud actions is 'scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud,' or the defendant's 'severe recklessness.'" *Horizon Asset Mgmt. Inc.*, 580 F.3d at 761 (quoting *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008)).

Scienter can be established "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Detroit Gen. Ret.*

*Sys.*, 621 F.3d at 808; *In re K-tel Int'l*, 300 F.3d at 893. This involves a holistic inquiry looking for "badges of fraud." *In re Navarre Corp. Sec. Litig.*, 299 F.3d at 745. Inferences of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*; *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1029 (8th Cir. 2011) (quoting *Tellabs, Inc.*, 551 U.S. at 323–24).

### 1.    Gugino, Armstrong, and Wiltz

As noted above, Defendants Gugino, Armstrong, and Wiltz are only included in the complaint with respect to their certification of the Form 10-K filings and quarterly earnings reports and calls. Armstrong's sole involvement is his certification of the 2013 and 2014 Form 10-K filings. Wiltz certified the 2017 Form 10-K filing and participated on the FY2018 Q1 earnings call, noting that Patterson had not yet seen competition from the online marketplace such as Amazon. Gugino had the largest role, but she mostly recounted financial information during various earnings calls—unsurprising given her role as Patterson's CFO. On the FY2017 Q1, Q2, and Q3 earnings calls, she attributed poor financial performance to a sales force realignment, but Anderson was the Patterson representative who expanded upon the purpose of the sales force realignment. During the FY2018 Q2 earnings call, Gugino attributed Patterson's "leaking market share" to a "variety of competitors" but that Patterson could rebound with competitive prices and value-added business practices.

Plaintiffs cannot solely rely on Gugino, Armstrong, and Wiltz's positions as officers at Patterson to support an inference of scienter. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 382 (citing *In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997)); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *17 (E.D. Mich. Jan. 30, 2007) (holding that, without more, certifications of the accuracy of quarterly and annual reports do not permit a strong inference of scienter as it is required of all corporate officers and directors and says nothing about the defendants' intent). "[C]orporate officials are not required to be clairvoyant and are responsible only for revealing the material facts reasonably available to them." *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1032 (D. Minn. 2007) (citing *In re Navarre Corp. Sec. Litig.*, 299 F.3d at 743); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (it is insufficient to "simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud"). Absent any direct connection to the underlying anticompetitive actions of Anderson's subordinates, Plaintiffs have not pointed to any "badges of fraud" showing that Gugino, Armstrong, and Wiltz knowingly made false statements of material fact or that they intended to deceive, manipulate, or defraud.[11]

After the poor fiscal performances in FY2017 and the first three quarters of FY2018, Gugino resigned. Plaintiffs argue scienter can be inferred from Gugino's resignation. Absent any other allegation tying Gugino to the underlying anticompetitive

---

[11] This Court will not use the "core operations" theory as urged by Plaintiffs where the Eighth Circuit has not addressed it and noted that it has been rejected by other circuit courts. *Elam v. Niedorff*, 544 F.3d 921, 929 (8th Cir. 2008).

actions, her departure does not establish scienter. *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (holding that "notable departures are not in and of themselves evidence of scienter" because "[m]ost major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions").

**2.    Anderson**

As compared to Gugino, Armstrong, and Wiltz, the complaint does contain "badges of fraud" detailing Anderson's knowledge of the alleged anticompetitive behavior: Plaintiffs assert that Anderson was aware of the collusive agreement as early as June 2013, that he communicated with the principle enforcers of the collusive agreement, and that he directly supervised those actors.

Looking at all the facts alleged, Anderson's connection to the anticompetitive conduct perpetrated by his underlings gives rise to a strong inference of scienter. The complaint alleges, at the least, that Anderson knew of an anticompetitive agreement between Patterson, Benco, and Schein, that he allowed that agreement to persist, and that he did nothing to prevent his direct reports from furthering and enforcing that agreement. Specifically, Anderson was apprised early on by Guggenheim that he had been in contact with Benco's Cohen regarding GPOs. Anderson took no action to curtail these missives. Several months later, Guggeheim affirmed to Anderson that Patterson was rejecting GPOs and monitoring how its competitors interacted with GPOs. Rather that reject Guggenheim's handling of GPOs, Anderson doubled down by pointing out the weakness of those entities doing business with GPOs and requested continued monitoring.

