# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PLYMOUTH COUNTY RETIREMENT
SYSTEM, Individually and on Behalf of
All Others Similarly Situated,

        Plaintiff,

v.

PATTERSON COMPANIES, INC., and
SCOTT P. ANDERSON,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 18-871 (MJD/HB)

Lucas F. Olts, Jonah H. Goldstein, Jennifer N. Caringal, Alexi H. Pfeffer-Gillett, and Heather G. Schlesier, Robbins Geller Rudman & Dowd LLP; Anne M. Lockner, Robins Kaplan LLP; Steven B. Singer, Kyla Grant, Joshua Saltzman, Maya Saxena, Joseph E. White, III, Lester R. Hooker, Dianne Anderson, Saxena White P.A.; Garrett D. Blanchfield, Jr. and Brant D. Penney, Reinhardt Wendorf & Blanchfield; and Robert D. Klausner, Klausner, Kaufman, Jensen & Levinson, Counsel for Plaintiff.

Patrick S. Williams, Mark G. Schroeder, Aaron G. Thomas, and Jordan L. Weber, Taft Stettinius & Hollister LLP, Counsel for Defendants.

## I.  INTRODUCTION

This matter is before the Court on Lead Plaintiffs' Motion to Certify Class, Appoint Class Representatives and Appoint Class Counsel. [Docket No. 134] The Court heard oral argument on August 12, 2020.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Alleged Conspiracy

Defendant Patterson Companies Inc. ("Patterson"), headquartered in Minnesota, is the second largest distributor of dental supplies in the United States.  ([Docket No. 74] Amended Class Action Complaint ("Compl.") ¶¶ 25, 39-40.)  Patterson and its two main competitors control approximately 80% of the dental supply industry.  (Id. ¶ 40.)

Defendant Scott Anderson served as the Chief Executive Officer and President of Patterson from April 25, 2010 through June 1, 2017, and as Chairman of the Board from April 2013 to June 1, 2017.  (Compl. ¶ 26.)

In the past, dental supply distributors, such as Patterson, acted as middlemen between manufacturers and small, dispersed dental practices, and, as a result, they enjoyed large profit margins of over 30%.  (Compl. ¶ 41.) Starting in 2011, individual dental practices began consolidating their purchasing power into organized groups of independent dentists known as Group

Purchasing Organizations ("GPOs").  (Id. ¶ 42.)  The bargaining power of the

GPOs threatened the high profit margins of Patterson and its competitors.  (Id.)

In response to the emergence of GPOs, Patterson and its chief rivals, Benco

Dental Supply Company ("Benco") and Henry Schein, Inc. ("Schein"), conspired

to eliminate GPOs from the dental supply industry by agreeing to collectively

boycott GPOs.  (Compl. at 1-2; id. ¶ 1.)

The Federal Trade Commission ("FTC") determined that Patterson's

agreement with Benco constituted an illegal conspiracy that violated federal

antitrust laws.  (Olts Aff., Ex. 2, FTC Oct. 15, 2019 Initial Decision in In the Matter

of Benco Dental Supply Co., Henry Schein, Inc., & Patterson Companies, Inc.,

Docket No. 9379 (F.T.C.) ("FTC Decision") 44-45, 238.)

### 2.     Misrepresentations

According to the Complaint, in spite of this unlawful conspiracy,

Defendants repeatedly made material false representations to investors

throughout the Class Period.  (Compl. ¶¶ 109, 116, 225.)  Specifically, Defendants

made three misrepresentations on five dates:

> (i) On June 26, 2013; June 25, 2014; June 24, 2015; June 29, 2016; and
> June 28, 2017; in Patterson's Form 10-K filings incorporating
> Principles of Business Conduct and Code of Ethics: "Patterson fully
> complies with the antitrust laws and fair trade practices of the

United States. . . . [S]pecific guidelines that should be observed by all employees . . . "[n]ever discuss pricing policies with competitors . . . [n]ever engage in a joint selling activity with a competitor . . . [n]ever ask a vendor to cease doing business with a competitor . . . [a]void even the appearance of improper or collusive conduct when meeting with competitors or vendors at trade shows or trade association meetings."

(ii) On June 29, 2016; and June 28, 2017; in Patterson's Form 10-K Filings: "[W]e compete against Henry Schein, Inc. [and] Benco Dental Supply Company."

(iii) On June 29, 2016; and June 28, 2017; in Patterson's Form 10-K Filings: "Although we are seeking to obtain access to lower prices demanded by GPO contracts or other contracts, and develop relationships with provider networks and new GPOs, we cannot assure that such terms will be obtained or contracts will be executed."

(Id. ¶¶ 108-09, 188, 190, 224-25; Weber Decl., Ex. 1, Gompers Report ¶ 15; Weber Decl., Ex. 2, App'x A.)

### 3.   Corrective Disclosures

#### a)   November 22, 2016

On November 22, 2016, Patterson issued an earnings release announcing its financial results for the fiscal 2017 second quarter and revealed a 2.5% decrease in sales of consumable dental supplies – the first decline in that metric during the Class Period – and a reduction in annual guidance by almost 15%. (Compl. ¶¶ 113, 197-99, 242.)  After this disclosure, Patterson's stock dropped

16.7% on unusually heavy trading volume.  (Compl. ¶¶ 201, 243; [Docket No. 138-1] Olts Aff., Ex. 1, Steinholt Report, Ex. D.)

Defendants assert that the November 22, 2016 disclosure also reflected unrelated earnings declines stemming from: (i) margin pressure in the Animal Health segment; (ii) general dental market trends, (iii) the salesforce realignment, and (iv) the termination of an exclusive distribution agreement with Sirona Dental Systems ("Sirona").  (Weber Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 167-176; Weber Decl., Sealed Ex. 9, Washkowiak (Fairpointe) 30(b)(6) Dep. 59-70.)

### b)  February 12, 2018

On February 12, 2018, the FTC announced that it was filing a formal complaint against Patterson, Schein, and Benco, alleging, among other things, that Patterson had illegally conspired with Benco and Schein to freeze GPOs out of the dental market.  (Compl. ¶¶ 117, 245; Weber Decl., Ex. 16, Feb. 12, 2018 FTC Press Release.)  Plaintiffs allege that the "nature of the distributors' conspiracy to block GPOs emerged" with the announcement of the filing of the FTC Complaint on February 12, 2018.  (Compl. ¶ 245.)  The next day, Patterson's stock price

dropped 5% on unusually heavy trading volume.  (Compl. ¶ 246; Olts Aff., Ex. 1,

Steinholt Report, Ex. D.)

### c)  March 1, 2018

On March 1, 2018, Patterson issued an earnings release for the fiscal 2018

third quarter, announcing a 26% decline in overall earnings and a reduction in

Patterson's annual guidance of 18%, revealing to the market that Defendants'

once high profit margins had been dependent on their anticompetitive scheme

and that the historically high profit margins could not survive the growth of

GPOs in the dental market.  (Compl. ¶¶ 12, 123-26, 247.)  Patterson's stock price

fell 24% on unusually heavy trading volume.  (Id. ¶¶ 247-48.)