Buttressing this, Anderson directly supervised Misiak and received reports of how he communicated the anti-GPO position to subordinate sales staff. Moreover, Anderson made statements as to the competitiveness of the market[12] and Patterson while the company was under investigation, suggesting his statements "were made with the requisite scienter." *Utesch*, 2019 WL 2136467, at *8. Thus, it is reasonable to infer Anderson's scienter; Plaintiffs have pleaded Anderson's repeated statements concerning the competitive nature of the dental supply market, the competitiveness of Patterson, Patterson's competition with Benco and Schein, and that Patterson was seeking business opportunities with GPOs were made with the requisite state of mind.

Unlike Gugino, Anderson's resignation is accompanied by allegations tying him to the underlying anticompetitive actions. Anderson's resignation was abrupt and not discussed on the earnings call held one week prior. Based on the allegations of the complaint, it is difficult to tie Anderson's resignation to any specific precipitating factor. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."). Thus, while not much standing alone, Anderson's resignation buttresses the inference of scienter under the holistic approach. *Id.* ("Even though it is also possible to infer, for example, that Defendants left of their own volition or that they were removed for mismanagement unrelated to wrongdoing, the Court finds that the proximity of

---

[12] Ignoring statements certified by Anderson in Patterson's Form 10-K filings, Anderson repeatedly cited the dental supplies market's stability, (Compl. ¶¶ 148, 172, 174, 177, 183), and Patterson's competitiveness, (Compl. ¶¶ 158, 160–62, 164–65, 179), in earnings calls.

Defendants' departures to the financial restatements and investigations adds one more piece to the scienter puzzle.") (quotation omitted).

### 3.    Patterson

The "Eighth Circuit has not directly addressed the issue of 'collective scienter,'" but "has done so implicitly." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1035; *Horizon Asset Mgmt. Inc.*, 508 F.3d at 767 ("The appropriate standard for considering the pleading of corporate scienter under the PSLRA appears to be an open question in this circuit."). Accordingly, courts in this District have not applied the "collective scienter" doctrine but instead require plaintiffs "establish corporate scienter by adequately alleging the scienter of individual corporate officers." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1035. "The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 896 (D. Minn. 2011); *Beaver Cty. Employees' Ret. Fund v. Tile Ship Holdings, Inc.*, 94 F. Supp. 3d 1035, 1054 (D. Minn. 2015). As concluded above, Plaintiffs have adequately pled scienter as to Anderson, Patterson's CEO. This also imputes sufficient scienter to Patterson.

Even if this Court were to consider the "collective scienter" reasoning, the collective action of Patterson's employees satisfies the standard. As discussed, Misiak had a line of communication with Anderson. Misiak and McFadden repeatedly distributed marching orders to their sales managers who then passed on that information to their middle-management and ground-level sales representatives. Sales representatives' requests for guidance on how to proceed with GPOs, even with

substantial business opportunities on the line, were repeatedly met with the same answer: "No business with GPOs—just like Benco and Schein." Indeed, there were frequent check-ins with counterparts at Benco and Schein when Patterson employees suspected their competitors of reneging on their plan towards GPOs. Where the "wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business," corporate scienter is sufficiently pled. *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007).

### D. Loss Causation

"Loss causation in a securities fraud case is analogous to the common law's requirement of proximate causation. The plaintiff must show 'that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk.'" *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (citing and quoting *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)). The securities statutes make fraud actions available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm.*, 544 U.S. at 345; *see also* 15 U.S.C. § 78u–4(b)(4) (requiring plaintiffs to prove the defendant "caused the loss"). "A complaint must 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *McAdams v. McCord*, 584 F.3d at 1114 (quoting *Dura Pharm*, 544 U.S. at 347).

Defendants point out that the alleged antitrust misconduct was already known to the market prior to the FTC's complaint by reason of the various private lawsuits against

Patterson and its collusive competitors. Private lawsuits were filed against Patterson on September 21, 2015, February 11, 2016, and August 17, 2017, well before the February 12, 2018 FTC complaint was filed and made public. Defendants also assert that Patterson's stock "quickly rebounded" following the FTC action's commencement.