The March 1, 2018 earnings release contains no explicit reference to the

alleged collusive behavior with respect to GPOs or to the implications of the

alleged unraveling of this behavior.  (See Compl. ¶ 247; Weber Decl., Ex. 23,

Patterson Fiscal 2018 Third-Quarter Results.)  Defendants assert that the negative

news made public on March 1, 2018 was driven by four factors unrelated to the

alleged antitrust misconduct: (i) further decline of Patterson's Animal Health

segment; (ii) challenges in implementing a new enterprise resource planning

("ERP") system; (iii) continued impacts of Patterson's salesforce realignment; and

(iv) Patterson's expanded digital segment following termination of the Sirona

exclusive distribution agreement.  (Weber Decl., Sealed Ex. 8, Vingers (LMCG)

30(b)(6) Dep. 209-213; Weber Decl., Sealed Ex. 9, Washkowiak (Fairpointe)

30(b)(6) Dep. 140-148; Weber Decl., Sealed Ex. 11, Reed (Atlanta) 30(b)(6) Dep.

96-97; see also Weber Decl., Ex. 1 Gompers Report ¶¶ 49-57.)

### 4.    Proposed Lead Plaintiffs

Plaintiff Plymouth County Retirement System ("Plymouth") and Lead

Plaintiffs Pembroke Pines Fund for Firefighters and Police Officers

("Pembroke"), Central Laborers Pension Plan ("Central Laborers"), and

Gwinnett County Public Employees Retirement System ("Gwinnett")

(collectively, "Plaintiffs") assert that they acquired Patterson common stock

between June 26, 2013 and February 28, 2018, inclusive, (the "Class Period").

(Compl. at 1.)

During the Class Period, Plaintiffs delegated all investment decisions to

their outside investment managers: McDonnell Investment Management, LLC

("McDonnell") (Plymouth), LMCG Investments, LLC ("LMCG") (Plymouth,

Pembroke, Central Laborers), Atlanta Capital Management Company, LLC

("Atlanta") (Gwinnett, Pembroke), Rhumbline Advisers LP ("Rhumbline")

(Central Laborers), and Fairpointe Capital, LLC (Gwinnett) (collectively, the "Investment Managers").   (Weber Decl., Ex. 2, Lead Plaintiffs' Responses to Defendants' First Set of Interrogatories, at No. 1.)  None of the Plaintiffs participated in any decision by the Investment Managers to purchase or sell any Patterson stock during the Class Period.  (Id.; Weber Decl., Sealed Ex. 4, Fisher (Pembroke) 30(b)(6) Dep. 23-24; Weber Decl., Sealed Ex. 5, Sullivan (Plymouth) 30(b)(6) Dep. 28-29; Weber Decl., Sealed Ex. 6, Koeppel (Central Laborers) 30(b)(6) Dep. 26-28; Weber Decl., Sealed Ex. 7, Ludwiczak (Gwinnett) 30(b)(6) Dep. 50-51.)  Nor did any of the Investment Managers consult with Plaintiffs before deciding to purchase or sell Patterson stock on Plaintiffs' behalf during the Class Period.  (Weber Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 56; Weber Decl., Sealed Ex. 9, Washkowiak (Fairpointe) 30(b)(6) Dep. 23-24; Weber Decl., Sealed Ex. 10, Kusmierz (Rhumbline) 30(b)(6) Dep. 29-31; Weber Decl., Sealed Ex. 11, Reed (Atlanta) 30(b)(6) Dep. 32-33, 52-53.)

**B.    Procedural History**

On March 28, 2018, Plymouth filed a Complaint against Patterson, Anderson, and former Patterson Chief Financial Officer Ann Gugino in this Court.  [Docket No. 1]  On August 30, 2018, the Court appointed Plymouth, Gwinnett, Pembroke, and Central Laborers as Lead Plaintiffs and Robbins Geller

8

Rudman & Dowd LLP ("Robbins Geller") and Saxena White P.A. ("Saxena White") as Lead Counsel.  [Docket No. 63]  On November 9, 2018, Plymouth filed an Amended Complaint against Patterson, Anderson, Gugino, former Patterson Chief Financial Officer and Treasurer R. Stephen Armstrong, and former Patterson Interim Chief Executive Officer and President James Wiltz alleging Count 1: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Against All Defendants); and Count 2: Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants).  [Docket No. 74]  On September 10, 2019, the Court dismissed Gugino, Armstrong, and Wiltz as Defendants.

Plaintiffs now move to certify this action as a class action, appoint Plaintiffs as Class Representatives, and appoint Saxena White and Robbins Geller as Class Counsel.

Plaintiffs seek certification of the following class of investors (the "Class"):

All person or entities who purchased or otherwise acquired Patterson Companies, Inc., common stock between June 26, 2013 and February 28, 2018, inclusive (the "Class Period").  Excluded from the Class are Defendants, the officers and directors of Patterson at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or

subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

## III.   DISCUSSION

### A.   Standard for Class Certification

The class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1979). Whether an action should be certified as a class action is governed by Rule 23 of the Federal Rules of Civil Procedure.

> To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b). The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005) (citing Fed. R. Civ. P. 23(a)) (footnote and other citations omitted).

Plaintiffs seek certification of a class under Rule 23(b)(3). Rule 23(b)(3) allows a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."

> The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, <u>etc.</u>

<u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011). At this stage, "[m]erits

questions may be considered to the extent – but only to the extent – that they are

relevant to determining whether the Rule 23 prerequisites for class certification

are satisfied." <u>Amgen Inc. v. Conn. Ret. Plans and Trust Funds</u>, 568 U.S. 455, 466

(2013) (citations omitted).

> **B.     Numerosity (Rule 23(a)(1))**

Numerosity is met when the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, numerosity has been met because Patterson common stock is traded on the NASDAQ (Compl. ¶ 238), with as "high as 105 million shares" outstanding and more than 1,100 institutional investors owning more than 90% of Patterson's common stock during the Class Period (Olts Aff., Ex.1, Steinholt Report ¶¶ 25, 32; see also Compl. ¶ 256).

## C.      Commonality (Rule 23(a)(2))

Federal Rule of Civil Procedure 23(a)(2) requires that there are "questions of law or fact common to the class."

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. . . . Their claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Wal-Mart Stores, Inc., 564 U.S. at 349–50 (citation omitted). "In securities fraud class actions, questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact." In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 296 (D. Del. 2003) (citation omitted).

Here,

12

members of the proposed class share issues in the case that involve identical claims and common evidence, including: (1) whether Defendants engaged in a scheme to defraud; (2) whether Defendants knowingly or recklessly made material misrepresentations or omitted material information in their public statements; (3) whether the price of [Patterson] common stock artificially inflated during the class period; and (4) the extent of damages sustained by Class members and the appropriate measure of damages.