This Court is unpersuaded by Defendants' argument that the alleged antitrust misconduct was already known to the market prior to the FTC's complaint. Defendants essentially ask this Court to weigh their truth-on-the-market defense. This a defense that seeks to "rebut the fraud-on-the-market presumption of reliance by proving that 'the market makers were privy to the truth.'" *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004) (quoting *Basic Inc.*, 485 U.S. at 248). This is an intensely fact-specific defense that is rarely appropriate to determine at the motion to dismiss stage. *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d at 985–86 (citing *Ganino v. Citizens Utils. Co.*, 228 F. 3d 154, 167 (2d Cir. 2000)). As Plaintiffs point out, the FTC complaint provided new information to the market unrevealed by the previous private lawsuits, mainly internal communications, and a financial analyst described the FTC complaint "as very serious [and] much more severe" than the allegations of the private lawsuits.

This Court is more sympathetic to Defendants' arguments concerning the causal connection between the FTC complaint and the stock losses, particularly where Defendants point to data that shows Patterson's stock price was ultimately unaffected in the weeks following the FTC complaint until the March 1, 2018 earnings report was released. (*See* Thomas Aff., Ex. A). As detailed in the various earnings reports above, Patterson's earnings had been dropping for some time before the FTC complaint was

revealed. Plaintiffs have not clearly explained how the FTC complaint was the precipitating cause of the stock price fall in March 2018 as compared to the accumulated effects of Patterson's near-continuous declining earnings. To counteract Defendants' argument, Plaintiffs assert that the declining earnings were the result of Patterson's unraveling anticompetitive conduct; essentially, Patterson's previously-inflated financial performance had to normalize to the reality that Patterson was not actually as competitive in the dental supply marketplace as it had continuously touted. Thus, Plaintiffs assert, the stock price drop in March 2018 was due to the materialization of the concealed anticompetitive conduct.

These entangled facts are difficult to resolve in the absence of discovery and would be better suited for resolution on summary judgment where experts can weigh in with their analysis. *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003) (declining "to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context"). Nonetheless, Defendants' argument may be more relevant to the economic harm analysis than that of loss causation. At this stage in the proceeding, this Court cannot draw appropriate boundaries for stock value consideration and what impact the FTC complaint's revelation of the extent of Patterson's anticompetitive behavior had on Patterson's stock prices as compared to its declining earnings. As the Eighth Circuit has noted, the "causation requirement for damages is not very stringent." *Id.* at 831. Plaintiffs have pleaded a revelation—the February 2018 FTC complaint—followed by the March 2018 earnings

call and contemporaneous drop in stock value. At this point in the litigation, this Court concludes Plaintiffs have sufficiently provided Defendants "some indication of the loss" and the causal connection to survive the motion to dismiss.

### E. Summary

Plaintiffs have alleged a long-running scheme at Patterson, concocted in the upper echelons of corporate management, to collude with its direct competitors to stifle new entrants to the market to protect its artificially inflated prices charged by reason of unorganized buyers with little power. Because of an FTC complaint, Plaintiffs have provided allegations with a degree of clarity ordinarily unavailable. But those allegations are insufficient to assert securities violations against all Defendants. This Court concludes Plaintiffs have properly pled securities violations against Anderson and Patterson. As to the other named Defendants—Gugino, Armstrong, and Wiltz—Plaintiffs have failed to sufficiently plead their involvement with the underlying misconduct and this Court concludes they should be dismissed as defendants.

Because this Court concludes Plaintiffs have adequately pled a Section 10(b) claim against Anderson, their Section 20(a) claim survives against him and Patterson. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d at 911. As noted above, Plaintiffs have sufficiently alleged that Anderson supervised the principle actors in the misconduct and was apprised of their actions. *Lustgraf v. Behrens*, 619 F.3d 867, 873–74 (8th Cir. 2010); *Beaver Cty. Employees' Ret. Fund*, 94 F. Supp. 3d at 1054–55.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, record, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion to Dismiss the Amended Class Action Complaint, (ECF No. 89), be **GRANTED IN PART and DENIED IN PART** as set forth herein.

Date: July 25, 2019                              _____s/ Steven E. Rau_____
                                                 Steven E. Rau
                                                 United States Magistrate Judge
                                                 District of Minnesota

                                                 *Plymouth Cty. Ret. Sys. v. Patterson Cos., Inc.*
                                                 Case No. 18-cv-871 (MJD/SER)

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).