City of Pontiac Gen. Employees' Ret. Sys. v. Wal-Mart Stores, Inc., No. 5:12-CV-5162, 2016 WL 5400373, at *4 (W.D. Ark. Sept. 20, 2016).

### D.   Typicality (Rule 23(a)(3))

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "The burden is fairly easily met so long as other class members have claims similar to the named plaintiff.  Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) (citations omitted).

Typicality has been met because Plaintiffs and Class members share common claims against Defendants.  Plaintiffs, like Class members, purchased Patterson's publicly traded securities during the Class Period at prices allegedly

artificially inflated by Defendants' misrepresentations.  Plaintiffs further assert

that, like Class members, they were then damaged when the price of those

publicly traded securities declined after public disclosure of Defendants' fraud.

Plaintiffs have claims that are typical of the claims of the Class, bring claims

under the same federal securities law, and seek the same relief as other Class

members; thus, the typicality requirement is satisfied.

The Court rejects Defendants' arguments that Plaintiffs are atypical

because they are subject to unique defenses:

### 1.    Purchase of Stock After Partial Corrective Disclosures

The Court rejects Defendants' claim that Plaintiffs' purchases of Patterson

shares after each corrective disclosure makes them subject to unique non-reliance

defenses which will prevent them from serving as effective class representatives.

Defendants note that Gwinnett did not make its first purchase of Patterson

stock until December 1, 2016, (Weber Decl., Sealed Ex. 7, Ludwiczak (Gwinnett)

30(b)(6) Dep. 34-35), after the first corrective disclosure on November 22, 2016.

Gwinnett bought 61,018 shares of Patterson stock from December 1, 2016 to

January 30, 2018.  ([Docket No. 35-2] Gwinnett Certification at 4.)  Another

alleged corrective disclosure occurred on February 12, 2018, and Gwinnett

bought 500 shares of Patterson stock on February 13, 2018.  (Id.)  The final alleged

corrective disclosure occurred on March 1, 2018, and Defendants claim that

Gwinnett bought 26,500 shares of Patterson stock after that date, 24,000 of which

were purchased after this Complaint was filed on March 28, 2018.  (Weber Decl.,

Sealed Ex. 17 at 18-19.)

Pembroke purchased more than 18,000 shares of Patterson stock after the

first alleged corrective disclosure from November 22, 2016 to November 16, 2017.

([Docket No. 28-2] Pembroke Certification at 5.)  Pembroke purchased an

additional 1,572 shares of Patterson stock at the end of June 2018, approximately

four months after the alleged March 1, 2018 corrective disclosure and three

months after the Complaint was filed. (Weber Decl., Sealed Ex. 22 at 6)

Plymouth and Central Laborers only purchased Patterson stock during the

Class Period after the alleged November 22, 2016 corrective disclosure.  (Weber

Decl., Sealed Ex. 22 at 2, 8.)  LMCG, the investment manager for Plymouth,

Central Laborers, and Pembroke, testified that its purchases of Patterson stock in

the fourth quarter of 2016 were made with knowledge that there were allegations

of antitrust misconduct against Patterson dating back to the fall of 2015.  (Weber

Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 183-186; 203.)

Most of the purchases at issue were made after the first partial disclosure on November 22, 2016, but before the extent of the entire fraud was allegedly revealed on March 1, 2018.  By definition, the partial disclosure did not fully reveal the extent of the previous misrepresentations and antitrust misconduct.  See, e.g., Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 328 F.R.D. 86, 92 (S.D.N.Y. 2018) (finding plaintiff who purchased stock after partial disclosure to be typical because disclosure was not a full disclosure).

In any case, the great weight of the authority provides that purchasing shares after a disclosure does not destroy typicality, because, in an efficient market, the investor still relies on the fact that the disclosure information will be absorbed by the market and reflected in the new share price.  See Weiner v. Tivity Health, Inc., 334 F.R.D. 123, 130 (M.D. Tenn. 2020).  "This later purchase does not undercut or diminish the argument that the same investor may have purchased the security pre-disclosure relying on the fact that all information available at the time was reflected in the then current price."  Id. (citation omitted).  Also, "other class members also presumably purchase[] [stock] after . . . corrective disclosure[s]."  Milbeck v. TrueCar, Inc., No. 218CV02612SVWAGR, 2019 WL 2353010, at *3 (C.D. Cal. May 24, 2019) (citation omitted).  "Courts

16

routinely certify a class with representatives who purchased stock during and after a class period." In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607 n.12 (D. Minn. 2001).

### 2.    Awareness of Misrepresentations

Defendants also assert that Plaintiffs are atypical because they cannot show reliance because they do not unequivocally testify that they or their investment managers read the specific misstatements at issue before purchasing Patterson stock.  (See Weber Decl., Sealed Ex. 4, Fisher (Pembroke) 30(b)(6) Dep. 117-119; Weber Decl., Sealed Ex. 5, Sullivan (Plymouth) 30(b)(6) Dep. 172-174; Weber Decl., Sealed Ex. 6, Koeppel (Central Laborers) 30(b)(6) Dep. 143-146; Weber Decl., Sealed Ex. 7, Ludwiczak (Gwinnett) 30(b)(6) Dep. 51-52; Weber Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 141-149; Weber Decl., Sealed Ex. 9, Washkowiak (Fairpointe) 30(b)(6) Dep. 171-172; Weber Decl., Sealed Ex. 10, Kusmierz (Rhumbline) 30(b)(6) Dep. 36-37; Weber Decl., Sealed Ex. 11, Reed (Atlanta) 30(b)(6) Dep. 61-62, 88-89.)  LMCG, the investment manager for three of the four Plaintiffs, testified that it has never relied upon a company's code of ethics to make an investment decision.  (Weber Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 148-149.)

17

The fact that Plaintiffs, and perhaps their investment managers, did not personally read Patterson's statements but, instead, relied on the market price (Weber Decl., Sealed Ex. 10, Kusmierz (Rhumbline) 30(b)(6) Dep. 34-36; Olts Aff., Sealed Ex. 8, Reed (Atlanta) 30(b)(6) Dep. 39-40, 55-56; Olts Aff., Sealed Ex. 9, Washkowiak (Fairpointe) 30(b)(6) Dep. 66-67, 89-90; Olts Aff., Sealed Ex. 10, Vingers (LMCG) 30(b)(6) Dep. 156, 173-174) does not make Plaintiffs atypical when the Class theory is fraud-on-the-market. Indeed, "[e]ven sophisticated investment advisers (like those involved in this case) rely on the integrity of the market . . . even if they do not incorporate particular informational disclosures into their investment strategies." Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1260 (11th Cir. 2014) (citation omitted).

Plaintiffs rely on a theory of liability and damages that depends on an efficient market that absorbs all of the information in Patterson's filings into the market price. The premise of the Basic presumption, which applies in an efficient market, is that direct reliance is not required. Plaintiffs' failure to personally read Patterson's filings is irrelevant and does not make Plaintiffs different from a typical Class member.

18

### E.    Adequacy (Rule 23(a)(4))

Named Plaintiffs are adequate representatives if they "have common interests with the members of the class, and . . . will vigorously prosecute the interests of the class through qualified counsel."  Paxton v. Union Nat. Bank, 688 F.2d 552, 562–63 (8th Cir. 1982).

### 1.    Adequacy of Plaintiffs

Plaintiffs have established that they are adequate class representatives. Plaintiffs are the type of "large, institutional lead plaintiff[s] envisioned by Congress when the PSLRA was enacted."  Mayer v. Apogee Enterprises, Inc., No. 18-CV-3097 (NEB/SER), 2019 WL 927315, at *2 (D. Minn. Feb. 26, 2019) (citations omitted).  Plaintiffs have common interests with the proposed Class.  They purchased Patterson securities during the Class Period at prices that were allegedly artificially inflated by Defendants' misrepresentations.  They then suffered significant damages when the price of Patterson's publicly traded securities declined when the truth was disclosed.

The Court rejects Defendants' claim that Plaintiffs are inadequate because they relied on portfolio monitoring services and have given their counsel unwarranted discretion.  While Plaintiffs have relied heavily on their counsel to

bring the potential case to their attention and to craft the pleadings, Plaintiffs

have demonstrated adequate knowledge of and participation in this case.

Plaintiffs certified that they reviewed the Complaint and presented

knowledgeable witnesses as 30(b)(6) deponents.  They all testified that they

understood their decision-making role as Lead Plaintiffs.  (See Olts Aff., Ex. 11,

Koeppel (Central Laborers) 30(b)(6) Dep. 42 (testifying that Central Laborers

understood its role to "take a role in the decision-making" and "monitor the

activities," and "make decisions about settlements or non-settlements or we're

part of the discussion in the litigation"); Olts Aff., Ex. 12, Sullivan (Plymouth)

30(b)(6) Dep. at 38 (testifying that Plymouth made the decision to proceed with

this lawsuit and that its role as Lead Plaintiff means that it "get[s] to make

decisions"); Olts Aff., Ex. 13, Fisher (Pembroke) 30(b)(6) Dep. 169 (testifying that

Pembroke's board has the authority to decide to move forward or not move

forward with this lawsuit); Olts Aff., Ex. 14, Ludwiczak (Gwinnett) 30(b)(6) Dep.

15 (testifying that being a lead plaintiff means that Gwinnett is "prosecuting the

case"); [Docket No. 74-1] Lead Plaintiffs' Certifications (averring that they have

reviewed the Complaint and authorized its filing and the filing of a motion for

appointment as lead plaintiff and that they are willing to provide testimony at

deposition and trial).)  These facts show that, in fact, counsel do not have

unfettered discretion, and that the use of portfolio monitoring agreements did

not fatally taint Lead Plaintiffs.  This is not a case in which a class representative

"simply lend[s] his name to a suit controlled entirely by the class attorney."  In re

Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (citation

omitted) (addressing case in which plaintiff's deposition demonstrated that

plaintiff "did not know the name of the stock at issue in this case, did not know

the name of either individual defendant, did not know whether [it] ever owned

[defendant's] stock," and did not know anything about the lawsuit, having no

knowledge of having ever seen the complaint).

　　　The Court further finds that sophisticated institutional investors' use of

experienced counsel to monitor their portfolios and suggest initiation of lawsuits

does not make them inadequate class representatives.  "Courts have routinely

rejected attacks on the propriety of portfolio monitoring agreements []."

Plumbers & Pipefitters Nat'l Pension Fund v. Burns, 292 F.R.D. 515, 523 (N.D.

Ohio 2013) (gathering cases).  See also, e.g., Pub. Emps.' Ret. Sys. of Miss. v.

TreeHouse Foods, Inc., No. 16-CV-10632, 2020 WL 919249, at *6 (N.D. Ill. Feb. 26,

2020).  The Court further notes that, here, Plymouth uses seven different

portfolio monitoring law firms (Weber Decl., Sealed Ex. 5, Sullivan (Plymouth) 30(b)(6) Dep. 206-07); Central Laborers testified that it had portfolio monitoring agreements with a number of law firms (Weber Decl., Sealed Ex. 6, Koeppel (Central Laborers) 30(b)(6) Dep. 150-53); and all Plaintiffs have demonstrated a baseline knowledge of the facts of the lawsuit and have actively and diligently participated in this litigation.  Cf. In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 148-49 (N.D. Tex. 2014) (criticizing portfolio monitoring arrangement when plaintiff had exclusive portfolio monitoring agreement with one law firm and plaintiff failed to attend multiple proceedings and a demonstrated no knowledge of the allegations in the complaint).

### 2.    Class Counsel

In appointing class counsel, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

The Court appoints Saxena White and Robbins Geller as Class Counsel. Both firms are highly qualified and have extensive experience in securities class action litigation. As demonstrated by the law firms' submissions, Saxena White and Robbins Geller are experienced in leading large securities class actions and have obtained substantial recoveries for plaintiffs in such lawsuits. Both firms have demonstrated diligence and expertise in their work in this case. Defendants do not dispute that Saxena White and Robbins Geller are qualified to represent the class.

### F.      Predominance (Rule 23(b)(3))

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." <u>Avritt v. Reliastar Life Ins. Co.</u>, 615 F.3d 1023, 1029 (8th Cir. 2010).

> If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

<u>Id.</u> (citations omitted).

> Rule 23(b)(3), however, does <u>not</u> require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof. What the rule does require is that

23

common questions <u>predominate</u> over any questions affecting only
individual [class] members.

<u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 568 U.S. 455, 469 (2013) (citations

omitted).

"Predominance is a test readily met in certain cases alleging . . . securities

fraud." <u>Amchem Prod., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997).  The

predominance inquiry looks to the elements of the underlying causes of action.

<u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809-10 (2011)

("<u>Halliburton I</u>").

Because the Supreme Court has held that falsity, materiality, and loss

causation are common issues to a class, <u>Amgen</u>, 568 U.S. at 474-75, predominance

in a securities fraud action often turns on the reliance element.  <u>Halliburton I</u>, 563

U.S. at 810.

### 1.      Class-wide Reliance with the <u>Basic</u> Presumption

Plaintiffs have shown that they are entitled to a presumption of classwide

reliance under the fraud-on-the-market theory established in <u>Basic, Inc. v.</u>

<u>Levinson</u>, 485 U.S. 224, 247 (1988), and reaffirmed in <u>Halliburton Co. v. Erica P.</u>

<u>John Fund, Inc.</u>, 573 U.S. 258, 283-84 (2014) ("<u>Halliburton II</u>").  Plaintiffs may

satisfy Section 10(b)'s reliance element by "invoking a presumption that a public,

24

material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton II, 573 U.S. at 283-84. However, "defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." Id.

To invoke the Basic presumption, Plaintiff must establish that (1) the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. Halliburton I, 563 U.S. at 811. The Basic presumption substitutes for individualized proof of each buyer's reliance on the alleged misrepresentations. Basic, 485 U.S. at 242.

The fraud-on-the-market presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies;" therefore, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Halliburton II, 573 U.S. at 268, 272

25

(citation omitted).  Thus, "a buyer of the security may be presumed to have relied on that information in purchasing the security."  <u>Amgen</u>, 568 U.S. at 458.

"<u>Basic</u> [] establishes that a plaintiff satisfies that burden [of showing predominance] by proving the prerequisites for invoking the presumption— namely, publicity, materiality, market efficiency, and market timing." <u>Halliburton II</u>, 573 U.S. at 276.  "<u>Basic</u> does afford defendants an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock."  <u>Id.</u>  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."  <u>Id.</u>

Plaintiffs present evidence to show that the prerequisites for the <u>Basic</u> presumption – publicity, timing, and market efficiency – have been met. Patterson is a giant entity with millions of shares, closely followed by many analysts and traded on the NASDAQ.  There is no plausible argument that Patterson's statements were not publicly made, that Plaintiffs and class members did not make trades after the statements were made but before the disclosures, or that Patterson stock was not traded in an efficient market.

### a)  Publicity

Plaintiffs meet the publicity prong because they alleged that Defendants made material misrepresentations in Patterson's public filings that artificially inflated or maintained the market price of Patterson's securities.

### b)  Timing

Plaintiffs meet the market timing prong because they allege that they purchased Patterson common stock during the Class Period and suffered losses when the artificial inflation came out of the price of those securities when the truth was disclosed.

### c)  Market Efficiency

The market for Patterson stock was efficient during the Class Period.

Courts analyze the efficiency of the market under the factors outlined in Cammer v. Bloom, 711 F. Supp. 1264, 1286 (D.N.J. 1989), and Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001).  The Cammer factors address: "(1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC Form S-3; and (5) empirical facts showing a cause and effect relationship between

27

unexpected corporate events or financial releases and an immediate response in the stock price." <u>Första AP-Fonden v. St. Jude Med., Inc.</u>, 312 F.R.D. 511, 518 (D. Minn. 2015) (citing <u>Cammer</u>, 711 F. Supp. at 1286-87).  The <u>Krogman</u> factors are: "(6) the company's market capitalization, (7) the bid-ask spread for stock sales, and (8) float (the percentage of shares held by the public, as opposed to insiders)." <u>Första AP-Fonden</u>, 312 F.R.D. at 518 (citing <u>Krogman</u>, 202 F.R.D. at 478).  Courts also examine factors such as whether a stock shows "autocorrelation," which measures "how predictable a stock's pricing is based on historical data," and whether a stock is traded on a major stock exchange.  <u>Id.</u>

During the Class Period, Patterson common stock traded on the NASDAQ, with an average weekly trading volume of 4.8 million shares and average weekly turnover of 4.6%.  (Olts Aff., Ex. 1, Steinholt Report ¶ 25.)  An "[a]verage weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." <u>In re Winstar Commc'ns Sec. Litig.</u>, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citing <u>Cammer</u>, 711 F. Supp. at 1286).  Additionally, "[i]t would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often

presumed to be traded on an efficient market." Lumen v. Anderson, 280 F.R.D.

451, 459 (W.D. Mo. 2012) (footnote omitted) (citation omitted).

Coverage of Patterson by analysts and the media weighs in favor of

market efficiency. Nineteen well-known analyst firms followed Patterson during

the Class Period. (Steinholt Report ¶ 27.) Cf. Lumen, 280 F.R.D. at 460 (noting

that 15 analysts covered the stock during the class period and that "less-

favorable facts have been found to substantiate an efficient market").

"The existence of market makers and arbitrageurs" is persuasive evidence

of market efficiency because it "would ensure completion of the market

mechanism; these individuals would react swiftly to company news and

reported financial results by buying or selling stock and driving it to a changed

price level." Cammer, 711 F. Supp. at 1286-87. There were more than 200 market

makers for Patterson common stock, including 39 with volume of at least one

million shares. (Steinholt Report ¶ 31.)

Eligibility to file an abbreviated SEC Form S-3 is probative of efficiency. 17

C.F.R. § 239.13; see Cammer, 711 F. Supp. at 1287. Patterson was eligible to file a

Form S-3 throughout the Class Period. (Steinholt Report ¶¶ 33-34.)

Plaintiffs have "allege[d] empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer, 711 F. Supp at 1287. Plaintiffs' expert, Bjorn Steinholt, conducted an event study to show that Patterson common stock reacted quickly in response to company-specific news and unexpected information during the Class Period. (Steinholt Report ¶¶ 35-44.) "Event studies are 'regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events.'" Första AP-Fonden, 312 F.R.D. at 520 n.4 (quoting Halliburton II, 573 U.S. 280). Event studies are "considered prima facie evidence of the existence of this causal relationship." Winstar, 290 F.R.D. at 448.

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." Krogman, 202 F.R.D. at 478. "The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares. A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is

too expensive to trade." <u>Id.</u>  Finally, "[i]n determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." <u>Id.</u> Patterson had a market capitalization of more than $2.5 billion through the Class Period, an average bid-ask spread of 0.04%, and a public float that exceeded 75% of shares outstanding.  (Steinholt Report ¶¶ 48, 50.)

Altogether, the relevant factors all support the Court's conclusion that Patterson's stock traded in an efficient market and that the <u>Basic</u> presumption applies.

### d)    Rebuttal of the <u>Basic</u> Presumption

The <u>Basic</u> presumption can be rebutted with evidence that the alleged misrepresentation did not affect the stock's market price.  <u>Halliburton II</u>, 573 U.S. at 279, 284.  <u>See also</u> <u>IBEW Local 98 Pension Fund v. Best Buy Co., Inc.</u>, 818 F.3d 775, 780 (8th Cir. 2016) (noting that "there is an additional question at the class certification stage — whether the Rule 10b–5 defendant can rebut the <u>Basic</u> presumption with evidence showing an absence of price impact").  "[T]he <u>Basic</u> presumption . . . c[an] be rebutted by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock."  <u>Halliburton II</u>, 573 U.S. at 279–280.  To prevail on

31

their argument of lack of price impact, Defendants must show that they have "sever[ed] the link" between the alleged misrepresentations and any impact on Patterson's stock price.  Basic Inc., 485 U.S. at 248; Halliburton II, 573 U.S. at 281-82 (holding that defendant must "show[] that the alleged misrepresentation[s] did not actually affect the stock's market price").

In Best Buy, the Eighth Circuit reversed class certification because the defendants presented "overwhelming evidence of no 'front-end' price impact" "by submitting direct evidence (the opinions of both parties' experts) that severed any link between the alleged conference call misrepresentations and the stock price at which plaintiffs purchased." Best Buy Co., 818 F.3d at 782-83.  In its opinion, the Best Buy court stated: "We agree with the district court that, when plaintiffs presented a prima facie case that the Basic presumption applies to their claims, defendants had the burden to come forward with evidence showing a lack of price impact." Id. at 782 (citing Fed. R. Evid. 301).  However, "[t]he Eighth Circuit's statement appears to be dictum because the extent of the burden was not at issue.  The Eighth Circuit ultimately concluded that the 'overwhelming evidence' in the case demonstrated that there had been no price impact and that the Basic presumption had therefore been rebutted.  Thus, the

32

Eighth Circuit's ruling did not depend on the standard of proof."  Waggoner v.

Barclays PLC, 875 F.3d 79, 103 n.36 (2d Cir. 2017).  In any event, even if the

standard were a mere burden of production, in this case, Defendants have failed

to meet that burden because they have failed to produce evidence to sever the

link between the alleged misrepresentations and any impact on Patterson's stock

price.

Because price impact can be observed on the "front-end" (i.e.,

misstatements causing or maintaining inflation) or on the "back-end" (i.e., a

decline in price caused by the corrective disclosures), Defendants must

affirmatively disprove both to satisfy their burden.  See Ark. Teacher Ret. Sys. v.

Goldman Sachs Grp., Inc., 955 F.3d 254, 265–66, 271 (2d Cir. 2020) (rejecting

argument that absence of price movement on misstatement days rebutted price

impact because "inflation was demonstrated on the [corrective-disclosure]

dates"); In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 260 (2d Cir. 2016) (rejecting

notion that price impact requirement means a "misstatement must be associated

with an increase in inflation to have any effect on a company's stock price").

### e)      Front-End Impact

Defendants argue that they have rebutted the Basic presumption because none of the alleged misrepresentations caused a statistically significant price change on the dates that the misrepresentations were made. (Weber Decl., Ex. 1, Gompers Report ¶ 22; Steinholt Report ¶ 53; Steinholt Report, Ex. D.) On two of the five alleged misrepresentation dates—June 26, 2013 and June 24, 2015—Patterson's stock price actually decreased. (Steinholt Report, Ex. D.)

The Court concludes that the fact that Patterson shares did not show a statistically significant increase on the dates of the alleged misstatements does not rebut the Basic presumption at this stage, where Plaintiffs are relying on a price maintenance theory.

First, Plaintiffs have provided evidence of back-end price impact. As the Seventh Circuit has noted, "the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 415 (7th Cir. 2015). Instead, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." Id.

Here, as discussed in the next section, Plaintiffs have provided, and Defendants

have failed to rebut, evidence of back-end price impact.

Second, Plaintiffs are proceeding under a price maintenance theory.  "The

lack of statistically significant proof that a statement affected the stock price is

not statistically significant proof of the opposite, i.e., that it did not actually affect

the stock price."  Di Donato v. Insys Therapeutics, Inc., 333 F.R.D. 427, 444 (D.

Ariz. 2019).  "[A] stock can be inflated even if the price remains the same or

declines after a false statement because the price might have fallen even more."

Glickenhaus & Co., 787 F.3d at 415.  While the Eighth Circuit has not explicitly

endorsed the price maintenance theory, it has not rejected the theory.   See, e.g.,

Baker v. SeaWorld Entm't, Inc., No. 14CV2129-MMA (AGS), 2017 WL 5885542, at

*11 (S.D. Cal. Nov. 29, 2017) (noting that Best Buy was a unique case decided on

the unusual fact that the "'allegedly 'inflated price' was established by [a] non-

fraudulent' disclosure") (quoting Best Buy, 818 F.3d at 783).  The underlying

theory in Haliburton II was price maintenance, and the Supreme Court cited,

with approval, Schleicher v. Wendt, which endorsed price maintenance.  618 F.3d

679, 684 (7th Cir. 2010), quoted in Halliburton II, 573 U.S. at 272.  After

Halliburton II, 70% of securities plaintiffs in federal district court cases involving

a defendant's attempt to rebut the <u>Basic</u> presumption proceeded on a price
maintenance theory, and in every one of those cases, the district courts held that
the defendants failed to rebut the presumption. <u>Goldman Sachs Group, Inc.</u>, 955
F.3d at 266 n.9.

Third, Defendants bear the burden of producing evidence capable of
rebutting the <u>Basic</u> presumption, yet their own expert, Paul Gompers, conceded
that the alleged false statements were not previously disclosed, and failed to
address Plaintiffs' claim that Defendants' "confirmatory misrepresentations"
about their business maintained inflation in Patterson's stock price, instead
opining only that there were no statistically significant price increases on the
alleged misrepresentation dates. (Olts Aff., Ex. 7, Gompers Dep. 58-60, 64-65.)
Thus, Defendants did not produce affirmative evidence of a lack price impact.
<u>See, e.g.</u>, <u>Vizirgianakis v. Aeterna Zentaris, Inc.</u>, 775 F. App'x 51, 53 (3d Cir. 2019)
(noting that "plaintiffs do not have the burden to prove price impact (or lack
thereof), so it was not surprising that their expert's report did no such thing").

### f)      Back-End Impact

Defendants have failed to rebut the <u>Basic</u> presumption because they are
unable to rebut evidence of back-end price impact.

First, even Defendants' expert does not dispute that there were statistically significant price drops following all three disclosure dates.  This is sufficient to prevent Defendants from completely "sever[ing] the link" between the alleged misrepresentations and any impact on Patterson's stock price.  See, e.g., Monroe County Employees' Ret. Sys. v. S. Co., 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("This concession [that Defendants cannot rule out price impact because the stock price decline following at least one Class Period corrective disclosure was statistically significant] dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage.").  Steinholt demonstrated through his event study analysis that the alleged corrective disclosure dates of November 22, 2016, February 12, 2018, and March 1, 2018 were each followed by a decline in Patterson stock that was statistically significant.  (Steinholt Report ¶¶ 41-43; Olts Aff., Ex. 7, Gompers Dep. 55-58.) Gompers, who did not conduct his own event study, agreed with Steinholt. (Gompers Dep. 48-49, 55-58.)

37

Under <u>Basic</u>, Defendants bear the burden of presenting evidence to show "that the entire price decline on the corrective-disclosure dates was due to something other than the corrective disclosures." <u>Goldman Sachs Grp., Inc.</u>, 955 F.3d at 271. Even under a lesser burden of production, not persuasion, Defendants fail to rebut the <u>Basic</u> presumption. <u>See, e.g.</u>, <u>KBC Asset Mgmt. NV v. 3D Sys. Corp.</u>, No. CV 0:15-2393-MGL, 2017 WL 4297450, at *8 (D.S.C. Sept. 28, 2017) ("On the record before it, the Court is unable to say Defendants have presented evidence sufficient to convince it there was no price impact associated with the May 6, 2015 disclosure. In fact, 3D Systems's stock price decreased by over five percent on May 6, 2015. Whether the stock price was caused by alleged misrepresentations or some other factor is for now an open question.") (applying Fed. R. Evid. 301 burden of production standard); <u>Marcus v. J.C. Penney Co.</u>, CIVIL ACTION NO. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at *7-8 (E.D. Tex. Aug. 29, 2016) (concluding that the defendants failed to meet a "burden of production to rebut the presumption of reliance," even though there were no front-end price increases on misstatement dates, because the stock declined following corrective disclosures, thereby showing price impact, so it was "not

necessary to reach the question of whether [defendants] also bear the burden of persuasion"), adopted, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).

Second, arguments about whether particular statements were actually disclosures, like arguments about loss causation and that the market already was aware of antitrust allegations, are common questions that can be adjudicated on a class-wide basis at summary judgment or trial.  See, e.g., Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 475 (2013).  Similarly, at the class certification stage, a truth-on-the-market defense raises common class-wide issues.  See id. at 482.  See also, e.g., Washtenaw County Employees' Ret. Sys. v. Walgreen Co., No. 15-CV-3187, 2018 WL 1535156, at *4 (N.D. Ill. Mar. 29, 2018) ("Numerous courts have agreed that a 'truth on the market' defense cannot be used to rebut the presumption of reliance at the class certification stage.") (gathering cases).

Third, Defendants' claim that the price declines after the disclosures were due to information other than revelation of the antitrust conduct and its impact is insufficient to rebut the Basic presumption.  To prove lack of back-end price impact, Defendants must show "that the entire price decline on the corrective-disclosure dates was due to something other than its alleged misstatements."

Goldman Sachs, 955 F.3d at 270.  "[S]imply pointing to other potential causes for

a stock price change following a corrective disclosure is therefore not enough to

rebut the Basic presumption."  W. Palm Beach Police Pension Fund v. DFC Glob.

Corp., No. CV 13-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016) (citation

omitted).  Defendants produce no evidence to show that the antitrust misconduct

revelations had no impact on the price declines.  See, e.g., Monroe County

Employees' Ret. Sys., 332 F.R.D. at 395 (holding that defendants' concession that

there was a statistically significant stock price decline following a corrective

disclosure "dooms Defendants' attempt to rebut the presumption of reliance

because the inquiry is whether Defendants have proven a complete lack of price

impact during the Class Period, not whether the stock price decline following

individual corrective disclosures was caused by the alleged misrepresentations,

which is a loss causation analysis not appropriate at this stage").  Here, Gompers

admitted that he has "not offered the opinion about what caused the stock price

decline" following the February 12 corrective disclosure.  (Olts Aff., Ex. 7,

Gompers Dep. 82-83.)

40

### 2.     __Affiliated Ute__ **Presumption**

Because the Court concludes that the Basic fraud-on-the-market

presumption applies, it need not reach Plaintiffs' alternative argument under

Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54(1972).

### 3.     **Whether Common Issues of Damages Predominate**

The Court concludes that common issues of damages predominate.  To

establish predominance, Plaintiffs must show that "damages are susceptible of

measurement across the entire class."  Comcast Corp. v. Behrend, 569 U.S. 27, 35

(2013).  Plaintiffs must put forward a damages model that is "consistent with

[their] liability case."  Id. (citations omitted).  "If the model does not even attempt

to do that, it cannot possibly establish that damages are susceptible of

measurement across the entire class for purposes of Rule 23(b)(3)."  Id.

Here, Plaintiffs propose a commonly accepted damages model for

securities fraud that is consistent with their theory of liability and calculates

damages on a classwide basis.  Plaintiffs rely on Steinholt's event study damages

model, which "is the standard measurement of damages in Section 10(b)

securities cases."  City of Miami Gen. Employees' & Sanitation Employees' Ret.

Tr. v. RH, Inc., No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11,

2018) (gathering cases).  Steinholt's report "satisfies what <u>Comcast</u> demands, that

a viable calculation of damages can be made in this case."  <u>Beaver County</u>

<u>Employees' Ret. Fund v. Tile Shop Holdings, Inc.</u>, No. 14-786 (ADM/TNL), 2016

WL 4098741, at *11 (D. Minn. July 28, 2016) (footnote omitted).  "It is sufficient

for class certification that [Steinholt] has specified a damages model that can be

used to establish damages using a common methodology for all class members,

even though certain of the inputs to that model are not yet ascertainable."

<u>Monroe County Employees' Ret. Sys.</u>, 332 F.R.D. at 399.

Steinholt proposes an event study to create an inflation ribbon that would

measure the amount of fraud-related inflation in the price of Patterson's

securities on each day of the Class Period; this daily inflation amount would

provide the inputs to calculate classwide damages.  (Steinholt Report ¶¶ 56-59.)

Defendants' criticisms of the specifics of which techniques will be used to

construct the inflation ribbon and actually calculate losses with Steinholt's

damages model are premature.  As another district court explained:

> [D]efendants' argument that the plaintiffs' proposed method fails
> "to demonstrate how one would measure inflation using any
> 'standard tools of valuation' if it cannot be measured using an event
> study" is essentially an assertion that plaintiffs' method will result in
> incorrect calculations.  However, this criticism prematurely
> addresses the quantification and allocation of damages, which

42

courts consistently find are not appropriately raised at the class
certification stage.

RH, Inc., 2018 WL 4931543, at *4.

Defendants' concerns that Steinholt has not yet calculated an inflation

ribbon or adequately addressed disaggregation are loss causation disputes that

are not appropriate for resolution at class certification.  See, e.g., Amgen, 568 U.S.

at 475.

> Calculating the actual inputs into the out-of-pocket method by
> parsing and scaling the abnormal returns requires an analysis of loss
> causation.  For present purposes, one need only realize that the
> inflation-ribbon inputs will be common and applied classwide.
> Thus, the out-of-pocket method does not involve any individualized
> issues.

SEB Inv. Mgmt. AB v. Symantec Corp., No. C 18-02902 WHA, 2020 WL 2306490,

at *10 (N.D. Cal. May 8, 2020).  As in Willis v. Big Lots, Inc.,

> Defendants' argument is not really that Steinholt's damages opinion
> is irrelevant or that it is not tied to Plaintiffs' theory of liability but
> rather that his opinion "fails to account for the facts of this case" in
> the sense that he has not already performed the damage calculation
> specific to this case.  But that is not required at this stage of the
> litigation.

No. 2:12-CV-604, 2017 WL 1074048, at *7 (S.D. Ohio Mar. 17, 2017).

Defendants protest that it will be difficult and complex to calculate

damages because there was other information provided by Patterson that could

have influenced the securities' prices, the change in the risk of regulatory action

arising from the alleged antitrust misconduct changed over the Class Period, the

dental supply industry underwent changes during this time that influenced the

prices of securities, and the publicly available information regarding alleged

antitrust activity changed over time.  All of these criticisms go to the accuracy of

the damages model and loss causation, but do not prevent class certification

because all of these alleged obstacles for accurate calculation of the damages are

the same if there is one plaintiff or one million plaintiffs.  Defendants can argue

the merits of Plaintiffs' proposed damages model at summary judgment or trial,

but whether the Court certifies a class or not has no impact on those arguments.

There is nothing about there being more plaintiffs that makes the damages model

more or less accurate, because there is no argument here that damages would be

individualized.  See, e.g., Menaldi v. Och-Ziff Cap. Mgmt. Grp., LLC, 328 F.R.D.

86, 98-99 (S.D.N.Y. 2018) (disaggregation "goes beyond the Rule 23 inquiry"

because "[t]he answer for the class will be the same as the answer for the

hypothetical lone plaintiff").

### G.    Superiority (Rule 23(b)(3))

A class action is the superior method to fairly and efficiently adjudicate

this controversy.  In general, "securities cases easily satisfy the superiority

44

requirement of Rule 23." In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 80

(S.D.N.Y. 2009) (citation omitted).

Rule 23(b)(3) requires the Court to consider four factors when determining

superiority: "(A) the class members' interests in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3).

This action meets all four factors.  First, Plaintiffs seek to represent a class

of thousands of Patterson securities purchasers whose individual damages might

be too small to make the expense of litigation worthwhile.  Second, there is no

evidence of any other litigation concerning this controversy already begun by or

against Class members.  Third, concentrating the litigation in this forum will

promote judicial efficiency by resolving the claims of thousands of shareholders

in one case.  Fourth, there are no manageability concerns.

### H.    Definition of the Class Period

The Court denies Defendants' request to shorten the Class Period by

ending it on February 12, 2018, rather than on March 1, 2018.  On February 12,

2018, the FTC publicly announced the filing of its complaint against Patterson, Benco, and Schein alleging that "they violated U.S. antitrust laws by conspiring to refuse to provide discounts to or otherwise serve buying groups representing dental practitioners." (Weber Decl., Ex. 16.)  Defendants claim that the March 1, 2018 earnings release and subsequent conference call and market commentary did not correct any previously uncorrected misrepresentation because they did not contain any information relating to the alleged antitrust misconduct, misrepresentations, or GPOs.  (See Weber Decl., Sealed Ex. 8, Vingers (LMCG) 30(b)(6) Dep. 209.)  Defendants argue that the only explicit mention of the FTC action was in a statement on the March 1 earnings call, which repeated the denials disclosed in Patterson's February 13, 2018 press release.  (Compare Weber Decl., Ex. 25, Mar. 1, 2018 Transcript Patterson Q3 2018 Earnings Call at 8, with Weber Decl., Ex. 24, Feb. 13, 2018 Patterson Press Release.)

At the class certification stage, the Court will not shorten the Class Period. First, both Defendants' and Plaintiffs' expert found a statistically significant drop in share price after the March 1, 2018 disclosure date.  See Monroe County Employees' Ret. Sys. v. S. Co., 332 F.R.D. 370, 395–96 (N.D. Ga. 2019) ("[N]umerous courts addressing class certification have refused to shorten class

periods by dismissing subsequent corrective disclosures where some but not all

of the stock price declines following the alleged corrective disclosures were

statistically significant.  Instead, these courts found that the question of what

caused the stock price to decline is an ultimate merits question for which

plaintiffs bear the burden at trial, not at class certification.").  "[D]efendants'

arguments present loss causation issues that need not be decided at the class

certification stage as the issues would be common to the putative class."  SEB

Inv. Mgmt. AB v. Symantec Corp., No. C 18-02902 WHA, 2020 WL 2306490, at *9

(N.D. Cal. May 8, 2020).

Second, Plaintiffs plausibly argue that the March 1, 2018 drop in earnings

revealed to the market the full impact that the antitrust conduct had had on

propping up Patterson's prior earnings.  Other courts have found a material fact

question in similar circumstances.  For instance, in City of Ann Arbor

Employees' Retirement System v. Sonoco Prods. Co., the plaintiffs alleged that

the defendant had made misrepresentations and omissions hiding the fact that

the defendant's earnings were propped up through concessions to customers.

270 F.R.D. 247, 255 (D.S.C. 2010).  During a July 20, 2007, press conference, the

defendant disclosed that the company had given prior price concessions to a

significant number of customers.  Id.  On September 18, 2007, the defendant

lowered its earnings guidance, without mentioning the concessions and blaming

the decline on other reasons.  Id. at 257-58.  The court allowed the class period to

end after that later date on the theory that "the market did not fully appreciate

the import of the concessions until September 18, 2007" and noted that the class

period could be shortened after discovery.  Id. at 258, 258 n.2.

Plaintiffs set forth a similar theory here.  Although the March 1, 2018

statement did not mention the antitrust conduct, the drop in earnings and

reduction in Patterson's annual guidance revealed to the market the full impact

that the antitrust conduct had had on propping up Patterson's prior earnings.

This case is similar to Sonoco in that there is a fact question whether the decline

in stock price after the March 1 earnings statement was caused by the market's

realization of the full impact of the previously concealed antitrust conduct or the

result of other factors that caused Patterson's earnings to decline.

Overall, the Court concludes that shortening the Class Period would be

inappropriate at this time and notes that "arguments regarding the impact or

lack of impact of different disclosures on the market are generally reserved for

the merits stage, rather than class certification," In re Snap Inc. Sec. Litig., 334

F.R.D. at 225 (citing <u>Amgen Inc.</u>, 568 U.S. at 470, 482), particularly "when a

securities class action defendant has [not] <u>unequivocally</u> disclaimed the prior

assertion" <u>id.</u>  (<u>See, e.g.</u>, Weber Decl., Ex. 24, Feb. 13, 2018 Patterson Press Release

(denying FTC antitrust allegations and representing that Patterson did not

"anticipate that this matter w[ould] have a material adverse effect on our

financial condition or results of operations").)

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.     Lead Plaintiffs' Motion to Certify Class, Appoint Class
       Representatives and Appoint Class Counsel [Docket No. 134]
       is **GRANTED**.

2.     This action is hereby certified as a Class Action pursuant to
       Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure
       on behalf all person or entities who purchased or otherwise
       acquired Patterson Companies, Inc., common stock between
       June 26, 2013 and February 28, 2018, inclusive (the "Class
       Period").  Excluded from the Class are Defendants, the officers
       and directors of Patterson at all relevant times, members of
       their immediate families, and their legal representatives, heirs,
       agents, affiliates, successors or assigns, Defendants' liability
       insurance carriers, and any affiliates or subsidiaries thereof,
       and any entity in which Defendants or their immediate
       families have or had a controlling interest.

3.     Plymouth County Retirement System, Pembroke Pines Fund
       for Firefighters and Police Officers, Central Laborers Pension

Plan, and Gwinnett County Public Employees Retirement System are hereby appointed as Class Representatives.

4.      Saxena White P.A. and Robbins Geller Rudman & Dowd LLP are hereby appointed as Class Counsel pursuant to Rule 23(g).

Dated:   September 28, 2020          s/ Michael J. Davis
                                    Michael J. Davis
                                    United States District Court